325600

STATE OF MICHIGAN

IN THE 14TH CIRCUIT COURT
FOR THE COUNTY OF MUSKEGON

* * *

PEOPLE OF THE STATE
OF MICHIGAN,

        Plaintiff              File #14-64458-FC

    V

DEREK JAMES RAINBOLT,

        Defendant.
-----------------------------------------------\

JURY TRIAL - DAY 1

BEFORE THE HONORABLE WILLIAM C. MARIETTI,

Muskegon, Michigan, on Tuesday, October 7, 2014.

APPEARANCES:

For the Plaintiff:  Christina E. Johnson

For the Defendant:  Paula Baker

**CALENDARED**

2015 FEB 13 P 2:53
NANCY A. WATERS
MUSKEGON COUNTY CLERK
FILED

RECEIVED
SEP 16 2015
COURT OF APPEALS
THIRD DISTRICT

Transcribed by:    MILLS COURT REPORTING
                      1615 Sunset
                      N Muskegon, MI 49445
                      231-744-6823
                      BOBBIE SPRINGER, CER-3408

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 31 of 301

INDEX

WITNESSES:        PLAINTIFF                                    PAGE

        Jennifer Houston                                      156

        Alyssa Ward                                           182

        Andrea Tindall                                        234

WITNESSES:        DEFENDANT

        None.

EXHIBITS:                              identified      received

        Defendant's Exhibit A              211            212

        Defendant's Exhibit B              214            215

        Defendant's Exhibit C              221

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 32 of 301

(Videotape, 10-07-14; 10:28:49)

1    THE COURT: Well, good morning, ladies and

2    gentlemen, and welcome to the 14th Circuit Court. You're

3    here for assisting us in the case of The People of the

4    State of Michigan versus Derek Rainbolt, and I'll tell you

5    more about what the case is about here shortly. I know

6    that this jury service is probably new for most of you.

7    How many of you have been on a jury before? Okay, not

8    many, you know, maybe a dozen of you and that's it. That

9    is creating a situation here where I'm going to have to go

10   over a lot of details here about what to expect, so for

11   the 12 or so of you that have already been jurors, I'm

12   sorry, probably bore you a little bit but, you know,

13   you've got another 60, 70 people here who have never had

14   to be involved in the jury process, so I want to give all

15   of you as much as I can an opportunity to understand

16   what's going to be expected of you and what you can expect

17   of us here.

18   Because jury duty, it's one of the most serious

19   duties that you can perform as a member of our free

20   society here. Our system of self-government in America

21   cannot exist without a jury. That's one of the

22   fundamental parts of our system of government that

23   distinguishes us from many other counties is the jury

24   system, and so you're an important part of this Court.

_Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823_

3

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 33 of 301

(Videotape, 10-07-14; 10:28:49)

1          The right to a jury trial, it's an ancient

2    tradition.  It's a part of our heritage that a person that

3    is accused of a crime as well as the State is entitled to

4    have a jury decide this case and not just one person but a

5    jury of 12 impartial persons selected from the local

6    community to make this decision.  So jurors are expected

7    to be as free as humanly possible of any bias or prejudice

8    or sympathy for one side or the other because each side in

9    a trial is entitled to have jurors who keep open minds and

10   agree to keep their minds open until it comes time to

11   actually decide the case.

12          Now this trial, as with any trial that we do

13   here in the circuit court, is going to begin with the

14   selection of a jury, and that selection process has a

15   technical, legal name.  It's called the voir dire.  And

16   during this voir dire you've already submitted some basic

17   questionnaires.  There may be some additional questions we

18   would want to ask you, either the attorneys or myself, and

19   these questions really are meant to find out if you know

20   anything about this particular case, and we also want to

21   know if you have any personal experiences or opinions that

22   might make it difficult for you to decide this case and,

23   of course, we also want to know if you're acquainted with

24   anyone who may be involved in the case such as the

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

4

(Videotape, 10-07-14; 10:28:49)

witnesses or the attorneys or any of the parties in the case.

And one or more of those things might be a reason why it would not be appropriate for you to be a juror on this case, although you certainly would be appropriate to be a juror on any other case that we have. And so these questions may probe into your attitudes or beliefs or experiences. They're not meant to be an unreasonable prying into your private life. The law requires that we have that information so that a fair and impartial jury can be selected.

Now if you do not hear or understand a question that is asked, please let us know. Raise your hand or something along those lines and we will elevate the volume or rephrase the question to make it more understandable for you. However, if you do hear the question and you do understand the question, then we would expect that you answer it truthfully and completely, and don't hesitate to speak freely about anything that you think we should know as it relates to your ability to be a juror in this case.

Now during this voir dire or selection process some of you may be excused. Do I have everybody's attention now? It's possible you may be excused from the process here, and that can come about in a couple ways.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 35 of 301

(Videotape, 10-07-14; 10:28:49)

1    You'll hear me ask the attorneys at different points in
2    this process do you have any juror that you wish to excuse
3    for cause.  And if the attorney does, she will simply
4    announce I'd like to excuse juror number, whatever your
5    number is, number 15 and then she'll give a reason for
6    doing that.  I want to -- for example, if one of you
7    happened to be the brother-in-law of the Defendant in the
8    case, well, obviously, you know, that's going to be
9    difficult for you to be fair and impartial so she would
10   say I want to excuse number 15 because he's related to a
11   party in the case; give a reason for it; number 15 we'd
12   say thank you, you can certainly be a juror on another
13   case but it wouldn't be appropriate for you to be a juror
14   on this case.

15          Now the other way you can be excused is through
16   what is called a peremptory challenge, and again you'll
17   hear me ask the attorneys at various points do you have
18   any peremptory challenges, and if an attorney does have a
19   peremptory challenge, she will simply identify the number
20   of the juror that she wants excused and no reason will be
21   given.  I wish to excuse juror number 15; no reason given.
22   Now if you happen to be somebody who is excused under one
23   of these peremptory challenges without a reason being
24   given, there's no use speculating as to why you were

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

6

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 36 of 301

(Videotape, 10-07-14; 10:28:49)

excused.  I mean, there's no need to feel ashamed or upset or, you know, rejected.  There's no need to stand up and shout hallelujah either.  It's just a process that we go through to arrive at what the parties are comfortable with as a fair and impartial jury.

Now at this point I'm going to ask that all of you please rise and the bailiff is going to administer a oath to you to answer these questions.  If anybody has any reservations about taking an oath, you can simply affirm that you'll abide by the terms of it, so if you'd like to administer the oath now.

THE CLERK: Okay.  Please rise and raise your right hand.  Do you solemnly swear or affirm that you will truthfully and completely answer all questions concerning your qualifications to serve as jurors in this case so help you God?

JURORS: I do.

THE COURT: Okay, thank you.  I probably ought to introduce myself before we go any further.  My name is Judge William C. Marietti.  I am the chief judge of this circuit court and I'll be presiding over this trial.  When I say I'm the chief judge, that means I'm responsible for all the administration of the courts here, and so sometimes I have to be involved in administration matters.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 37 of 301

(Videotape, 10-07-14; 10:28:49)

1    As a matter of fact, that's why you were waiting in here

2    for about five to ten minutes for me to come in here.  I

3    wasn't back there watching television or, you know, having

4    a good time.  I had a meeting with another judge over an

5    administrative matter and I'm going to have to do that

6    unfortunately at various times throughout this trial.

7    That's just part of my job and there's nothing I can do

8    about it.  Believe me, I wish I wasn't the chief judge,

9    but I am, so that's the way it works.

10         So in any event, this is a criminal case, and

11    the name of the case is The People of the State of

12    Michigan versus Derek Rainbolt, and the charge that has

13    been made against the Defendant will be read to you later,

14    but I do want to at this time let you know that The People

15    of the State of Michigan are represented by the

16    prosecuting attorney's office here, and in this case

17    assistant prosecutor Christina Johnson will be

18    representing The People of the State of Michigan.

19    Ms. Johnson, if you'd like to rise and introduce yourself

20    and any witnesses you intend to call, please.

21         MS. JOHNSON: Thank you, your Honor.  Good

22    morning, everyone.  As the Judge said, my name is

23    Christina Johnson and I was appointed by your elected

24    prosecutor, D. J. Hilson to represent the People in this

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 38 of 301

(Videotape, 10-07-14; 10:28:49)

1    matter.  Also sitting with me is Erica Peabody.  She is an

2    intern with our office and is observing and may be

3    assisting me at certain points in the trial.  I also

4    expect Officer Hertel to join us momentarily.  She is the

5    lead investigator on this case.  She is with Fruitport and

6    Muskegon Township Police Departments.  Some other

7    witnesses you will hear from are Alyssa Ward, Andrea

8    Tindall, Jennifer Houston, Tim Houston, Barb Cross, Dr.

9    Debra Simms, Kim Watson, and Officer Vandommelen.

10           THE COURT: Okay, thank you, Ms. Johnson.  And

11   the Defendant in this case is represented by Attorney

12   Paula Baker from the Muskegon County Public Defender's

13   Office.  Ms. Baker, if you'd like to rise and introduce

14   yourself, your client, and anybody else that you think has

15   to be introduced here, go ahead.

16           MS. BAKER: Thank you, your Honor.  Good morning,

17   ladies and gentlemen.  My client here is Derek Rainbolt

18   and he will be seated next to me during the trial.

19   Additionally, I have an intern, Nicole Rapp, who might be

20   helping us throughout this case so you might see her face

21   coming in and out of the courtroom.  The witnesses that we

22   expect to call will include Sarah Beckley, Michelle

23   Beckley, Adam Rice, Michelle Rivera, Bonnie Hammond, Mark

24   VanHook, Brett Whalen, Penny Vondering, Nick Roseboom, and

25   I think that's it for our witnesses.  Thank you.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 39 of 301

(Videotape, 10-07-14; 10:28:49)

1    THE COURT: Okay, thank you, Ms. Baker.  Now if

2    any of you are acquainted with any of those people who

3    have been announced here, we're gonna want to know that if

4    you're actually called to be a juror in the case, and that

5    might be a reason why you shouldn't be on the case but it

6    may be something that's perfectly innocuous and not be an

7    impediment to you being a juror in the case.

8    I'm advised by these ladies who are going to be

9    trying the case that this case should conclude Thursday or

10    Friday; is that a fair statement?  Just to let -- I'm just

11    letting you know that.  Now that's an estimate.  It could

12    be done today, it could be done tomorrow, but that's our

13    best estimate and you'll have to keep that in mind so that

14    if any of you have, you know, open heart surgery scheduled

15    tomorrow morning, we need to know that because you're not

16    gonna be able to be available for us then, so we need to

17    know that.  But, in any event, that's our best estimate of

18    about how long this trial should take to conclude.

19    Now this is a criminal case and so the paper

20    that is used to charge or present the charge in a criminal

21    case is called an Information, and the Information in this

22    case should be read to all of you and I'm going to do that

23    now, so if you'll bear with me I'm going to read it to

24    you.  The Information in this case charges as follows:

25    That between August 1 of 2010 and August 1 of 2012 Derek

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 40 of 301

(Videotape, 10-07-14; 10:28:49)

1    James Rainbolt at 4759 Airline Highway in Fruitport

2    Township in the County of Muskegon and State of Michigan

3    did engage in sexual penetration, penis-vagina with Alyssa

4    Ward, the victim being at least 13 but less than 15 years

5    of age and the Defendant was related to the victim by

6    blood or affinity to the fourth degree.  That is known as

7    criminal sexual conduct in the first degree, and Mr.

8    Rainbolt has pled not guilty to that charge, and you

9    should clearly understand that the Information that I just

10   read to you is not evidence.  We have to read an

11   Information in every trial so the defendant and the jurors

12   know what the charges are, and you shouldn't think that

13   it's evidence of Mr. Rainbolt's guilt simply because he's

14   been charged or that there's an Information that has been

15   read to you.  And that's because basic to our system of

16   criminal justice in America is the principle that a person

17   that is accused of a crime is presumed to be innocent and

18   that presumption must start at the beginning of this trial

19   for you and that presumption continues throughout the

20   trial and entitles Mr. Rainbolt to a verdict of not guilty

21   unless you are satisfied beyond a reasonable doubt that he

22   is guilty.

23          Now this charge of criminal sexual conduct in

24   the first degree, as with any criminal charge, is made up

25   of parts or elements and the prosecutor has to prove each

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 41 of 301

(Videotape, 10-07-14; 10:28:49)

element of the charge beyond a reasonable doubt.  Mr. Rainbolt, as a defendant, is not required to prove his innocence or to do anything at a trial, and if you find that the prosecutor has not proved each element of the charge beyond a reasonable doubt, then you must find him not guilty of that charge.

Now I've used that term reasonable doubt, and when we say a reasonable doubt in the law, we're talking about a reasonable, honest doubt, a fair doubt growing out of the evidence or lack of evidence.  It's not merely an imaginary doubt, it's not a possible doubt; it's a doubt that's based upon reason and common sense.  A reasonable doubt in the law is just that, it's a doubt that's reasonable after a careful and considered examination of all of the facts and circumstances that you find to exist in the case.

Now I think that's all you need to know at this time to be able to intelligently respond to any questions that are asked of you as it relates to your ability to be a juror, so the next thing we're going to is we're going to draw the first 13 jurors who are going to be seated in the jury box, and as I always do, I want to hasten to add I didn't have anything to do with who these people are and neither did he; okay?  This is all done by a computer, so we're not picking on anybody.  The computer just gave us

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 42 of 301

(Videotape, 10-07-14; 10:28:49)

1    the names and that's the way we gotta call 'em, folks;

2    okay?  So if your name is called, the bailiff will show

3    you where you should have a seat up here and then when we

4    have 13 we'll commence the questioning.

5            THE CLERK:  Carrie Bose, David Pugh, Steven Six,

6    Joanne Metcalf, Shirley Coleman, Lindsey Osborn, Carrie

7    Shanty, Martin Klassen, Samantha Anthony, Julianna Denio,

8    Ann Walters, Sharon Booth, Robert Sturgeon.

9            THE COURT:  Okay.  Now for those of you who are

10   still out there, all with big smiles on your faces right

11   now thinking you've dodged a bullet, you have not; okay?

12   There is a possibility that any one of these folks might

13   be excused under either a challenge for cause or one of

14   those peremptory challenges, and if they are, then we go

15   back to the list and we pull another one of you from the

16   audience and have you have a seat up here.  And we go

17   through that process until there's no more jurors that

18   need to be excused.  So the reason I bring that to your

19   attention is, as I said, the attorneys here may have some

20   questions for some of these folks and please listen to the

21   questions and think about what your answer might be if

22   you're called to replace somebody, and the reason I

23   suggest you do that is then that avoids us having to

24   repeat all these questions every time a new person comes

25   up here.  So if you just pay attention and think about

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

13

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 43 of 301

(Videotape, 10-07-14; 10:28:49)

what your answer might be, then if you get called to
replace somebody, instead of going through all the
questions again, I'll simply ask you have you heard
everything that the other jurors have been asked and is
there anything that was asked that relates particularly to
your ability to be a juror, and then we can cut through
this a little quicker.  And so for those of you who are
not going to be on this case you can get out of there, so
I think you all appreciate that, so everybody has to
cooperate to get there.

So the first thing I want to ask you folks, is
there anybody that is seated up here now who is acquainted
with anyone who was introduced in the case, either the
witnesses or the attorneys or anybody like that?  No?
Okay, great.  That's pretty amazing.  Usually we have some
people that are acquainted, but that's wonderful.  Ms.
Johnson, if you have any questions you want to ask the
jurors, you may at this time.

MS. JOHNSON: Thank you, your Honor.  Good
morning, everyone.

JURORS: Good morning.

MS. JOHNSON: I want to thank you all for your
service today, except that my pen just dropped.  I want to
thank you all for your service today.  This process, this
voir dire process, it's my experience that it works best

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 44 of 301

(Videotape, 10-07-14; 10:28:49)

1    for all of us if it's a conversation, if you all

2    participate with me, you know, one-word answers sometimes

3    may cut it, but for other conversations we're going to

4    need some more, and listen to what your fellow jurors or

5    potential jurors are saying.  And if you have something to

6    add to that conversation, a lot of times I'll ask people

7    agree or disagree to raise their hand and I'll call on

8    you, but if there's something you want to volunteer or add

9    to the conversation, please bring it to my attention.

10        I do want to warn you I know a lot of attorneys

11   get up here and say I don't mean to pry when I'm asking

12   these questions.  I'm of the belief that sometimes prying

13   is necessary; okay?  And I want to warn you.  You've heard

14   the charges in this case.  We're talking about a child

15   sexual abuse case, so my questions may get personal with

16   you at some times.  I apologize for that in advance, but I

17   do promise you that every question I'm asking I have a

18   reason to ask it.

19        MS. JUROR: Speak up.

20        THE COURT: Okay.  Can't hear?

21        SEVERAL JURORS: No.

22        THE COURT: Okay.  You're going to have to speak

23   up.  Is that part of the PA system, that microphone?

24        THE CLERK: The microphone is.  You have to stand

25   in front of it for it to --

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

15

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 45 of 301

(Videotape, 10-07-14; 10:28:49)

1      THE COURT: Okay, right.  So you'll have to stick

2  close to that, Ms. Johnson, so everybody can hear you.

3  Can you hear me all right?

4      SEVERAL JURORS: Yes.

5      THE COURT: Okay, all right.  Go ahead, Ms.

6  Johnson.

7      MS. JOHNSON: I apologize.  I have trouble

8  staying tied to a podium at times, but I'll try to do so

9  so the microphone picks me up.  I was just explaining to

10  the jurors up here in the box that I apologize if I'm

11  prying.  A lot of attorneys say they don't mean to pry

12  during this questioning, but I'm of the belief that at

13  times it's necessary.  With the subject matter of this

14  case, there may be some personal questions and I'm

15  apologizing in advance if I ask you anything, but I do

16  promise that every question I ask has a reason for why I'm

17  asking it.

18      The purpose of voir dire is also to make sure

19  that we find appropriate jurors that are suited for this

20  case.  You may ask what do you mean by that?  You know,

21  people can be fair and impartial, that's what we're

22  looking for.  Well, based on subject matter, it may be

23  more difficult to be fair and impartial on certain cases.

24  To give you an example of what I'm talking about, I

25  personally am an animal lover.  I grew up on a farm, I

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

16

(Videotape, 10-07-14; 10:28:49)

1   adopt stray dogs, I volunteer at shelters.  If a case were

2   to come before me that was an animal cruelty case, I'm not

3   sure I could sit as a juror on that and set aside my

4   personal feelings to sit fairly and impartially.  So a lot

5   of the questions I'm going to be asking you tody are to

6   find out your personal feelings and see if there's

7   anything that may cause you a bias one way or the other.

8            And I guess I'm going to jump right in with some

9   difficult questions.  We're talking about a criminal

10  sexual abuse case, and the Defendant is accused of raping

11  his daughter when she was 13 or 14 years old, when she was

12  in 8th grade.  Is there anybody who just hearing that --

13  and let me preface this by saying I don't think anybody

14  wants to sit and watch and listen to that, but is there

15  anybody who says I'm not going to be able to sit and

16  listen to that and judge that evidence?  Okay.  Mr. Powe

17  -- Pugh; sorry.  What's your --

18           JUROR PUGH: This I don't want -- I don't want to

19  deal with that.  I don't like him already.

20           MS. JOHNSON: Okay.  You said you don't like him

21  already?

22           JUROR PUGH: Uh-huh.

23           MS. JOHNSON: Okay.  As he's sitting there, do

24  you think he must have done something wrong?

25           JUROR PUGH: No, just -- I've known people that's

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 47 of 301

(Videotape, 10-07-14; 10:28:49)

1   done that, not friends of mine, but I've known people

2   that's done this and I don't want -- I don't want to think

3   about it, you know.  It's not on my mind.

4       MS. JOHNSON: You say you know people who have

5   done it.  I'm not asking for names, but relationship-wise,

6   who are these people that you know?

7       JUROR PUGH: These are people I don't know who

8   they were.  This is people I talk to.

9       MS. JOHNSON: Do you know people who have been

10  victims of it or people who have been accused of it or

11  perpetrators of it?

12      JUROR PUGH: I had a girlfriend a victim of it.

13  Her daughter.

14      MS. JOHNSON: Her daughter.  And did you speak

15  with your girlfriend and her daughter about what happened?

16      JUROR PUGH: Oh, yeah.

17      MS. JOHNSON: Okay.  Do you think you can set

18  aside those feelings and listen to the evidence in this

19  case?

20      JUROR PUGH: Yeah.

21      MS. JOHNSON: How old was her daughter when it

22  happened?

23      JUROR PUGH: Six, and her stepfather molested

24  her.  Nothing come of that.

25      MS. JOHNSON: And how long after it happened were

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 48 of 301

(Videotape, 10-07-14; 10:28:49)

1    you with the mother?

2              JUROR PUGH: Two years.

3              MS. JOHNSON: Okay.  And, again, you think you

4    can set that aside and judge the facts in this case?

5              JUROR PUGH: Well, I'll put it -- I don't think

6    about it anymore, you know.  It's over with.  It's in the

7    history.

8              MS. JOHNSON: Let me ask you without getting into

9    too much detail about her case, do you think all victims

10   would react the exact same way?

11             JUROR PUGH: I don't know how to answer that.

12             MS. JOHNSON: Okay.  If the victim in this case

13   were to get up and you were to see something, a way that

14   she reacted differently than your girlfriend's child

15   reacted, would that to you mean that she's lying or would

16   you sit with an open mind to listen to her?

17             JUROR PUGH: I'd sit with an open mind to listen

18   to her.

19             MS. JOHNSON: Okay.  Did I see some other hands

20   raised?  Mr. Sturgeon?

21             JUROR STURGEON: Yes.  It happened to my best

22   friend's son when he was 12.

23             MS. JOHNSON: How long ago was that?

24             JUROR STURGEON: Nine years, ten years?

25             MS. JOHNSON: Were you friends with him at the

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 49 of 301

(Videotape, 10-07-14; 10:28:49)

1    time?

2         JUROR STURGEON: Yes, I've known the kid since he

3    was probably 2.

4         MS. JOHNSON: How did you find out that it had

5    happened?

6         JUROR STURGEON: My buddy actually called me to

7    talk to him about it.

8         MS. JOHNSON: How did he find out?

9         JUROR STURGEON: His son told him that -- he was

10   going through a divorce with his wife and he was with his

11   mother and one of the -- some boy babysitting him got a

12   hold of him.

13        MS. JOHNSON: Did he tell right away after it

14   happened?

15        JUROR STURGEON: I don't exactly recall.

16        MS. JOHNSON: Did you talk to this boy about it?

17        JUROR STURGEON: No.

18        MS. JOHNSON: Okay.  Would you be able to set

19   aside what you know about that case and listen to the

20   evidence and the testimony in this case and judge it

21   fairly and impartially or would that be on your mind while

22   you were listening to evidence?

23        JUROR STURGEON: I think it would be on my mind.

24        MS. JOHNSON: Do you think you'd be able to set

25   it aside?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

20

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 50 of 301

(Videotape, 10-07-14; 10:28:49)

1        JUROR STURGEON: I can't even watch movies that

2   would go to that.

3        MS. JOHNSON: Okay.  Were there any other hands?

4   All right, Ms. Shanty?

5        JUROR SHANTY: Yep.  A good friend I work with,

6   it happened to her daughter.

7        MS. JOHNSON: When did that happen?

8        JUROR SHANTY: Probably three years ago.

9        MS. JOHNSON: Okay.  Did she talk to you about

10  the abuse, your friend?

11       JUROR SHANTY: The mother or the daughter?

12       MS. JOHNSON: Well, let's start first with the

13  mother.

14       JUROR SHANTY: Yes, mother did, yeah.

15       MS. JOHNSON: Okay.  And was anybody ever

16  arrested or brought to trial for that?

17       JUROR SHANTY: (Indistinguishable.)

18       MS. JOHNSON: Was that here locally?

19       JUROR SHANTY: Yes.

20       MS. JOHNSON: Okay.  Did she talk to you about

21  the court process at all?

22       JUROR SHANTY: Yeah.

23       MS. JOHNSON: Okay.  Without saying, I just want

24  a yes or no to this, do you know what the punishment is

25  for this?

---

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

21

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 51 of 301

(Videotape, 10-07-14; 10:28:49)

1    JUROR SHANTY: No, I don't.  I know it's a second

2    offense though.

3    MS. JOHNSON: Okay, I'm going to stop you there.

4    Okay.  On your friend's person it was a second offense?

5    JUROR SHANTY: The dad.

6    MS. JOHNSON: That has nothing to do with this

7    case?

8    JUROR SHANTY: Huh-uh.

9    MS. JOHNSON: Okay.  Did you talk to the victim

10   about it?

11   JUROR SHANTY: No.

12   MS. JOHNSON: Do you know -- did your friend tell

13   you about how her daughter was acting around the time that

14   it happened?

15   JUROR SHANTY: Yes.

16   MS. JOHNSON: Okay.  Do you know how your friend

17   found out about it?

18   JUROR SHANTY: Her daughter told her.

19   MS. JOHNSON: Okay.  Do you know if she told

20   immediately?

21   JUROR SHANTY: I believe she did.

22   MS. JOHNSON: My first question is do you think

23   you can set that aside and judge the evidence in this

24   case?

25   JUROR SHANTY: No, I don't think I could set it

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 52 of 301

(Videotape, 10-07-14; 10:28:49)

1    aside.

2              MS. JOHNSON: No, you don't; okay.  Would you be

3    biased against the Defendant from the beginning of the

4    case?

5              JUROR SHANTY: Yes.

6              MS. JOHNSON: Is that what you're telling me?

7    Okay.  Okay.  Is there anyone else who feels that they

8    could not sit in judgment on this case because of the

9    charge alone?  Okay.  Has anyone here ever been a victim

10   or been a close friend of a victim or family member of a

11   victim of sexual abuse other than the three that I've

12   already spoken to?  Okay, and that's Ms. Anthony?  Okay.

13   Was it you or was it someone you're close to?

14             JUROR ANTHONY: It was me.

15             MS. JOHNSON: I'm sorry?

16             JUROR ANTHONY: It was me.

17             MS. JOHNSON: All right.  How old were you when

18   it happened?

19             JUROR ANTHONY: About 6.

20             MS. JOHNSON: Okay.  Was the person who did it to

21   you ever brought to court?

22             JUROR ANTHONY: No.

23             MS. JOHNSON: Do you know why or why not?

24             JUROR ANTHONY: Yes and no.

25             MS. JOHNSON: Okay.  What do you -- tell me the

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

23

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 53 of 301

(Videotape, 10-07-14; 10:28:49)

1    yes part.

2              JUROR ANTHONY: Well, I did tell somebody about

3    it, but nothing was done about it.

4              MS. JOHNSON: Were the police ever called?

5              JUROR ANTHONY: No.

6              MS. JOHNSON: No?  Do you feel you can set that

7    aside?

8              JUROR ANTHONY: Yes.

9              MS. JOHNSON: Have you dealt with that, you know,

10   emotional trauma?

11             JUROR ANTHONY: Yes and no.

12             MS. JOHNSON: Okay.  As he sits here today, do

13   you already feel the Defendant's guilty in any way or can

14   you presume him innocent?

15             JUROR ANTHONY: I'm pretty much in limbo.

16             MS. JOHNSON: Okay.  Do you think all victims

17   would have the same feelings that you had around this

18   time?

19             JUROR ANTHONY: Yes.

20             MS. JOHNSON: Okay.  Do you think all victims

21   would act the same way after this happened?

22             JUROR ANTHONY: Not exactly, no.

23             MS. JOHNSON: Okay.  If you were to hear from the

24   victim in this case and her experience was different than

25   yours, her reactions were different than yours, would that

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

24

(Videotape, 10-07-14; 10:28:49)

1    cause you to not believe her?

2              JUROR ANTHONY: No.

3              MS. JOHNSON: Okay.  How close were you to the

4    person who did that to you?

5              JUROR ANTHONY: Well, it was like an after-school

6    babysitter.  You know, it was her son.

7              MS. JOHNSON: Okay, so it was not a family

8    member.  Okay.  Is there anyone else who has either been a

9    victim or had a close friend or family member been a

10   victim of a sexual crime?  Okay, Ms. Osborn.  Was it you

11   or someone close to you?

12             JUROR OSBORN: Both.

13             MS. JOHNSON: Okay.  Let's start with you.  How

14   old were you when it happened?

15             JUROR OSBORN: 18.

16             MS. JOHNSON: And how close were you to the

17   person who did it?

18             JUROR OSBORN: A friend.

19             MS. JOHNSON: Was that friend ever prosecuted or

20   the police ever called?

21             JUROR OSBORN: Police was called

22   (indistinguishable),  prosecuted.

23             MS. JOHNSON: Do you think the police handled it

24   appropriately?

25             JUROR OSBORN: Yeah.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 55 of 301

(Videotape, 10-07-14; 10:28:49)

1    MS. JOHNSON: Uhm, can you set that aside and

2    listen to the evidence in this case?

3    JUROR OSBORN: Yeah.

4    MS. JOHNSON: Okay.  And, again, the same

5    questions.  Do you think all victims react the same way?

6    JUROR OSBORN: No.

7    MS. JOHNSON: And if the victim in this case were

8    to do something different than you did, have a reaction

9    different than you did, would you assume she's lying or

10    would you be able to listen to her with an open mind?

11    JUROR OSBORN: I'd be (indistinguishable.)

12    MS. JOHNSON: Okay.  And then the close friend or

13    family member, was that a child?

14    JUROR OSBORN: Yes.

15    MS. JOHNSON: How old was the child?

16    JUROR OSBORN: 6 (indistinguishable.)

17    MS. JOHNSON: How close are you to the child?

18    JUROR OSBORN: (Indistinguishable.)

19    MS. BAKER: I'm sorry, I can't hear back here.

20    JUROR OSBORN: He's my nephew.

21    MS. BAKER: Okay.

22    MS. JOHNSON: And his parents, have they talked

23    to you about what happened?

24    JUROR OSBORN: Yes.

25    MS. JOHNSON: And have you talked to him to about

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 56 of 301

(Videotape, 10-07-14; 10:28:49)

1  what happened, your nephew?

2         JUROR OSBORN: Vaguely.  He started

3  (indistinguishable.)

4         MS. JOHNSON: Okay.  Do you think you can set

5  that aside?

6         JUROR OSBORN: I have anxiety about it sitting

7  here.

8         MS. JOHNSON: Okay.  Do you think you can listen

9  to evidence of this type for the next, the better part of

10  this week?

11         JUROR OSBORN: I don't think so.

12         MS. JOHNSON: Would it cause you anxiety

13  problems, is that what I'm hearing?

14         JUROR OSBORN: (Indistinguishable.)  Yeah.

15         MS. JOHNSON: Okay.  Anyone else?  Okay.  Let's

16  talk about the flip side of that coin.  Has anyone been

17  accused or know anyone who's been accused, close friend or

18  family member, of doing something like this or had to go

19  through the court process for this?  Okay, I see no hands.

20  Okay.  Ms. Bose, moving onto something a little lighter

21  topic, I see you work for GE.  I've never had this in a

22  jury panel, but there are multiple people in this room who

23  work for GE.  Do you know any of them?

24         JUROR BOSE: No.

25         MS. JOHNSON: Okay.  If you were to find out that

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 57 of 301

(Videotape, 10-07-14; 10:28:49)

1    somebody on the jury were to work for the same company,

2    would that cause you any problems speaking your mind in

3    the jury room?

4              JUROR BOSE: (Indistinguishable.)

5              MS. JOHNSON: Okay.  Is anybody familiar with any

6    of the witnesses that I listed?

7              MS. JUROR: I don't know if I'm - or if Jennifer

8    Houton --

9              MS. JOHNSON: Houston, yes.

10             MS. JUROR: Houston, okay.  Does she work at GE?

11             MS. JOHNSON: Yes.  Do you know her?

12             MS. JUROR: (Indistinguishable.)

13             MS. JOHNSON: Okay.  How do you know her?  I

14   mean, at work, but how close do you know her?

15             MS. JUROR: We have -- we don't each lunch

16   together or nothin', but I say hi to her.

17             MS. JOHNSON: Okay.  Has she talked to you about

18   anything that's going on with her family or with the court

19   system?

20             MS. JUROR: No.

21             MS. JOHNSON: Would you have a tendency to

22   believe her or disbelieve her just based on what you know

23   of her from work?

24             MS. JUROR: No.

25             MS. JOHNSON: You don't know her well enough to

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 58 of 301

(Videotape, 10-07-14; 10:28:49)

1   say that you're going to believe everything she says;

2   right?

3           MS. JUROR: Right, right.

4           MS. JOHNSON: And on the flip side of that, you

5   don't know her well enough to say I can't believe what

6   this woman says?

7           MS. JUROR: Right.

8           MS. JOHNSON: Okay.  So you'll judge her as you

9   would any other witness?

10          MS. JUROR: Yeah.

11          MS. JOHNSON: Okay.  Anyone else know anybody

12  from the witness list?  No.  This is alleged to have

13  happened at a computer store run by the Defendant on

14  Airline Road.  Is anybody familiar with that computer

15  store?  I believe it was in a strip mall where Essential

16  Life Church currently is.  Anybody familiar with that

17  area?  No.  Prior to coming to Court today, had anybody

18  seen or heard anything about this case?  I don't think it

19  was in the media, but I can't watch everything.  All

20  right.  So that's everybody on the jury, no, has not heard

21  anything about this case prior to coming to Court?  Okay.

22  Who here has kids by a show of hands?  Okay.  Almost

23  everybody but two or three of you.  So let's start, Ms.

24  Booth?

25          JUROR BOOTH: Uh-huh.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 59 of 301

(Videotape, 10-07-14; 10:28:49)

1        MS. JOHNSON: All right.  You have children.  How

2 many?

3        JUROR BOOTH: Two, they're adults.

4        MS. JOHNSON: Okay.  When they were younger, did

5 they ever lie to you?

6        JUROR BOOTH: I'm sure they did.

7        MS. JOHNSON: Did you ever catch them in lies?

8        JUROR BOOTH: I mean, we're talkin' a long time

9 ago.  I mean, I'm sure little, you know, kid type things.

10 Nothing of any significance when they were older.

11        MS. JOHNSON: Okay.  Who has children in their

12 home now?  Let's try this.  Okay.  Ms. Walters, have your

13 children -- how old are your children?

14        JUROR WALTERS: 19 and 13.

15        MS. JOHNSON: Okay, so actually right in the age

16 range we're talking about.

17        JUROR WALTERS: Is in college and

18 (indistinguishable.)

19        MS. JOHNSON: Have they ever lied to you?

20        JUROR WALTERS: I really can't say, you know,

21 that I've caught them in, no.

22        MS. JOHNSON: Okay.  Has anybody here ever caught

23 their child in a lie?  Okay, working my way down the row.

24 Ms. Denio.  Okay.  How old's your child?

25        JUROR DENIO: I have one 24 and one 27.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

30

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 60 of 301

(Videotape, 10-07-14; 10:28:49)

1       MS. JOHNSON: And when you caught them in a lie,

2  what type of a lie was it?

3       JUROR DENIO: I caught him smoking pot.

4       MS. JOHNSON: Okay. Did they lie about it, deny

5  it?

6       JUROR DENIO: Oh, definitely.

7       MS. JOHNSON: Okay. Was it -- how did you know

8  they were lying?

9       JUROR DENIO: The eyes. I just looked at his

10  eyes.

11       MS. JOHNSON: Okay. Was it pretty -- so it was

12  pretty easy in that instance for you to tell?

13       JUROR DENIO: Very, very obvious.

14       MS. JOHNSON: How old were they when that

15  happened?

16       JUROR DENIO: He was 15.

17       MS. JOHNSON: Okay. Anybody else have any

18  experience with catching a child in a lie? No, okay. So

19  it was an easy thing to do?

20       JUROR DENIO: Uh-huh.

21       MS. JOHNSON: Okay. You're not trained in the

22  art of cross-examination or --

23       JUROR DENIO: No. He thought I was, but

24  (laughing) ...

25       MS. JOHNSON: He thought it was what?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

31

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 61 of 301

(Videotape, 10-07-14; 10:28:49)

1       JUROR DENIO: He thought that I was trained in

2   the art of cross-examination.

3       MS. JOHNSON: Did he?  Okay.  But you were able

4   to question him and find out that he was lying?

5       JUROR DENIO: Uh-huh.

6       MS. JOHNSON: Okay, all right.  So one of the

7   things you'll hear repeated in this courtroom again and

8   again is that as the prosecutor I have the burden of

9   proof.  It's my job to prove the Defendant guilty.  I

10  welcome that burden.  He does not have to prove anything

11  to you.  You'll hear that again and again.  But what

12  exactly does that mean?  What do I have to prove?  The

13  Judge is going to give you jury instructions at some point

14  during the case that list for you the elements of the

15  crime.  I ask and I'll repeat this again in my closing

16  argument, I ask that when you think of these elements you

17  think of them as a checklist; okay?  And I have to prove

18  -- and you will hear from the Court I have to prove

19  nothing more and nothing less than the checklist.  Those

20  are the only things I have to prove beyond a reasonable

21  doubt.  Can everybody promise to hold me to that burden,

22  nothing more, nothing less?  Raise your hand if you can

23  make me that promise.  Okay, thank you.  I see all hands

24  raised.

25       So the next logical question is how do I prove

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

32

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 62 of 301

(Videotape, 10-07-14; 10:28:49)

1    these things?  And I prove them to you through testimony

2    and evidence.  Okay.  There are a couple different types

3    of evidence.  There is testimony which will come from

4    witnesses sitting right here at this jury -- excuse me, at

5    that witness stand swearing to tell the truth and then

6    testifying to what -- their evidence they have to offer

7    and there may also be physical evidence, things that you

8    can hold, touch, see.  For example, in a homicide case you

9    might expect to see the murder weapon.  That would be an

10   example of physical evidence.

11         I'm going to tell you right now there is no

12   physical evidence in this case.  It's all gonna come from

13   the witness stand.  Is there anybody sitting amongst you

14   who says without something physical that I can touch and

15   see and hold in my hands, testimony alone is not gonna be

16   enough to prove this case?  Testimony alone will never

17   reach beyond a reasonable doubt?  Please raise your hands.

18   Ms. Denio, I see your eyebrows kind of raising.

19         JUROR DENIO: Yeah.  Mmmmm, no physical evidence

20   at all.

21         MS. JOHNSON: Share your thoughts aloud with me.

22         JUROR DENIO: But it just goes back to, you know,

23   with my son, as his mother and the motherly instinct I

24   know you're lying, but to do that to somebody else that I

25   don't know, that I didn't give birth to, to say you're

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 63 of 301

(Videotape, 10-07-14; 10:28:49)

1  guilty just because?  I don't know.  That brings up a

2  question in my mind.

3        MS. JOHNSON: Okay.  So if the witnesses were,

4  you know, we have multiple witnesses, I've read you the

5  list.  If they were to testify and they were to give you

6  the elements in their testimony, you don't think based on

7  testimony alone that that could ever rise to the beyond a

8  reasonable doubt standard?

9        JUROR DENIO: (Indistinguishable.)

10        MS. JOHNSON: You got to speak up.

11        JUROR DENIO: I don't know.

12        MS. JOHNSON: You don't know.

13        JUROR DENIO: I don't know.

14        MS. JOHNSON: Okay.  So you cannot say that

15  testimony alone is enough?

16        JUROR DENIO: No, I can't say that.

17        MS. JOHNSON: Thank you.  Is there anyone who

18  agrees with Ms. Denio who says, you know, testimony alone

19  is not gonna be enough for me for that beyond a reasonable

20  doubt standard?  Okay.  Ms. Coleman, you've been very

21  quiet.  What do you think of that?  Do you think you can

22  listen to the witnesses and decide for yourself if they're

23  telling the truth?

24        JUROR COLEMAN: Yes.

25        MS. JOHNSON: And if you believe they're telling

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

34

(Videotape, 10-07-14; 10:28:49)

1    the truth or that there is enough truth in the case to

2    prove the elements beyond a reasonable doubt, are you

3    going to be able to return a verdict of guilty without any

4    physical evidence?

5              JUROR COLEMAN: Yes.

6              MS. JOHNSON: And Ms. Metcalf, same question for

7    you.  How do you feel about the testimony versus physical

8    evidence issue?

9              JUROR METCALF: Well, I don't know if this is

10   appropriate, but as a nurse I work in a hospital.  No --

11   are you saying there's no physical evidence --

12             MS. JOHNSON: I'm saying there's nothing you're

13   going to be able to hold in your hand.

14             JUROR METCALF: Just based on

15   (indistinguishable.)

16             MS. JOHNSON: Just based on testimony alone will

17   you be able to make a decision if you believe -- if you

18   believe what the witnesses say and you believe what they

19   say meets the elements, will you be able to return a

20   verdict of guilty?

21             JUROR METCALF: (Indistinguishable.)

22             MS. JOHNSON: Okay.  What type of nurse are you?

23             JUROR METCALF: I'm a registered nurse.

24             MS. JOHNSON: Okay.  Do you have a specialty as a

25   -- no.  Have you ever worked in gynecology or obs -- I can

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 65 of 301

(Videotape, 10-07-14; 10:28:49)

1    never say the other word, ob -- obstetics (sic).  Have you

2    done that?

3              JUROR METCALF: Yes.

4              MS. JOHNSON: Okay.  How recently?

5              JUROR METCALF: It's been 10 years.

6              MS. JOHNSON: It's been 10 years?

7              JUROR METCALF: Yes.

8              MS. JOHNSON: Okay.  Did you perform

9    examinations, pelvic examinations?

10             JUROR METCALF: With physicians, yes.

11             MS. JOHNSON: All right.  Sorry, I got

12   sidetracked there.  Anybody else, the physical versus

13   testimonial evidence issue?  Mr. Six, could you listen to

14   a case that was testimonial only and return a verdict of

15   guilty if you think that the witnesses are credible and

16   that their evidence establishes the elements?

17             JUROR SIX: Yes.

18             MS. JOHNSON: Okay.  Is there anybody who cannot

19   do that?  Last show of hands.  Okay, I see no hands

20   raised, so Ms. Denio, you're the -- but I got your answer

21   already.  All right, okay.  So I guess I should talk to

22   you about what beyond a reasonable doubt is and I know the

23   Judge talked about it a little bit.  It's kind of a

24   circular definition.  A reasonable doubt is a doubt that's

25   reasonable.  It's a doubt based in reason and it's not a

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 66 of 301

(Videotape, 10-07-14; 10:28:49)

1   possible doubt or a, you know, hypothetical doubt or a

2   forced doubt.  Not speculative.

3         I grew up watching a lot of legal movies, and

4   they're not as fun for me anymore because I know a little

5   too much about the law now.  And I was watching a movie

6   recently and it was driving me crazy.  There were jurors

7   in the back and they kept saying, but this is possible.

8   It's possible that it happened this way.  It's possible

9   that it happened that way, and they kept throwing out it's

10  possible, it's possible.  That is not the standard.  Is it

11  possible but also is it reasonable in light of the

12  evidence?  To give you a little example, if you were to

13  pretend there's no windows in this room or that the blinds

14  were drawn and when you had walked in this morning it was

15  cloudy and as we were sitting here you saw someone come in

16  with a yellow slicker and had raindrops on it or wet drops

17  on it, and when you walk outside at the end of the day

18  there's puddles everywhere and there's droplets of water

19  on the cars, what do you think happened outside or what

20  did happen outside?

21        SEVERAL JURORS: Rained.

22        MS. JOHNSON: It rained.  Is it possible that the

23  firemen in this town had a party, had a little too much to

24  drink, got on their firetrucks, came down to the

25  courthouse and hosed everything down as a gag?  Is that

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

37

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 67 of 301

(Videotape, 10-07-14; 10:28:49)

1   possible?  Could that happen?  I see some -- I see one no,

2   but I saw some yeses.  It's possible that the firemen

3   brought their hoses out, whether it was because of a party

4   or a gag or whatever.  Is that a reasonable thing to

5   believe?  No.  Okay.  That's what I'm talking about.  When

6   you're sitting in the back and ask your -- and, you know,

7   if you were talking about the case and you say it's

8   possible it did this, it's possible that it did that,

9   that's not where the conversation should end.  The

10  conversation should end with well, but is it reasonable;

11  okay?

12          Let's see.  Okay.  You're going to hear from

13  some expert witnesses in this case, and they may say some

14  things that are contrary to a belief or two that you

15  commonly hold; okay?  Is there anybody on the panel who is

16  an expert in child sexual abuse?  Everybody raise your

17  hand, say you're not an expert in that field.  Okay.

18  Everybody's not an expert.  And everybody is also -- is

19  there anybody on the panel that's a doctor who specializes

20  in child sexual abuse or child abuse?  All right.  I see

21  no hands.  So can we all agree that you do not have an

22  expertise in that area?  Okay.  And I want to see a show

23  of hands.  Can you all agree to be open-minded to what

24  these experts are going to tell you?  Everybody agree?

25  Okay.

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

38

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 68 of 301

(Videotape, 10-07-14; 10:28:49)

1      Has anybody ever been in a jail or a mental

2  institution before.  Okay.

3      MR. JUROR: (Indistinguishable.)

4      MS. JOHNSON: Ms. -- okay.  I'll start in the

5  back row, Mr. Powe, Powe, Pugh.  I'm gonna write it down

6  phonetically.

7      JUROR PUGH: Pugh. Do it all the time.

8      MS. JOHNSON: Jail or mental hospital or --

9      JUROR PUGH: Jail.

10      MS. JOHNSON: Okay.  As a visitor or were you --

11      JUROR PUGH: No, I was an inmate.

12      MS. JOHNSON: An inmate, okay.  Let me see.  I

13  think I do have a note that you had some misdemeanors;

14  correct?  Is that what it was for?

15      JUROR PUGH: Yeah.

16      MS. JOHNSON: How long ago was that?

17      JUROR PUGH: 1990.

18      MS. JOHNSON: Okay.  Have you had any other

19  brushes with the law since then?

20      JUROR PUGH: No.

21      MS. JOHNSON: No?  Okay.  Was that here?

22      JUROR PUGH: When I was 17 I got in trouble.

23      MS. JOHNSON: Okay.

24      JUROR PUGH: (Indistinguishable) in trouble. I

25  had -- I did ti -- I had some felonies on me.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 69 of 301

(Videotape, 10-07-14; 10:28:49)

1  MS. JOHNSON: Oh, you did.  Okay.  Are you a

2  convicted felon?

3  JUROR PUGH: Yeah.

4  MS. JOHNSON: And have you had your civil rights

5  restored at all?

6  JUROR PUGH: Well, I didn't lose no rights.  I

7  was just -- I was in the county jail here, just -- it's

8  all -- this is years ago.

9  MS. JOHNSON: Okay.  But that was here in

10  Muskegon?

11  JUROR PUGH: Yes.

12  MS. JOHNSON: Do you think you were treated

13  fairly throughout that process?

14  JUROR PUGH: Yes.

15  MS. JOHNSON: And in 1990 as well, do you think

16  you were treated fairly?

17  JUROR PUGH: Yes.

18  MS. JOHNSON: Okay.  Is there anything about that

19  experience that you would hold against the police or the

20  prosecutor's office?

21  JUROR PUGH: No.

22  MS. JOHNSON: Can you set that experience aside

23  and listen to the evidence today or this week?

24  JUROR PUGH: Uh-huh (indistinguishable.)

25  MS. JOHNSON: Moving down the row, I think the

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 70 of 301

(Videotape, 10-07-14; 10:28:49)

1   next hand I -- was there another hand in the back row,

2   ladies?  Okay.  Ms. Shanty.

3          JUROR SHANTY: Yes, it was in Grand Haven.

4          MS. JOHNSON: Okay.

5          JUROR SHANTY: It was actually for having too

6   many dogs.

7          MS. JOHNSON: Okay.  How long ago was that?

8          JUROR SHANTY: Probably eight years ago.

9          MS. JOHNSON: Okay.  Do you think you were

10  treated fairly throughout that?

11         JUROR SHANTY: No, because they couldn't give a

12  reason why.

13         MS. JOHNSON: Is there anything about that

14  experience that you would hold against the police in this

15  case?  You said it was Grand Haven; right?

16         JUROR SHANTY: Yeah.

17         MS. JOHNSON: So it was a different county,

18  different police, different --

19         JUROR SHANTY: Prosecutor.

20         MS. JOHNSON: Okay. Different prosecutor's office

21  and completely different crime; correct?  Is there

22  anything about that that you hold against the prosecution

23  or the police in this case?

24         JUROR SHANTY: (Indistinguishable.)

25         MS. JOHNSON: You think you can set it aside and

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 71 of 301

(Videotape, 10-07-14; 10:28:49)

1   just listen to the testimony and evidence?

2            JUROR SHANTY: Yes, I could.

3            MS. JOHNSON: Okay.  Mr. Sturgeon?

4            JUROR STURGEON: Just a misdemeanor I did one

5   night.

6            MS. JOHNSON: Okay.  How long ago?

7            JUROR STURGEON: 2009, (indistinguishable).

8            MS. JOHNSON: Was that here?

9            JUROR STURGEON: Yes.

10           MS. JOHNSON: So that would have been my office

11  that prosecuted you?

12           JUROR STURGEON: Yes.

13           MS. JOHNSON: I don't think I was there at the

14  time, but do you think you were treated fairly?

15           JUROR STURGEON: Yes.

16           MS. JOHNSON: Would you think you can set that

17  aside and listen to the testimony and evidence in this

18  case, aside from what we already talked about?  Okay.  So

19  nodding yes?

20           JUROR STURGEON: Yes.

21           MS. JOHNSON: Anybody else in the front row or

22  back row?  Okay, Ms. Anthony.

23           JUROR ANTHONY: (Indistinguishable.)

24           MS. JOHNSON: Okay.  Was any of that in

25  connection with what we talked about earlier?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 72 of 301

(Videotape, 10-07-14; 10:28:49)

1        JUROR ANTHONY: No.

2        MS. JOHNSON: No, okay.  For the jail, were you

3    there as a visitor or an inmate?

4        JUROR ANTHONY: Inmate.

5        MS. JOHNSON: All right.  How long ago?

6        JUROR ANTHONY: Oh, like a year and a half ago?

7        MS. JOHNSON: Okay.  Here?

8        JUROR ANTHONY: Yes.

9        MS. JOHNSON: Were you convicted of anything?

10       JUROR ANTHONY: I had a misdemeanor, yeah.

11       MS. JOHNSON: Misdemeanor.  Do you think you were

12   treated fairly?

13       JUROR ANTHONY: Yeah.

14       MS. JOHNSON: Anyone else?  All right.  Mr. Six,

15   you're a refrigerator repairman?

16       JUROR SIX: Refrigeration.

17       MS. JOHNSON: Refrigeration, is it -- okay.  I'm

18   sorry.  That's different?

19       JUROR SIX: It's -- I work on --

20       MS. JOHNSON: Broader then?

21       JUROR SIX: Yeah, industrial.

22       MS. JOHNSON: Okay.  You've obviously a very

23   handy person then?

24       JUROR SIX: (Indistinguishable.)

25       MS. JOHNSON: Do you have a specialization?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

43

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 73 of 301

(Videotape, 10-07-14; 10:28:49)

1    JUROR SIX: Yeah.

2    MS. JOHNSON: Do you think you have the same

3    knowledge about, say, residential heating that you have

4    about commercial refrigeration?

5    JUROR SIX: Yeah, I did that too.

6    MS. JOHNSON: You've done that too? Okay. You

7    think you have the same knowledge of plumbing as you do

8    about the two things that you've specialized in?

9    JUROR SIX: Yeah.

10   MS. JOHNSON: So despite the fact that those are

11   both very handy things, if there were to be a plumbing

12   expert that came in, would you listen to that plumbing

13   expert or would you -- would you be able to listen to a

14   plumbing expert with an open mind?

15   JUROR SIX: Yes.

16   MS. JOHNSON: Okay, because it's not your

17   specialization?

18   JUROR SIX: Sure.

19   MS. JOHNSON: Okay. So Ms. Metcalf, similar in

20   my question to you is we've already established you're not

21   an expert -- or a specialization in child sexual abuse.

22   If one of the witnesses is specialized in child sexual

23   abuse, would you be able to listen to that expert or would

24   you say, I'll be thinking, ah, that's not quite how I

25   understand things.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 74 of 301

(Videotape, 10-07-14; 10:28:49)

1    JUROR METCALF: I would listen.

2    MS. JOHNSON: You would listen, okay.  Ms.

3    Coleman, your questionnaire says you used to work for the

4    county?

5    JUROR COLEMAN: Yes.

6    MS. JOHNSON: In accounting; right?

7    JUROR COLEMAN: Yes.

8    MS. JOHNSON: Did you have anything to do with

9    the courts at all?

10   JUROR COLEMAN: No.

11   MS. JOHNSON: Throughout your career?  No?  Okay.

12   So there's nothing about that that should influence you

13   sitting here?

14   JUROR COLEMAN: No.

15   MS. JOHNSON: No, all right.  Ms. Osborn, your

16   questionnaire indicates there's a misdemeanor conviction?

17   How long ago was that?

18   JUROR OSBORN: I'm not sure.  Like a road

19   violation, traffic ticket.

20   MS. JOHNSON: Oh, traffic ticket?

21   JUROR OSBORN: Yes.

22   MS. JOHNSON: Okay.  Nothing about that that

23   should affect your ability to sit here?

24   JUROR OSBORN: No.

25   MS. JOHNSON: Gotcha.  I'm just going over my

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 75 of 301

(Videotape, 10-07-14; 10:28:49)

1   notes from your questionnaires to see if I have any last

2   questions for you.  Oh, Mr. Klassen, you're an engineer.

3   Okay.  My understanding of engineers is that it's very

4   precise work; is that correct?

5            JUROR KLASSEN: Yes.

6            MS. JOHNSON: All right.  And figures have to

7   match up exactly and so your mind must work in a very

8   precise way.

9            JUROR KLASSEN: Right.

10           MS. JOHNSON: Okay.  Trial work is a much

11   different type of work for a juror to do.  There is no one

12   victim plus one murder weapon equals one conviction; okay?

13   You have to sit and judge the testimony, decide what of it

14   you believe and decide does that meet this idea of beyond

15   a reasonable doubt, and are you going to be able to do

16   that?

17           JUROR KLASSEN: Yes.   (Indistinguishable.)

18           MS. JOHNSON: You have?  Okay.  Criminal or

19   civil?

20           JUROR KLASSEN: It was a lawsuit.

21           MS. JOHNSON: Okay, so civil.  All right.  I am

22   about to sit down, and this is going to be my last

23   opportunity to speak with you all individually.  Is there

24   anyone who has anything to add to any of the conversations

25   I've had with your fellow jurors before I sit down?  All

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 76 of 301

(Videotape, 10-07-14; 10:28:49)

1      right.   Thank you so much for your attention.

2              THE COURT: Okay. Did you say you wanted to

3      take -- okay.   We're gonna take a five-minute break.

4              (Off the record at 11:29:37.)

5              (Court resumes at 11:38:39.)

6              THE COURT: Okay, we're back on the record in

7      People versus Rainbolt.   Ms. Baker, if you'd like to

8      question the jury, you may at this time.

9              MS. BAKER: Thank you, your Honor.   Good morning.

10             JURORS: Good morning.

11             MS. BAKER: All right.   I'm going to apologize.

12     Some of you folks, I can't see your faces when I'm over

13     there, so it was a little hard for me to hear sometimes,

14     but I tried.   Ms. Booth, are you a women's division

15     member?

16             JUROR BOOTH: I was years ago.   I haven't been

17     for probably four years.

18             MS. BAKER: Okay, I think I re -- I'm a member

19     and I looked at your name and I went, gosh, I think you

20     know me.

21             JUROR BOOTH: Oh.

22             MS. BAKER: Maybe I remember your name on lists,

23     so we don't meet but once a month in that group and it's

24     been four years since you've been a member, so you and I

25     haven't talked.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 77 of 301

(Videotape, 10-07-14; 10:28:49)

1        THE COURT: Ms. Baker, you're going to have to

2   speak up.

3        MS. BAKER: I need to talk louder, okay.

4        THE COURT: Louder.  We've got several jurors

5   that can't hear you.

6        MS. BAKER: Sorry.  Talked to Ms. Booth about a

7   group we belo -- we used -- or she used to belong to that

8   I still do belong to, so, okay.  Great.  All right.  Now I

9   have to ask, does anyone have any friends, close friends,

10  family members who are in law enforcement?  Okay.  I see

11  Ms. Osborn; right?

12       JUROR OSBORN: Yes.

13       MS. BAKER: Okay.  Who are --

14       JUROR OSBORN: I have a friend in Ottawa County.

15       MS. BAKER: Okay.

16       JUROR OSBORN: (Indistinguishable) Pierson.

17       MS. BAKER: All right.  And are you good friends?

18       JUROR OSBORN: Yeah.

19       MS. BAKER: Okay. Do you talk --

20       JUROR OSBORN: We're acquaintances, if that, so

21  yeah.

22       MS. BAKER: Do you talk about the cases that she

23  works on?

24       JUROR OSBORN: No.

25       MS. BAKER: Do you think that or what is your

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

48

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 78 of 301

(Videotape, 10-07-14; 10:28:49)

1  thought on their ability to testify?

2       JUROR OSBORN: Nothing really.

3       MS. BAKER: Nothing?  Okay.  Do you think they're

4  any different than any other person?

5       JUROR OSBORN: No.

6       MS. BAKER: Okay.  Ms. Metcalf?

7       JUROR METCALF: Yes.  I have a brother that's a

8  retired state police that works for the federal

9  government.

10      MS. BAKER: Okay.

11      JUROR METCALF: And Tom Kresnik is a family

12  friend.

13      MS. BAKER: Okay.  And your husband is the fire

14  marshal; correct?

15      JUROR METCALF: Yes, he is.

16      MS. BAKER: So he kind of does some investigation

17  into the source of fires; correct?

18      JUROR METCALF: Yes.

19      MS. BAKER: Do you think that that relationship

20  or your relationship with Mr. Kresnik or your family

21  members might color your view of the evidence in this

22  case?

23      JUROR METCALF: No.

24      MS. BAKER: You'll be able to set that aside?

25      JUROR METCALF: (Indistinguishable.)

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

49

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 79 of 301

(Videotape, 10-07-14; 10:28:49)

1    MS. BAKER: Thank you.  Did somebody else raise

2   their hand?  Is it Denio?

3    JUROR DENIO: Denio, yes.

4    MS. BAKER: Okay.

5    JUROR DENIO: My father-in-law and my husband and

6   several of their uncles were ex-police officers in

7   Eggleston Township.

8    MS. BAKER: In Eggleston Township?  Did they have

9   their own police force out there?

10    JUROR DENIO: Yes, back in the '60s and '70s.

11    MS. BAKER: Okay.  Quite some time ago?

12    JUROR DENIO: Uh-huh.

13    MS. BAKER: Now does that history or that

14   relationship make you favor the police more than anyone

15   else?

16    JUROR DENIO: No.

17    MS. BAKER: That's not gonna color your ability

18   to listen to this case?  All right.  Well, thank you for

19   your honesty and candor.  Ms. Osborn, you indicated you

20   had some anxiety sitting here about this case; correct?

21    JUROR OSBORN: Yes.

22    MS. BAKER: Okay.  I'm not gonna sugar-coat it.

23   This is a yucky case.  Criminal sexual conduct is not a

24   fun topic to talk about, despite the fact that Law and

25   Order has its own special victim's unit.  That doesn't

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

50

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 80 of 301

(Videotape, 10-07-14; 10:28:49)

1    make it fun to sit in this situation.  The question that

2    we need to get down to the nitty gritty on is does your

3    anxiety make it such that you would not be able to -- or

4    you would just go into it and go, I've already made my

5    decision, I don't need to hear anything, I don't see

6    anything, I'm done?

7        JUROR OSBORN: No. I could listen.

8        MS. BAKER: Okay.  All right.

9        JUROR OSBORN: Hurtfully.

10        MS. BAKER: It would hurt you?

11        JUROR OSBORN: Tears in my eyes probably, but I

12    could make a decision, I'm sure.

13        MS. BAKER: Do you think that you could do it

14    impartially?

15        JUROR OSBORN: Uhm, I could do it straight

16    (indistinguishable.)

17        MS. BAKER: Okay.  Now based on the nature of the

18    charge, is Mr. Rainbolt guilty or not guilty right now?

19        JUROR OSBORN: I can't say.

20        MS. BAKER: You can say.

21        JUROR OSBORN: I probably would say guilty just

22    by hearing that, of what he done, so ...

23        MS. BAKER: What he's alleged to have done.

24        JUROR OSBORN: Correct.

25        MS. BAKER: Okay.  So you've al -- you can say at

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

51

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 81 of 301

(Videotape, 10-07-14; 10:28:49)

1   this point in time you would find him guilty based on the

2   reading of the charge.  Does anyone else agree with Ms.

3   Osborn?

4                  JUROR STURGEON: Looking at that aspect, I have a

5   daughter at that age right now, and what happened to my

6   friend's son, I would need more -- I would have a hard

7   time tryin' to give him a fair trial.  I don't want to say

8   that he's a dirty person or anything, but I mean I just --

9   it's something that I don't -- I don't like.

10                  MS. BAKER: I completely understand.  I don't

11   think a single person in this courtroom --

12                  JUROR STURGEON: No, no, I --

13                  MS. BAKER:  -- would disagree with you regarding

14   that.  The question is can you sit there as a fair and

15   impartial juror, and if your answer is no, that's an okay

16   answer.  There's no wrong answer.

17                  JUROR STURGEON: I don't think I could.

18                  MS. BAKER: Okay.  Does anyone else agree with

19   Mr. Sturgeon?  Okay.  Thank you.  I appreciate both of

20   your candor.  It's difficult.  This is not easy.  I

21   understand that.  Now Ms. Shanty, you had indicated that

22   you were going to have some concerns as well; correct?

23                  JUROR SHANTY: Right.

24                  MS. BAKER: And do those concerns still continue

25   now that I'm here and Ms. Johnson has sat down?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

52

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 82 of 301

(Videotape, 10-07-14; 10:28:49)

1    JUROR SHANTY: Right, yes.  I don't think I could

2    set aside what's happened to my friend's daughter.

3    MS. BAKER: Okay.

4    JUROR SHANTY: It still kind of haunts me of what

5    happened to her.

6    MS. BAKER: Okay.  And that experience, we all

7    have different life experiences, and they all affect us in

8    different ways, so I appreciate you telling me that.  It

9    sounds like that experience with your friend and her

10   daughter would make it impossible for you to set aside or

11   to basically presume he's innocent.

12   JUROR SHANTY: I think so.

13   MS. BAKER: Okay, thank you.  Thank you for your

14   candor.  Does anyone agree with Ms. Shanty?  Okay, all

15   right.  Ms. Anthony, do you think you would have that

16   problem?  No?  Ms. Walters?

17   JUROR WALTERS: (Indistinguishable.)

18   MS. BAKER: Okay.  You don't agree with Ms.

19   Shanty?

20   JUROR WALTERS: I'm sorry, the question?

21   MS. BAKER: Do you agree with Ms. Shanty?

22   JUROR WALTERS: The question do I agree?

23   MS. BAKER: With her conclusions, she wouldn't be

24   able to sit impartially?

25   JUROR WALTERS: Oh, I would -- I -- no, I think I

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

53

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 83 of 301

(Videotape, 10-07-14; 10:28:49)

1  could.

2          MS. BAKER: Okay.  Are you going to have a

3  problem sitting through the trial regarding this

4  allegation of criminal sexual conduct?

5          JUROR WALTERS: Uhm, I don't believe so.

6          MS. BAKER: Okay.  Because you gotta be prepared

7  for it.  There's gonna be talk about sex.

8          JUROR WALTERS: I mean, yeah, I certainly, you

9  know, wouldn't like to.

10         MS. BAKER: No, I wouldn't either.

11         JUROR WALTERS: Jeez.

12         MS. BAKER: I completely understand, but is your

13  discomfort sitting here talking to me going to get in the

14  way of your listening to the evidence?

15         JUROR WALTERS: I don't believe so.

16         MS. BAKER: Okay.  Now the Judge did tell you

17  about the reasonable doubt and the burden of proof, and

18  everybody still -- I think some people forgot that Mr.

19  Rainbolt's presumed innocent; correct?

20         SEVERAL JURORS: Yes.

21         MS. BAKER: Okay.  So at right this moment that

22  presumption exists; okay?  We all agree?

23         SEVERAL JURORS: Yes.

24         MS. BAKER: Might have forgotten.  It's okay.

25  And that at the end of the trial that presumption still

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

54

(Videotape, 10-07-14; 10:28:49)

1   exists until the prosecutor has met their burden of proof;
2   correct?  Now Ms. Johnson asked a bunch of you or asked
3   about being victims of sexual abuse.  Ms. Walters, do you
4   have children in your house?
5          JUROR WALTERS: Yes.
6          MS. BAKER: Okay.  How old are they?
7          JUROR WALTERS: 13 and I have a 19-year-old in
8   college.
9          MS. BAKER: Okay.  Well, congratulations.  That's
10  an accomplishments these days.  Now is your 13-year-old a
11  girl or a boy?
12         JUROR WALTERS: Girl.
13         MS. BAKER: And can you tell us about the most
14  difficult situation you've had with her in which you
15  thought she wasn't telling the truth?
16         JUROR WALTERS: Uhm, honestly, I -- to be
17  truthful, I haven't had -- she's a straight A student,
18  she's -- I haven't had a situation where I haven't thought
19  she was telling the truth, honestly.
20         MS. BAKER: Thank you.  That's awesome.  That's
21  awesome.
22         JUROR WALTERS: She's a good girl.
23         MS. BAKER: I've got a 3-year-old and a 6-year-
24  old and I can't say that, so ...
25         I walked into the living room one day and looked

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 85 of 301

(Videotape, 10-07-14; 10:28:49)

1    at my glasses that were broken on the chair and I went,

2    who did that?  And they both looked at me like what?  Who

3    did what?  Took five minutes for me to figure out who it

4    was.  Has anyone -- well, you've had the smoking pot;

5    right?  There's kind of big telltale signs when they're

6    smokin' pot.

7           MS. JUROR: Uh-huh.

8           MS. BAKER: Mr. Sturgeon, have you had problems

9    with your child?

10          JUROR STURGEON: I'm sure I have.  I can't -- any

11   come to mind right off the top of my head.  I mean, I'm

12   sure she's lied to me when she shut the video games off at

13   night or 1:00 in the morning.

14          MS. BAKER: Well, how do you -- has anyone had an

15   incident at -- well, Mr. Six, when you were at work or on

16   this -- oh, I have to tell you, my dad does the same thing

17   or has done the same thing as you but he's on the other

18   side of the state, so no competition there, but when you

19   said refrigeration I'm like, I know exactly what he does.

20   So anyway, have you ever in your work or home life had to

21   deal with someone who was lying?

22          JUROR SIX: Oh, yeah.  I actually have a 14-year-

23   old step-son.

24          MS. BAKER: Okay.

25          JUROR SIX: He don't have any brothers or sisters

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 86 of 301

(Videotape, 10-07-14; 10:28:49)

1    or anything and he does something and we catch him and he

2    won't admit to it for a couple hours.  I'm like you're the

3    only one here.  We know we didn't do it.

4            MS. BAKER: Right.

5            JUROR SIX: Damaging something in the house or

6    somethin'.

7            MS. BAKER: Sure.

8            JUROR SIX: Eventually he comes out and tells us

9    the truth, but sometimes it takes a bit to get it out of

10   him.

11           MS. BAKER: Well, what do you look for when

12   you're trying to figure out what the truth is?

13           JUROR SIX: Just something that don't make sense.

14   I mean, the track's right there, something's damaged, we

15   didn't do it, he did it.  There's no one else in the

16   house.  The cat didn't do it.

17           MS. BAKER: Sure, sure.  Okay.  Now, Ms. Walters,

18   I know you said that your daughter doesn't lie, but do you

19   think that all teenagers don't lie?

20           JUROR WALTERS: No.

21           MS. BAKER: Okay.  Did your 19-year-old lie?

22           JUROR WALTERS: Not that I ever really know about

23   yet.  I'm sure.

24           MS. BAKER: All right.  Then I'm gonna have to

25   ask this.  Did you lie when you were a teenager?

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 87 of 301

(Videotape, 10-07-14; 10:28:49)

1        JUROR WALTERS: Yep, I probably did.

2        MS. BAKER: I'm pretty sure a lot of people would

3    admit that.

4        JUROR WALTERS: Yeah.

5        MS. BAKER: And I can' honestly say that I was

6    drinking under age when I was in high school and I lied

7    about it to my parents until I got caught.

8        JUROR WALTERS: That's right.

9        MS. BAKER: Anybody else done that or something

10   like that?  Okay, see?  All right.  This is going to be a

11   credibility issue, ladies and gentlemen.  It's going to

12   require that you use your reason and common sense to

13   determine who's telling the truth.  Does that create any

14   concerns for any of you?  No?  Ms. Bose, I have to ask

15   that since you might know this young lady's mother, if you

16   find Mr. Rainbolt not guilty, is that going to create an

17   issue for you at work?

18       JUROR BOSE: I hope not, but I don't (inaudible).

19       MS. BAKER: Okay.  Do you think that that might

20   affect how you sit here today?

21       JUROR BOSE: (Inaudible.)

22       MS. BAKER: Okay, thank you.  Most of the

23   testimony that's going to -- or most of the evidence

24   that's coming into this trial is going to be coming from

25   witnesses who sit in this box here today.  I'm trying to

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 88 of 301

(Videotape, 10-07-14; 10:28:49)

1    speak up; sorry.  Does anyone require that I present any

2    testimony or evidence to the trial?  Anyone?  All right.

3    Good, because the rules are that the prosecutor has the

4    burden of proof; correct?  All right.

5           One of the things that you're going to hear are

6    about the elements of the crime in this case and how each

7    one has to be proven beyond a reasonable doubt.  Please

8    remember that that is the prosecutor's burden.  You're not

9    going to hear that reasonable or beyond a reasonable doubt

10   is the burden maintained by myself and Mr. Rainbolt.

11   Would anyone require that Mr. Rainbolt present -- or

12   testify?  What if he doesn't testify?

13           MS. JUROR: That's his right.

14           MS. BAKER: Pardon me?

15           MS. JUROR: That's his right.

16           MS. BAKER: I beg your pardon?

17           MS. JUROR: (Inaudible.)

18           MS. BAKER: You think he would look guilty?

19           MS. JUROR: (Inaudible.)

20           MS. BAKER: You agree with that, Ms. Osborn?

21           JUROR OSBORN: To an extent, you know.

22           MS. BAKER: Does anyone else agree with that,

23   that he would look guilty if he didn't take the stand?

24   No?  Mr. Pugh.

25           JUROR PUGH: Yes.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

59

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 89 of 301

(Videotape, 10-07-14; 10:28:49)

1    MS. BAKER: What do you think about that?

2    JUROR PUGH: If he didn't take the stand, that'd

3    give me a reason to (indistinguishable) to think negative

4    on his part.

5    MS. BAKER: All right.  Thank you for sharing

6    that.  Well, you are going to be instructed that he has

7    the right not to take the stand.  Would you be able to

8    think about that or put that expectation aside or not?  If

9    not there's -- like I said, there's no wrong answer.  I'm

10   not trying to pick on anyone.  Well, thank you, folks, I

11   appreciate it.  Is there anything that you folks think

12   that I should know or that the Court should know that

13   might interfere with your ability to be a fair and

14   impartial juror here?  I don't see any hands up.  I'm

15   going to ask this because during the last jury trial I had

16   one of the jurors seated after the first day of trial said

17   I won't have transportation to get back here tomorrow, so

18   I'm done.  Anyone have that problem?  I'm just throwing it

19   out there.  If you do, you need to tell us when you get up

20   here, so please let us know.  Okay?  All right.  Thank you

21   very much for your attention.

22   THE COURT: Okay.  The jury's with the People for

23   cause.

24   MS. JOHNSON: The People would move for cause on

25   juror number -- in seat number two, Mr. Pugh.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

60

(Videotape, 10-07-14; 10:28:49)

1        THE COURT: Any objection?

2        MS. BAKER: No.

3        THE COURT: All right.  Thank you, Mr. Pugh, you

4    may stand down.  If you are excused -- do they need to

5    call this evening?

6        THE CLERK: Yes, sir.

7        THE COURT: They do?

8        THE CLERK: They do.

9        THE COURT: Okay.  If you are excused, you're

10   excused for the day but you do need to call the jury clerk

11   this evening to see if your services will be needed

12   tomorrow.  Thank you.  Next juror, please?

13       THE CLERK: Mary Thornton.

14       THE COURT: Ms. Thornton, have you heard all the

15   questions that were asked of the other jurors?

16       JUROR THORNTON: Yes.

17       THE COURT: Based on those questions, is there

18   anyone who's been introduced that you are acquainted with?

19       JUROR THORNTON: No.

20       THE COURT: And based on those questions are you

21   aware of any reason why you could not be a fair and

22   impartial juror?

23       JUROR THORNTON: Yes.

24       THE COURT: You are?

25       JUROR THORNTON: Yes.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

61

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 91 of 301

(Videotape, 10-07-14; 10:28:49)

1 THE COURT: Okay. And why would that be?

2 JUROR THORNTON: I have a close family member who

3 was abused, but I don't want to talk about it because

4 there's another juror here who knows the parties and it

5 was never brought out.

6 THE COURT: And so is there some reason because

7 of that incident that you couldn't be fair and impartial

8 in this case? This is a totally different case.

9 JUROR THORNTON: No, but if I was answered --

10 asked the questions by them, I wouldn't want to answer.

11 THE COURT: Okay, but can you be fair and

12 impartial?

13 JUROR THORNTON: I don't know.

14 THE COURT: Okay, you're excused. You may stand

15 down, ma'am. You need to call. You'll be needed for a

16 trial tomorrow morning. Next juror, please?

17 THE CLERK: Shannon McKinnon.

18 THE COURT: Mr. McKinnon, have you heard all the

19 questions?

20 JUROR McKINNON: Yes.

21 THE COURT: Are you acquainted with anyone

22 involved in the case?

23 JUROR McKINNON: I heard Mark VanHook.

24 THE COURT: Okay. Is there anything about your

25 acquaintance with that person that would cause you to be

---

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 92 of 301

(Videotape, 10-07-14; 10:28:49)

1    not fair and impartial?

2         JUROR McKINNON: No.

3         THE COURT: Do you feel you can be fair and

4    impartial to both sides?

5         JUROR McKINNON: Yes.

6         THE COURT: Anything, Ms. Johnson?

7         MS. JOHNSON: How do you know that witness?

8         JUROR McKINNON: Family friend.  He's known me

9    since, well, since I was a little kid.

10        MS. JOHNSON: Okay.  Are you close with him?

11        JUROR McKINNON: Not -- somewhat.

12        MS. JOHNSON: Okay.  How often do you see him?

13        JUROR McKINNON: A few times a year.

14        MS. JOHNSON: Okay.  You said he's a family

15   friend.  Are you friends with the rest of his family?

16        JUROR McKINNON: No.  I know them, but ...

17        MS. JOHNSON: Is he friends with your family

18   then?

19        JUROR McKINNON: Yeah.

20        MS. JOHNSON: Who is he closest to in your

21   family?

22        JUROR McKINNON: My grandfather.

23        MS. JOHNSON: Have you talked to him at all about

24   parties involved in this case or the store involved in

25   this case?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 93 of 301

(Videotape, 10-07-14; 10:28:49)

1      JUROR McKINNON: No.

2      MS. JOHNSON: Do you have any personal knowledge

3  of that computer store?

4      JUROR McKINNON: No.

5      MS. JOHNSON: He is listed by the defense as a

6  witness, so if you were to find the Defendant guilty and

7  he were to disagree with that, would that cause you a

8  problem the next time you see him?

9      JUROR McKINNON: Possibly.

10     MS. JOHNSON: Okay.  Do you have -- can you

11 explain that?

12     JUROR McKINNON: I guess I really don't know how.

13 It'd be awkward.

14     MS. JOHNSON: Would that be on your mind if you

15 were sitting as a juror?

16     JUROR McKINNON: Yes.

17     MS. JOHNSON: Okay.  Would that be on your mind

18 as you're deliberating in the back?

19     JUROR McKINNON: (Inaudible.)

20     MS. JOHNSON: Okay, thank you.

21     THE COURT: Any questions, Ms. Baker?

22     MS. BAKER: Mr. McKinnon, when was the last time

23 you saw Mr. VanHook?

24     JUROR McKINNON: Beginning of summer.

25     MS. BAKER: So a few months now?  Do you see him

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 94 of 301

(Videotape, 10-07-14; 10:28:49)

1  once or twice a year or how often?

2       JUROR McKINNON: I think a few times a year.

3  He's part of my grandpa's company.  He was part of it back

4  in the days.  He's really close friends with my grandpa.

5       MS. BAKER: Okay.  So when you see your grandpa,

6  is that when you see Mr. VanHook?

7       JUROR McKINNON: He'll come into work sometimes

8  and stuff.

9       MS. BAKER: Do you work with your grandpa?

10       JUROR McKINNON: Yeah, I work at the family

11  business.

12       MS. BAKER: The screen printing business?

13       JUROR McKINNON: It's all kinds of graphic stuff

14  and it's not just screen printing, but, yes.

15       MS. BAKER: Okay.  I was just reading your jury

16  questionnaire.  That's all.  I think that's what I saw

17  written down.  That was my note at least.  So when you are

18  seeing him just a couple times a year, you're saying that

19  that relationship would color your ability to sit here and

20  listen to testimony?

21       JUROR McKINNON: I -- well, I guess I look at him

22  like as a uncle, so he's always just, I don't know, I look

23  him as a leader, I guess.

24       MS. BAKER: Okay, all right.  Thank you.

25  Appreciate it.

_Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823_

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 95 of 301

(Videotape, 10-07-14; 10:28:49)

1          THE COURT: Okay.  Any challenges for cause, Ms.

2    Baker?

3          MS. BAKER: We would thank and -- or we would

4    challenge for cause Ms. Osborn in seat number six.

5          THE COURT: Position on that, Ms. --

6          MS. JOHNSON: No, your Honor.

7          THE COURT: Pardon?

8          MS. JOHNSON: No, I'm not taking a position.

9          THE COURT: Okay.  Ms. Osborn, you're excused for

10   cause.  Thank you.

11         THE CLERK: Michelle Johnson.

12         THE COURT: Okay, Ms. Johnson.  Are you

13   acquainted with anyone involved in the case?

14         JUROR JOHNSON: No.

15         THE COURT: Did you hear all the questions that

16   were asked of the other folks?

17         JUROR JOHNSON: Yes.

18         THE COURT: Is there any question that was raised

19   that would cause you to not be fair and impartial here?

20         JUROR JOHNSON: No.

21         THE COURT: Okay.  You feel you can be fair and

22   impartial to both sides?

23         JUROR JOHNSON: Yes.

24         THE COURT: Pardon?

25         JUROR JOHNSON: Yes.  I'm nervous; sorry.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

66

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 96 of 301

(Videotape, 10-07-14; 10:28:49)

1    THE COURT: That's okay.  I just want to make

2  sure I heard you.  You said you could be.

3    JUROR JOHNSON: Yes.

4    THE COURT: Okay, thank you, ma'am.  Ms. Johnson,

5  anything?

6    MS. JOHNSON: Thank you, your Honor.  Good

7  morning, Ms. Johnson.  We're not related.

8    JUROR JOHNSON: No, we're not.

9    MS. JOHNSON: Have you or anybody close to you

10  ever been either a victim of a sexual crime or accused of

11  a sexual crime?

12    JUROR JOHNSON: Uhm, one of my friends, we're not

13  close anymore, but when she was 12 she was sexually

14  assaulted.

15    MS. JOHNSON: Okay.  Did you talk to her about

16  the facts of what had happened?

17    JUROR JOHNSON: No.

18    MS. JOHNSON: Okay.  How did you find out about

19  it?

20    JUROR JOHNSON: Our moms are good friends, so I

21  heard about it from my mom.

22    MS. JOHNSON: Okay.  So you were friends with her

23  back when it had happened?

24    JUROR JOHNSON: Yeah.

25    MS. JOHNSON: Okay.  And you never talked to her

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

67

(Videotape, 10-07-14; 10:28:49)

1   about it; right?

2          JUROR JOHNSON: No, 'cause I was 12 so it's one

3   of those things, I guess, you don't really want to talk

4   about it.

5          MS. JOHNSON: I can understand that.  Do you know

6   anything about whether that person was arrested or went

7   through the court process?

8          JUROR JOHNSON: Yes.

9          MS. JOHNSON: Are you aware of anything involved

10  with that?

11         JUROR JOHNSON: Uhm, I mean I know what happened

12  to him.

13         MS. JOHNSON: Okay.  Do you think she was treated

14  fairly throughout the process?

15         JUROR JOHNSON: Yes.

16         MS. JOHNSON: You think the process worked in

17  that case?

18         JUROR JOHNSON: Uh-huh.

19         MS. JOHNSON: Okay.  Is there anything about that

20  that you would not be able to set aside as you sit here?

21         JUROR JOHNSON: I mean, it's hard, I mean

22  hearing, you know, just what we know but I'd like to think

23  that I can be partial?

24         MS. JOHNSON: Impartial.

25         JUROR JOHNSON: Impartial, yeah.  Not partial.

_Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823_

68

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 98 of 301

(Videotape, 10-07-14; 10:28:49)

1    I'm sorry.

2              MS. JOHNSON: Do you know what her relationship

3    was to the person who did that to her?

4              JUROR JOHNSON: Uhm, they weren't related.

5              MS. JOHNSON: They were not, okay.

6              JUROR JOHNSON: No.

7              MS. JOHNSON: Was it a close friend or more of an

8    acquaintance; do you know?

9              JUROR JOHNSON: It was in the bathroom in K-Mart.

10             MS. JOHNSON: So like a stranger?

11             JUROR JOHNSON: So it was a stranger.

12             MS. JOHNSON: Oh, okay, okay.  So really not

13   similar to the facts or the relationship here at all?

14             JUROR JOHNSON: (Indistinguishable.)

15             MS. JOHNSON: Do you think all vict -- would you

16   expect all victims to react the same way your friend did?

17             JUROR JOHNSON: I don't know.

18             MS. JOHNSON: Okay.  If you see differences

19   between the victim who testifies and your friend, would

20   you assume that the victim's lying?

21             JUROR JOHNSON: No.

22             MS. JOHNSON: Now did you hear the conversation

23   about testimonial evidence only, that really all of the

24   evidence is going to come from witnesses?

25             JUROR JOHNSON: Yes.

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 99 of 301

(Videotape, 10-07-14; 10:28:49)

1      MS. JOHNSON: Is that going to be enough to prove

2  a case to you beyond a reasonable doubt or are you going

3  to say, you know, Christina, no, you need to give me

4  something that I can hold and say this is evidence?

5      JUROR JOHNSON: I don't know.  I mean I -- we, of

6  course, have to because there isn't any, you know,

7  physical evidence but it's hard, you know.  How do you

8  take your opinion out of that?  So I think, you know -- I

9  think I can.  I just don't know, you know.  I guess I'd

10  have to think about how exactly to do that, you know,

11  because you're just hearing opinions, you know.

12  Everyone's saying what they think.

13      MS. JOHNSON: Are you comfortable deciding if

14  somebody's telling the truth?

15      JUROR JOHNSON: I never really thought about it

16  until today, so I guess yes.  I never had to think about

17  it before, so ...

18      MS. JOHNSON: Have you ever been lied to?

19      JUROR JOHNSON: Yes.

20      MS. JOHNSON: And how did you know you were being

21  lied to?

22      JUROR JOHNSON: Hmmm.  I guess maybe you hear

23  from other people and then you find out from the person

24  that they lied to you (inaudible.)

25      MS. JOHNSON: You confronted the person who lied

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 100 of 301

(Videotape, 10-07-14; 10:28:49)

1    to you or you talked to them about it?

2              JUROR JOHNSON: I guess more I would just avoid

3    them, I guess?

4              MS. JOHNSON: Okay.

5              JUROR JOHNSON: His view.  I guess -- so I guess

6    maybe then I'm assuming that they lied.  You're right.

7              MS. JOHNSON: Okay.  So you've never had an

8    instance where you've talked -- caught somebody in a lie

9    or confronted them about a lie?

10             JUROR JOHNSON: I'm sure I have.  I just can't

11   think of a time right off the top of my head.

12             MS. JOHNSON: Okay.  Have you ever been in a

13   mental hospital or a jail?

14             JUROR JOHNSON: No.

15             MS. JOHNSON: Let me just look real quickly at

16   some notes I have.  What's your degree in?

17             JUROR JOHNSON: Health management.

18             MS. JOHNSON: Do you work closely with doctors

19   and nurses?

20             JUROR JOHNSON: I work in a dentist's office.

21             MS. JOHNSON: A dentist's office, okay.  Okay.

22   That's all the questions I have for you.  Thank you.

23             THE COURT: Ms. Baker?

24             MS. BAKER: Thank you.  Ms. Johnson, did you hear

25   my questions?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

71

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 101 of 301

(Videotape, 10-07-14; 10:28:49)

1   JUROR JOHNSON: Yes.

2   MS. BAKER: Do you have any answers that we

3   should talk about?

4   JUROR JOHNSON: No.

5   MS. BAKER: Any concerns that you have about

6   sitting as a juror here today?

7   JUROR JOHNSON: I think it will be hard to hear,

8   you know, what people have to say but other than that I

9   can't think of anything.

10   MS. BAKER: When you say it'll be hard to hear

11   it, do you think that is going to prevent you from

12   listening closely?

13   JUROR JOHNSON: No.  I think it makes you listen

14   more closely because you want to, you know, try to hear

15   from that what's right and what's not.

16   MS. BAKER: All right.  Thank you.

17   THE COURT: The jury's with the People for cause.

18   MS. JOHNSON: Your Honor, the People would move

19   to strike Mr. McKinnon in seat number two for cause based

20   on his relationship with a defense witness.  He described

21   him as like an uncle, and he (indistinguishable.)

22   MS. BAKER: I'll leave it to the Court's

23   discretion.

24   THE COURT: Okay.  Mr. McKinnon, thank you, sir.

25   You're excused for cause.  You will be called tomorrow for

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 102 of 301

(Videotape, 10-07-14; 10:28:49)

1  jury service so please call this evening.

2        THE CLERK: Kathy Dawson.

3        THE COURT: Ms. Dawson, are you acquainted with

4  anybody involved in the case?

5        JUROR DAWSON: No.

6        THE COURT: Did you hear all the questions that

7  were asked by the attorneys?

8        JUROR DAWSON: Yes.

9        THE COURT: Is there anything that was brought up

10  in those questions that would cause you to be less than

11  fair and impartial for these sides here?

12        JUROR DAWSON: I don't think so.  I think I could

13  be fair and impartial.

14        THE COURT: Okay, thank you, ma'am.  That's all

15  we're looking for.  Did you have anything, Ms. Johnson?

16        MS. JOHNSON: Yes, your Honor.  Ms. Dawson, have

17  you or anybody close to you ever been a victim of or

18  accused of a sexual crime?

19        JUROR DAWSON: I babysat for a little girl who

20  was abused by her adopted father.

21        MS. JOHNSON: Okay.  How did you find out about

22  that?

23        JUROR DAWSON: They arrested the father at work.

24        MS. JOHNSON: Did you talk with her mother or

25  anybody close to the case about what had happened?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

73

(Videotape, 10-07-14; 10:28:49)

1        JUROR DAWSON: Well, we followed the case.

2        MS. JOHNSON: You did.

3        JUROR DAWSON: And I no longer baby -- had

4   babysat for her.

5        MS. JOHNSON: Okay.

6        JUROR DAWSON: And this happened when she was

7   more like a teenager.

8        MS. JOHNSON: Okay.  Are you going to be able to

9   set that aside and listen to the testimony and evidence in

10  this case?

11       JUROR DAWSON: I think so.

12       MS. JOHNSON: Okay.  I know that -- the issue

13  that we've talked about with a couple of people about

14  testimonial versus physical evidence, sorry I gotta get

15  behind the microphone, would you be able to judge a case

16  based on testimonial evidence only?

17       JUROR DAWSON: You know, you see all these shows,

18  I follow Criminal Minds.

19       MS. JOHNSON: Okay.

20       JUROR DAWSON: And they always have lots of

21  evidence or they have to prove the evidence or whatever.

22  So never being involved in a court before, that sticks in

23  my head, you know, evidence, physical evidence.

24       MS. JOHNSON: Would you agree that those TV shows

25  are some based on reality but also some Hollywood magic

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

74

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 104 of 301

(Videotape, 10-07-14; 10:28:49)

1   stuff?

2           JUROR DAWSON: Yes.

3           MS. JOHNSON: Okay.  Do you know how much is real

4   and how much fake?

5           JUROR DAWSON: No.  I also believe in God but

6   I've never seen him either, so ...

7           MS. JOHNSON: Okay.  But my point is you don't

8   know how much of it's real and how much of it's not;

9   right?

10          JUROR DAWSON: Right.

11          MS. JOHNSON: So can you agree to leave any

12  assumptions that those shows give you outside of the

13  courtroom?

14          JUROR DAWSON: Yes.

15          MS. JOHNSON: Okay, and listen to the testimony

16  and the evidence as it comes in here.  And if an expert

17  witness, a doctor, were to say something different than

18  what you've seen on those shows, would that cause you to

19  disbelieve the doctor or would you keep an open mind as to

20  what the doctor was saying or the expert witness?

21          JUROR DAWSON: Well, I respect the physician

22  because of his knowledge; however, they're not always

23  right either, so ...

24          MS. JOHNSON: Are you -- would you be skeptical

25  of an expert witness or would you listen to them with an

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

75

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 105 of 301

(Videotape, 10-07-14; 10:28:49)

1    open mind and decide for yourself if you believe them?

2          JUROR DAWSON: What determines an expert witness?

3          MS. JOHNSON: Well, you're gonna hear

4    qualifications and it's up to you to decide whether you

5    think they're an expert.

6          JUROR DAWSON: Okay.  So it's not because of

7    their degree or --

8          MS. JOHNSON: Uhm, I'm not sure how much I can

9    answer of what you're asking.  I'm just -- are you willing

10   to listen with an open mind and decide whether you believe

11   them is what I'm looking for.

12         JUROR DAWSON: Yes.

13         MS. JOHNSON: Okay.  You are, okay.  Now back to

14   the idea of testimonial evidence.  If you believe, and I'm

15   asking you to assume that you believe the witnesses, okay,

16   for this and if what they say proves the elements, will

17   you be able to render a guilty verdict based on testimony

18   alone or will you require me to bring in something you can

19   hold, something you can see?

20         JUROR DAWSON: No, I don't have to have anything

21   to hold or to see.

22         MS. JOHNSON: Okay.

23         JUROR DAWSON: That just seems -- it does seem --

24   I mean, I don't know if you can answer this for me.  It

25   does seem if you're going to accuse somebody of something

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 106 of 301

(Videotape, 10-07-14; 10:28:49)

1    that you should have --

2          MS. JOHNSON: Okay. So your answer to my question

3    is no, even if you believed them you wouldn't be able

4    to --

5          JUROR DAWSON: No.  Like I said, it's -- it would

6    determine, I guess.  You'd have to hear all the facts

7    first before you could make that assumption.

8          MS. JOHNSON: I'm asking you if you believed

9    them.  If you hear everything and if you believe --

10         JUROR DAWSON: Without any physical evidence?

11         MS. JOHNSON: Without any physical evidence.

12         JUROR DAWSON: If I believed them?

13         MS. JOHNSON: Yes.

14         JUROR DAWSON: Yes.

15         MS. JOHNSON: Okay.  And it's up to you to

16    determine why and how you believe them.

17         JUROR DAWSON: Beyond a reasonable doubt.

18         MS. JOHNSON: Beyond a reasonable doubt, but if

19    you believed them, words alone can reach beyond a

20    reasonable doubt for you?

21         JUROR DAWSON: It'd have to be beyond a

22    reasonable doubt.

23         MS. JOHNSON: Well, of course, everything for

24    guilty verdict does.  Okay.  Okay, thank you.

25         THE COURT: Okay.  Ms. Baker, any questions?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 107 of 301

(Videotape, 10-07-14; 10:28:49)

1    MS. BAKER: No, I have no questions for this

2    witness -- or excuse me, this juror.

3    THE COURT: Okay.  Any challenges for cause by

4    the Defendant?

5    MS. BAKER: We would challenge for cause Mr.

6    Sturgeon, number 13.

7    THE COURT: Okay.  Your basis?

8    MS. BAKER: He indicated he would not be able to

9    sit here fairly based on his relationship with a prior

10   victim.

11   THE COURT: Okay.  Any comment you want to have,

12   Ms. Johnson?

13   MS. JOHNSON: No, your Honor.

14   THE COURT: Okay, thank you, Mr. Sturgeon.

15   You're excused.

16   THE CLERK: Karen Geller.

17   THE COURT: Okay, Ms. Geller.  Have you heard all

18   the questions?

19   JUROR GELLER: Yes, sir.

20   THE COURT: Are you acquainted with anybody

21   involved in the case?

22   JUROR GELLER: No.

23   THE COURT: Are you aware of any reason based on

24   these questions why you couldn't be fair and impartial?

25   JUROR GELLER: No.

---

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

78

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 108 of 301*

(Videotape, 10-07-14; 10:28:49)

1      THE COURT: Okay, thank you.  Ms. Johnson, any
2  questions?
3      MS. JOHNSON: Your last name is Geller, with a G?
4      JUROR GELLER: Yes.  I probably am on there as
5  Webster.  I recently got married.
6      MS. JOHNSON: Thank you.  Have you or anyone
7  close to you ever been a victim or accused of a sexual
8  crime?
9      JUROR GELLER: No.
10      MS. JOHNSON: You've heard me talk with a couple
11  people about the idea of testimonial versus physical
12  evidence.  If you believe the testimony, would that be
13  enough for you to return a guilty verdict if it meets the
14  elements beyond a reasonable doubt or would you need --
15      JUROR GELLER: Yes.
16      MS. JOHNSON: Yes?
17      JUROR GELLER: Yes.
18      MS. JOHNSON: Okay.  What's your degree in?
19      JUROR GELLER: Food science.
20      MS. JOHNSON: Have you ever been in a jail or a
21  mental institution for any reason?
22      JUROR GELLER: Just as a visitor.
23      MS. JOHNSON: To which one?
24      JUROR GELLER: Ionia.
25      MS. JOHNSON: To jail or --

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

79

(Videotape, 10-07-14; 10:28:49)

1    JUROR GELLER: Yeah.  It was actually part of a

2    class.  When I was in college we spent part of the day

3    there.

4    MS. JOHNSON: Okay.

5    MS. GELLER: That's it.

6    MS. JOHNSON: So no professional reason other

7    than a class to be there?

8    MS. GELLER: No, no.

9    MS. JOHNSON: Okay.  Thank you.

10    THE COURT: Ms. Baker, any questions?

11    MS. BAKER: Yes, thank you.  Congratulations on

12    your marriage.

13    JUROR GELLER: Thank you.

14    MS. BAKER: Ms. Geller, do you have any strong

15    feelings about the nature of this case?

16    JUROR GELLER: Uhm, like many other jurors have

17    said, it's upsetting.  I do have a 17-year-old daughter.

18    MS. BAKER: Okay.  Is that going to color your

19    view of the testimony here?

20    JUROR GELLER: I don't think so.

21    MS. BAKER: All right.  Is she like Ms. Walters,

22    whose daughter doesn't lie or is she like somebody else's?

23    JUROR GELLER: I had to laugh because my daughter

24    is also a straight A student, a good kid, but I am sure

25    she has told some falsehoods that I just haven't caught

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

80

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 110 of 301

(Videotape, 10-07-14; 10:28:49)

1   her in.

2                MS. BAKER: Okay, all right.  Have you caught her

3   in some?

4                JUROR GELLER: No, really I haven't.

5                MS. BAKER: Oh, okay.

6                JUROR GELLER: Unless maybe I -- maybe when she

7   was tiny and, you know, little kids.  No, I didn't do that

8   but (indistinguishable.)

9                MS. BAKER: Do you think that a child would -- do

10  you think that a child would not lie about a sexual act?

11               JUROR GELLER: Would not lie?  I -- ooh, that's

12  hard.  Uhm, I think they could if there were certain

13  circumstances.

14               MS. BAKER: Okay.  What do you think those

15  circumstances would be?

16               JUROR GELLER: Well, there was a case, uhm, uhm,

17  in Montague a few years ago where somebody accused another

18  person and I know -- I knew the people a bit, not -- I

19  mean, just kind of as acquaintances and have a sister who

20  works at the school and, you know, you hear the

21  scuttlebutt there, and they felt that the young man was

22  falsely accused.

23               MS. BAKER: Okay.

24               JUROR GELLER: But -- so is it possible that

25  someone lies?  Sure.

---

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

81

(Videotape, 10-07-14; 10:28:49)

1      MS. BAKER: Okay.  I think I know which case

2  you're talking about.  It was quite newsworthy at the

3  time.

4      JUROR GELLER: Yeah, it was.  It was --

5      MS. BAKER: Yes.  Especially in Montague, I

6  think.

7      JUROR GELLER: Yeah.

8      MS. BAKER: Yep.  I remember.  Thank you.  I

9  appreciate your candor here today.  Thanks.

10     THE COURT: Any challenges for cause?  Okay, the

11  jury is with the People for --

12     MS. JOHNSON: Wait, Judge, I do have a challenge

13  for cause.  I just wasn't sure which side you were asking.

14     THE COURT: Okay.

15     MS. JOHNSON: The juror in seat number 10, Ms.

16  Denio, based on her statement that testimony alone is not

17  enough for a conviction or for proof beyond a reasonable

18  doubt.

19     THE COURT: If I instruct you, Ms. Denio, that

20  the testimony of one witness alone, if believed, can be

21  enough to establish all of the elements of the offense,

22  will you follow that instruction?

23     JUROR DENIO: Yes, sir.

24     THE COURT: Okay.  Your motion is denied.  Any

25  challenges for cause?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

82

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 112 of 301

(Videotape, 10-07-14; 10:28:49)

1        MS. BAKER: Yes.  We would challenge Ms. Shanty

2   in number 7.

3        THE COURT: Okay.  And reason?

4        MS. BAKER: She indicated that her relationship

5   with another victim of a criminal sexual conduct case

6   would color her ability to sit here.

7        MS. JOHNSON: I heard the same.

8        THE COURT: Okay.  You may stand down.  Thank

9   you.

10       THE CLERK: Joshua Glerum.

11       THE COURT: Mr. Glerum, have you heard all the

12  questions?

13       JUROR GLERUM: Yes, I have.

14       THE COURT: Is there anybody that you're

15  acquainted with in the case?

16       JUROR GLERUM: Nope.

17       THE COURT: Are you aware of any reason why you

18  could not be fair and impartial based on these questions?

19       JUROR GLERUM: No, sir.

20       THE COURT: Okay, thank you.  Any questions, Ms.

21  Johnson?

22       MS. JOHNSON: Thank you, your Honor.  Sir, have

23  you or anybody close to you been the victim of a sexual

24  crime or accused of a sexual crime?

25       JUROR GLERUM: No.

_Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823_

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 113 of 301

(Videotape, 10-07-14; 10:28:49)

1  MS. JOHNSON: Okay.  And the issue of testimonial

2  versus physical evidence, if you know there is nothing for

3  you to hold, no physical evidence for you to see, only

4  testimony, if you believe that testimony, is that enough

5  to prove a case to you beyond a reasonable doubt?

6  JUROR GLERUM: I believe so.

7  MS. JOHNSON: Okay.  Have you ever been in a jail

8  or a mental hospital for any reason, as a visitor or

9  anything?

10  JUROR GLERUM: No.

11  MS. JOHNSON: Thank you.

12  THE COURT: Okay.  Any questions, Ms.'Baker?

13  MS. BAKER: Just, Mr. Glerum, did you hear my

14  questions?

15  JUROR GLERUM: I did.

16  MS. BAKER: I saw you -- you were sitting in the

17  front row so you were pretty close.

18  JUROR GLERUM: Front and center.

19  MS. BAKER: Lucky.  You were one of the last to

20  come in.

21  JUROR GLERUM: It's awesome.

22  MS. BAKER: You're a teacher; correct?

23  JUROR GLERUM: I am.

24  MS. BAKER: All right.  Did any of my questions

25  prompt any thoughts in your mind that you felt you should

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

84

(Videotape, 10-07-14; 10:28:49)

1  bring them up here?

2          JUROR GLERUM: No.  I think like everybody else.

3  I -- you hear some of the charges and you -- and

4  accusations and you cringe a little bit, but other than

5  that, no.

6          MS. BAKER: Okay.  Is your employment going to be

7  okay with you being on jury duty?

8          JUROR GLERUM: Uhm, I'm also the athletic

9  director, so I realize it's my civic responsibility to

10  serve and that's something that I take really seriously,

11  uhm, but at the same time would -- would we have to do

12  some shuffling around?  Yes.

13          MS. BAKER: Okay.  Do you have some activities

14  that are scheduled in the afternoons this week?

15          JUROR GLERUM: Yeah, every day.

16          MS. BAKER: Every day, okay.  And what time are

17  those scheduled for?

18          JUROR GLERUM: Today we've got two volleyball

19  games, we've got a home cross country meet and two soccer

20  games.

21          MS. BAKER: A busy day, huh?  You're the director

22  of the entire athletic department at this school?

23          JUROR GLERUM: Western Michigan Christian.

24          MS. BAKER: So would that create a burden on your

25  employer?

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

85

(Videotape, 10-07-14; 10:28:49)

1        JUROR GLERUM: They get subs every day.  Uhm,
2   would it be challenging for them?  Yeah, probably.  Is it
3   too much to ask from them?  No, probably not.  We could
4   work it out.
5        MS. BAKER: Okay.  Thank you for your candor.
6        THE COURT: Okay.  Any challenges for cause, Ms.
7   Baker?
8        MS. BAKER: Mine was the last challenge for
9   cause, but if you --
10       THE COURT: Okay.  Ms. Johnson, any challenges
11   for cause?
12       MS. JOHNSON: No, your Honor.
13       THE COURT: Okay.  Ms. Baker, any cause
14   challenges?
15       MS. BAKER: No, not for cause.
16       THE COURT: The jury's with the People
17   peremptorily.
18       MS. JOHNSON: The People would thank and excuse
19   the juror in seat number 2, Ms. Dawson.
20       THE COURT: Okay.  Ms. Dawson, you may stand
21   down.  Thank you.
22       THE CLERK: Michael Haver.
23       THE COURT: Okay, Mr. Haver.  Have you heard all
24   the questions that were asked?
25       JUROR HAVER: Yep, yes.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 116 of 301

(Videotape, 10-07-14; 10:28:49)

1       THE COURT: Okay.  Are you acquainted with

2  anybody involved in the case?

3       JUROR HAVER: No.

4       THE COURT: Are you aware of based on these

5  questions of any reason why you could not be fair and

6  impartial?

7       JUROR HAVER: No.

8       THE COURT: Okay.  Any questions, Ms. Johnson?

9       MS. JOHNSON: Thank you, your Honor.  Mr. Haver,

10  have you or anybody close to you ever been a victim or

11  accused of a sexual crime?

12       JUROR HAVER: (Inaudible.)

13       MS. JOHNSON:  You've heard us talk about the

14  testimonial versus physical evidence now a number of

15  times, but it's one I feel I need to ask again.  If you

16  believed the testimony that comes from the witness stand

17  and it proves each of the elements beyond a reasonable

18  doubt to you, are you comfortable returning a guilty

19  verdict without physical evidence?

20       JUROR HAVER: Yeah.

21       MS. JOHNSON: All right.  If an expert says

22  something that's contrary to something you believe, do you

23  have an open mind to hear something like that?  Can you

24  answer out loud?

25       JUROR HAVER: Yes.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

87

(Videotape, 10-07-14; 10:28:49)

1    MS. JOHNSON: Okay, thank you.

2    THE COURT: Ms. Baker?

3    MS. BAKER: Mr. Haver, did you hear all of my

4    questions?

5    JUROR HAVER: Yes.

6    MS. BAKER: Did you -- did any of my questions

7    prompt any thoughts to discuss that with me now?

8    JUROR HAVER: No.

9    MS. BAKER: Okay, thank you.

10    THE COURT: Okay.  If there's no challenge for

11    cause, the jury is with the Defendant.

12    MS. BAKER: We would thank and excuse Ms. Walters

13    in seat 11.

14    THE COURT: Ms. Walters, thank you.  You may

15    stand down.

16    THE CLERK: Karen Selby.

17    THE COURT: Okay.  Ms. Selby, are you acquainted

18    with anyone involved in the case?

19    JUROR SELBY: No, I'm not.

20    THE COURT: Based on the questions that were

21    asked, are you aware of any reason why you could not be

22    fair and impartial?

23    JUROR SELBY: Uhm, the fact that I've worked in

24    the police department and register sex offenders every day

25    might make it a little bit hard for me to be impartial.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 118 of 301

(Videotape, 10-07-14; 10:28:49)

1    THE COURT: Okay.  Well, it may be hard for

2    everybody, but can you be fair and impartial?  That's the

3    question.

4    JUROR SELBY: I would do my best, yes.

5    THE COURT: Okay.  Any questions, Ms. Johnson?

6    MS. JOHNSON: Good morn -- or good afternoon I

7    guess now.  What do you do at Norton Shores Police?

8    MS. SELBY: I'm a clerk.  I make up court files,

9    register sex offenders, take phone calls, take some

10   (indistinguishable.)

11   MS. JOHNSON: Do you interact with the police

12   officers?

13   JUROR SELBY: Yes.

14   MS. JOHNSON: Okay.  Do you think you would be

15   able to judge an officer who was testifying the same as

16   you would any other witness and decide for yourself

17   whether they were believable or do you think because

18   they're a police officer you would automatically believe

19   them just a little more?

20   JUROR SELBY: I would be impartial.

21   MS. JOHNSON: Okay.  Uhm, I just want a yes or a

22   no to this one.  Do you know the penalty for this crime?

23   Yes or no only.

24   JUROR SELBY: No.

25   MS. JOHNSON: Okay.  Have you or anybody close to

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 119 of 301

(Videotape, 10-07-14; 10:28:49)

1    you ever been a victim or accused of a sexual crime?

2              JUROR SELBY: I have a niece that was a victim

3    and I have a girlfriend who's daughter was a victim.

4              MS. JOHNSON: Okay.  How much do you know about

5    each of those cases or incidents?

6              JUROR SELBY: It's been a while for both of them,

7    so, uhm, I knew at the time pretty much, but I don't

8    remember all of it.

9              MS. JOHNSON: Okay.  Would you be able to set

10   that aside and listen to the testimony and decide if you

11   believe what's being said today or this week?

12             JUROR SELBY: Yes.

13             MS. JOHNSON: Okay.  If a victim were to act --

14   do you have an idea of how every victim should act in a

15   sex case?

16             JUROR SELBY: No.

17             MS. JOHNSON: Do you think they all act the same?

18             JUROR SELBY: No.  (Indistinguishable.)

19             MS. JOHNSON: Okay.  And if you only hear

20   testimony and there's no physical evidence, if you believe

21   that, is that enough for you to return a guilty verdict if

22   it's proven beyond a reasonable doubt all of the elements?

23             JUROR SELBY: (Inaudible.)

24             MS. JOHNSON: Thank you.

25             THE COURT: Okay, Ms. Baker, any questions?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 120 of 301

(Videotape, 10-07-14; 10:28:49)

1            MS. BAKER: Thank you.  Hi.  How are you?

2            JUROR SELBY: I'm good.

3            MS. BAKER: Good.  I don't think that we've

4    formally met, but I recall reading your name in multiple

5    police reports coming out of Norton Shores Police

6    Department.

7            JUROR SELBY: I've been there a long time.

8            MS. BAKER: So you have as part of your job

9    duties, one of the things that you do is enter things into

10   a police report; correct?

11           JUROR SELBY: Yes.

12           MS. BAKER: And the things that you enter into

13   the police report are either things that are reported to

14   you by civilians or the police officers; correct?

15           JUROR SELBY: Generally civilians.

16           MS. BAKER: Okay.  So you are part of that

17   investigative process for the police department; correct?

18           JUROR SELBY: I wouldn't say the investigative

19   process.  I would never do, like, follow-ups on any

20   reports.  I would take the information, statement from the

21   person and write it up, but if it needed follow-up, it

22   would go to an officer to follow up.

23           MS. BAKER: Do you think that that part of your

24   employment or your work through the police department

25   might interfere with your ability to listen fairly to the

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

91

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 121 of 301

(Videotape, 10-07-14; 10:28:49)

1    evidence?

2            JUROR SELBY: I don't think so.  I'm non-

3    judgmental.

4            MS. BAKER: Okay, thank you.

5            THE COURT: There's no challenge for cause --

6    well, is there any challenge for cause at this time?

7            MS. JOHNSON: No, your Honor.

8            MS. BAKER: No, your Honor.

9            THE COURT: Okay.  There being none, the

10   Defendant -- or pardon me -- the jury is with the People.

11           MS. JOHNSON: The People would thank and excuse

12   the juror in seat number 10, Ms. Denio.

13           THE COURT: Ms. Denio, you may stand down.  Thank

14   you.

15           THE CLERK: Christina Coldise Clark.

16           THE COURT: Ms. Clark, have you heard all the

17   questions that were asked?

18           JUROR CLARK: Yes, sir.

19           THE COURT: Are you acquainted with anyone

20   involved in the case?

21           JUROR CLARK: No, I'm not.

22           THE COURT: Are you aware of any reason why you

23   could not be fair and impartial?

24           JUROR CLARK: I don't think so.

25           THE COURT: Okay.  Ms. Johnson, anything?

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 122 of 301

(Videotape, 10-07-14; 10:28:49)

1        MS. JOHNSON: Thank you. It says you used to be

2   professor?

3        JUROR CLARK: Yes.

4        MS. JOHNSON: What did you teach?

5        JUROR CLARK: Food science.

6        MS. JOHNSON: Okay. Have you or anyone close to

7   you ever been the victim or accused of a sexual crime?

8        JUROR CLARK: No.

9        MS. JOHNSON: And if an expert were to come in

10  and say something different than something you kind of

11  have always thought, would you be open to hearing

12  differently from an expert if it's a field you're not an

13  expert in?

14        JUROR CLARK: I believe so.

15        MS. JOHNSON: Okay. And now we've talked about

16  this testimonial thing with everyone. Do you think you

17  can jud -- if you believe it, can return a guilty verdict

18  based on testimony only?

19        JUROR CLARK: I believe so.

20        MS. JOHNSON: Okay, thank you.

21        THE COURT: Questions, Ms. Baker?

22        MS. BAKER: Did you hear all of my questions?

23        JUROR CLARK: I believe so.

24        MS. BAKER: And did any of them prompt any

25  thoughts that we should discuss your answers?

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 123 of 301

(Videotape, 10-07-14; 10:28:49)

1        JUROR CLARK: No.

2        MS. BAKER: Okay.  Were they similar to the other

3    people who are seated up --

4        JUROR CLARK: Sure, sure.  The nature of the case

5    is disturbing, but I would like to think I'm impartial,

6    so ...

7        MS. BAKER: Okay, thank you.

8        THE COURT: Okay.  If there's no cause

9    challenges, the jury is with the Defendant.

10       MS. BAKER: We would thank and excuse Ms.

11   Anthony, the 9 --

12       THE COURT: Ms. Anthony, thank you.  You may

13   stand down.

14       THE CLERK: Jill Ann Keevy.

15       THE COURT: Is it Keevy; is that correct?

16       JUROR KEVY: Kevy.

17       THE COURT: Kevy?  Ms. Kevy, have you heard all

18   the questions?

19       JUROR KEVY: Yes.

20       THE COURT: Are you acquainted with anyone

21   involved in the case?

22       JUROR KEVY: No.

23       THE COURT: Are you aware of any reason why you

24   could not be fair and impartial?

25       JUROR KEVY: I had a cousin that was charged with

_Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823_

94

(Videotape, 10-07-14; 10:28:49)

1   a mol -- somewhat similar crime, exposure, and he owned a

2   small store with a clerk that worked for him.

3           THE COURT: Okay.  Well, that's a totally

4   different set of facts and circumstances.  Could you be

5   fair and impartial in this case?

6           JUROR KEVY: I'd try to.

7           THE COURT: Okay.  Ms. Johnson, any questions?

8           MS. JOHNSON: Thank you.  How long ago was that?

9           JUROR KEVY: Probably about 15, maybe 18 years

10  ago.

11          MS. JOHNSON: Okay.  And did you talk to your

12  cousin during the pendency of that case?

13          JUROR KEVY: No, he lived in a different city.

14          MS. JOHNSON: Okay, all right.  You've heard my

15  questions about testimonial versus physical evidence to

16  the other jurors.  What would your answer be on that?

17          JUROR KEVY: That I would -- I'm a scientist by

18  nature.  I evaluate a lot of information like that.  I

19  used to work for the state as an investigator so, I mean,

20  I understand the difference between testimony and physical

21  evidence, so that should be (inaudible.)

22          MS. JOHNSON: Okay.  If there's no physical

23  evidence, could you just make a decision based on

24  testimonial evidence alone if you believed it?

25          JUROR KEVY: Yes.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 125 of 301

(Videotape, 10-07-14; 10:28:49)

1    MS. JOHNSON: And then the similar question I

2    asked to the engineer then.  There is no formula for this.

3    There is no exact science.  It's a do you believe it, do

4    you believe it beyond a reasonable doubt.

5    JUROR KEVY: Uh-huh.

6    MS. JOHNSON: Is that something you'd be

7    comfortable doing?

8    JUROR KEVY: I -- I think I could.

9    MS. JOHNSON: Okay.  Do you understand it's not a

10   beyond any doubt standard?

11   JUROR KEVY: Yeah.

12   MS. JOHNSON: Okay, thank you.

13   THE COURT: Any questions, Ms. Baker?

14   MS. BAKER: No questions.  Thank you.

15   THE COURT: Okay. If there's no challenges for

16   cause, the jury is back with the Defendant.

17   MS. BAKER: Nope, the People, I think.

18   THE COURT: I'm sorry, you're right, with the

19   People.  Thank you.

20   MS. JOHNSON: The People would thank and excuse

21   the juror in seat number 6, Ms. Johnson.

22   THE COURT: Ms. Johnson, thank you.  You may

23   stand down.

24   THE CLERK: Joseph Kammaraad.

25   THE COURT: Mr. Kammaraad, have you heard all the

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

96

(Videotape, 10-07-14; 10:28:49)

1  questions?

2            JUROR KAMMARAAD: Yes, sir.

3            THE COURT: Are you acquainted with anybody

4  involved in the case?

5            JUROR KAMMARAAD: Not that I'm aware of.

6            THE COURT: Are you aware of any reason why you

7  could not be fair and impartial?

8            JUROR KAMMARAAD: Not at all.

9            THE COURT: Okay.  Ms. Johnson, anything?

10           MS. JOHNSON: Thank you, your Honor.  Sir, I see

11 from your questionnaire that you do have a misdemeanor

12 conviction.

13           JUROR KAMMARAAD: Yes.

14           MS. JOHNSON: How long ago was that?

15           JUROR KAMMARAAD: Back in early '90s, late '80s.

16           MS. JOHNSON: Quite a while then.

17           JUROR KAMMARAAD: Yeah.

18           MS. JOHNSON: Was that here in Muskegon?

19           JUROR KAMMARAAD: Yes.

20           MS. JOHNSON: Is there anything about that case

21 that you are still holding onto that we should know about?

22           JUROR KAMMARAAD: Oh, no, not at all.

23           MS. JOHNSON: Okay.  Did you think you were

24 treated fairly?

25           JUROR KAMMARAAD: Oh, yeah.

_Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823_

97

(Videotape, 10-07-14; 10:28:49)

1    MS. JOHNSON: Anyone close to you or yourself

2 ever been the victim or accused of a sexual crime?

3    JUROR KAMMARAAD: Nobody at all that I know.

4    MS. JOHNSON: Okay.  And what would your answer

5 be regarding my question about testimonial versus physical

6 evidence?

7    JUROR KAMMARAAD: I could base my decision on

8 either.

9    MS. JOHNSON: Okay.  So testimony alone you can

10 base your decision on?

11    JUROR KAMMARAAD: Yes.

12    MS. JOHNSON: Okay.  And are you open-minded to

13 listening to an expert testify?

14    JUROR KAMMARAAD: Sure

15    MS. JOHNSON: Okay, thank you.

16    THE COURT: Ms. Baker, anything?

17    MS. BAKER: Thank you.  Mr. Kammaraad, did you

18 hear my questions?

19    JUROR KAMMARAAD: I did.

20    MS. BAKER: And did any of them prompt any

21 thoughts that we need to discuss then?

22    JUROR KAMMARAAD: No, not at all.

23    MS. BAKER: And if I asked you right now whether

24 or what -- whether Mr. Rainbolt is guilty, what is your

25 answer?

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 128 of 301*

(Videotape, 10-07-14; 10:28:49)

1    JUROR KAMMARAAD: I would say no, not that I -- I
2    would need to hear information, you know, before I can
3    make that judgment.
4         MS. BAKER: It would have to be proven beyond a
5    reasonable doubt, according to the instructions from the
6    Judge; correct?
7         JUROR KAMMARAAD: Yes, yes.
8         MS. BAKER: Okay.  Are you able to continue his
9    presumption of innocence throughout this case?
10        JUROR KAMMARAAD: I am.
11        MS. BAKER: Thank you.  I appreciate that.
12        THE COURT: Okay.  If there's no cause
13   challenges, the jury is with the Defendant.
14        MS. BAKER: We would thank and excuse Ms. Selby.
15        THE COURT: Ms. Selby, thank you.  You may stand
16   down.
17        THE CLERK: Belinda Johnson.
18        THE COURT: Okay, Ms. Johnson, have you heard all
19   the questions that were asked?
20        JUROR JOHNSON: Yes.
21        THE COURT: Are you acquainted with anyone
22   involved in the case?
23        JUROR JOHNSON: No.
24        THE COURT: Are you aware of any reason why you
25   could not be fair and impartial?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

99

(Videotape, 10-07-14; 10:28:49)

1        JUROR JOHNSON: Past experience.

2        THE COURT: Is there something in your past that

3    would cause you to not be fair and impartial?

4        JUROR JOHNSON: Yes, it would be.

5        THE COURT: All right.  You're excused for cause.

6    Thank you.  You may stand down.  Next witness -- or next

7    juror, please?

8        THE CLERK: Todd Goma.

9        THE COURT: Mr. Goma, have you heard all the

10   questions?

11       JUROR GOMA: Yes, I have.

12       THE COURT: Are you acquainted with anyone?

13       JUROR GOMA: No.

14       THE COURT: All right.  Is there any reason why

15   you can't be fair and impartial?

16       JUROR GOMA: No reason at all.

17       THE COURT: All right.  Ms. Johnson, anything?

18       MS. JOHNSON: Thank you, your Honor.  Sir, I see

19   you are a military police officer for the Marines?

20       JUROR GOMA: Yes.

21       MS. JOHNSON: Thank you for your service.

22       JUROR GOMA: Thanks.

23       MS. JOHNSON: Is there anything about that job

24   that you think either side would want to know about as far

25   as a bias that may have created for sitting in a criminal

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 130 of 301

(Videotape, 10-07-14; 10:28:49)

1    jury trial?

2              JUROR GOMA: None whatsoever.

3              MS. JOHNSON: Okay.  Have you or anyone close to

4    you ever been accused of or a victim of a sexual crime?

5              JUROR GOMA: I have a half brother that was, uhm

6    -- he was convicted -- well, he was not convicted, but he

7    was accused and was -- went through the court process and

8    found not guilty.

9              MS. JOHNSON: Okay.

10             JUROR GOMA: In the state of Texas.

11             MS. JOHNSON: In the state of Texas, so it was

12   not here.

13             JUROR GOMA: Right.

14             MS. JOHNSON: Were you familiar with what was

15   going on at the time?  Did you talk to him about it?

16             JUROR GOMA: Just hearsay from my mother.  That's

17   it.

18             MS. JOHNSON: Okay.  So is there anything about

19   that that you would be bringing to this case?

20             JUROR GOMA: No.

21             MS. JOHNSON: No?  Uhm, how old was the alleged

22   victim in that case?

23             JUROR GOMA: I believe that she was 11.

24             MS. JOHNSON: And you've heard my question about

25   testimonial versus physical evidence I think about 45

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 131 of 301

(Videotape, 10-07-14; 10:28:49)

1    times now, I'm sure.

2              JUROR GOMA: Yes.

3              MS. JOHNSON: What's your answer to that?

4              JUROR GOMA: I can based on testimony.

5              MS. JOHNSON: Okay.  And are you open-minded to

6    hearing an expert if it's maybe something you weren't

7    aware of or you thought differently about?

8              JUROR GOMA: Yes.

9              MS. JOHNSON: Okay, thank you.

10             THE COURT: Okay.  Ms. Baker, any questions?

11             MS. BAKER: Did you hear my questions?

12             JUROR GOMA: Yes, I did.

13             MS. BAKER: Did any of them prompt any thoughts

14   that we should discuss your answers?

15             JUROR GOMA: No.

16             MS. BAKER: Okay, thank you.

17             THE COURT: Okay.  If there's no challenge for

18   cause, the jury is with the People.

19             MS. JOHNSON: I'm sorry, your Honor?  With me for

20   the peremp?

21             THE COURT: Yes, uh-huh.

22             MS. JOHNSON: The People would thank and excuse

23   the juror in seat number 8, Mr. Klassen.

24             THE COURT: Okay.  Mr. Klassen, you may stand

25   down.  Thank you, sir.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

102

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 132 of 301

(Videotape, 10-07-14; 10:28:49)

1       THE CLERK: Matthew Shultz.

2       THE COURT: Mr. Shultz, have you heard all of the

3   questions that were asked?

4       JUROR SHULTZ: Yes, sir.

5       THE COURT: Are you acquainted with anyone

6   involved in the case?

7       JUROR SHULTZ: No.

8       THE COURT: Are you aware of any reason why you

9   could not be fair and impartial?

10      JUROR SHULTZ: I can be impartial.

11      THE COURT: Ms. Johnson, here we go.

12      MS. JOHNSON: I know, I talk too much.  The Judge

13  is annoyed with me.  You've all heard the same questions

14  over and over again, but this is important; okay?  Anyone

15  close to you ever been the victim or accused of a sexual

16  crime?

17      JUROR SHULTZ: No.

18      MS. JOHNSON: Okay.  My question about

19  testimonial and physical evidence, where do you fall on

20  that?

21      JUROR SHULTZ: I think I can give a verdict.

22      MS. JOHNSON: You think or you know you can if

23  you believe it?

24      JUROR SHULTZ: I know I can.

25      MS. JOHNSON: Okay.  Are you open to listening to

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

103

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 133 of 301

(Videotape, 10-07-14; 10:28:49)

1    an expert?

2           JUROR SHULTZ: Yes.

3           MS. JOHNSON: Okay.  Do you have any familiarity

4    with this computer store on Airline Road or anybody

5    involved in the case?

6           JUROR SHULTZ: No.

7           MS. JOHNSON: Okay.  Have you ever been in jail

8    for any reason or a mental hospital?

9           JUROR SHULTZ: Nope.

10          MS. JOHNSON: Okay, thank you.

11          THE COURT: Okay, thank you.  Ms. Baker, any

12    questions?

13          MS. BAKER: No questions.

14          THE COURT: Okay.  The jury is -- if there's no

15    cause, the jury's with the Defendant.

16          MS. BAKER: We would thank and excuse Mrs.

17    Metcalf, excuse me.

18          THE COURT: Okay, Ms. Metcalf, thank you.  You

19    may stand down.  Next juror, please.

20          THE CLERK: Mark Hudd.

21          THE COURT: Okay.  Mr. Hudd, are you acquainted

22    with anyone involved in the case?

23          JUROR HUDD: No.

24          THE COURT: Did you hear all the questions?

25          JUROR HUDD: Yes.

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445  231-744-6823*

104

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 134 of 301

(Videotape, 10-07-14; 10:28:49)

1      THE COURT: Are you aware of any reason why you
2  could not be fair and impartial?
3      JUROR HUDD: No.
4      THE COURT: Okay.  Ms. Johnson?
5      MS. JOHNSON: Sir, I see you're wearing a GE
6  shirt.  Do you work there?
7      JUROR HUDD: Uh-huh.
8      MS. JOHNSON: Do you know Ms. Bose?
9      JUROR HUDD: No.
10     MS. JOHNSON: Okay.  Do you know Jennifer
11 Houston?
12     JUROR HUDD: No.
13     MS. JOHNSON: You put on your questionnaire your
14 profession was SS?  What's that?
15     JUROR HUDD: SS?  Oh, a specialist.
16     MS. JOHNSON: A specialist?
17     JUROR HUDD: Uh-huh.
18     MS. JOHNSON: What do you do?
19     JUROR HUDD: Run the CNC and wire machines.
20     MS. JOHNSON: The same three questions I've asked
21 everybody else to try to go through it quickly.  Anybody
22 you know have anything to do with a sexual crime?
23     JUROR HUDD: No.
24     MS. JOHNSON: Testimonial versus physical
25 evidence, what's your answer on that?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

105

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 135 of 301

(Videotape, 10-07-14; 10:28:49)

1        JUROR HUDD: It's gonna be tough.

2        MS. JOHNSON: It's gonna be tough, okay.

3    Elaborate on that.

4        JUROR HUDD: I also own an underground sprinkling

5    business and, as you know, it's a busy time and I work.

6        MS. JOHNSON: Okay.

7        JUROR HUDD: So ...

8        MS. JOHNSON: So actually sitting here and being

9    a juror is gonna be tough for you.

10       JUROR HUDD: It has been already.

11       MS. JOHNSON: Okay.  Are you losing business by

12   being here?

13       JUROR HUDD: Yeah, and potentially three

14   sprinkling systems.

15       MS. JOHNSON: Okay.  Has that been on your mind

16   as you've been sitting here waiting?

17       JUROR HUDD: Yeah.

18       MS. JOHNSON: Are you going to be able to put

19   that out of your mind while you sit and listen to

20   testimony and evidence?  There is no right answer.

21       JUROR HUDD: No.

22       MS. JOHNSON: You're not going to be able to?

23   Okay.  Thank you for being honest.

24       THE COURT: Any questions, Ms. Baker?

25       MS. BAKER: No.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 136 of 301

(Videotape, 10-07-14; 10:28:49)

1      THE COURT: Any challenges for cause?

2      MS. JOHNSON: Yes, your Honor.  The People would

3  challenge Mr. Hode, Hood for cause.

4      THE COURT: Who?  Who's that?

5      MS. JOHNSON: I'm not pronouncing it right.  The

6  juror we just spoke with.

7      THE COURT: Which juror?  Oh, okay, okay.  Well,

8  sir, you know, I have a lot of things on my mind too, and

9  I'm sure you do and I certainly understand that, but are

10  you going to be able to pay attention?

11      JUROR HUDD: Probably.

12      THE COURT: Okay.  No cause here.  The jury is

13  with the People peremptorily.

14      MS. JOHNSON: The People thank and excuse the

15  juror in seat number 9, Ms. Kevy.

16      THE COURT: Okay.  Ms. Kevy, thank you, you may

17  stand down.

18      THE CLERK: Suzanne Peters.

19      THE COURT: Ms. Peters, have you heard all the

20  questions?

21      JUROR PETERS: Yes, I have.

22      THE COURT: Are you acquainted with anybody in

23  the case?

24      JUROR PETERS: No.

25      THE COURT: Are you aware of any reason why you

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 137 of 301

(Videotape, 10-07-14; 10:28:49)

1 can't be fair and impartial?

2    JUROR PETERS: No.

3    THE COURT: Okay.  Ms. Johnson?

4    MS. JOHNSON: Do you know anyone who's been a

5 victim or accused of a sexual crime?

6    JUROR PETERS: No.

7    MS. JOHNSON: The question about testimonial

8 versus physical evidence, what's your answer there?

9    JUROR PETERS: I understand the difference and I

10 could make a decision based on testimony.

11    MS. JOHNSON: And are you open to hearing from an

12 expert, even if it's something that you may have believed

13 to be different?

14    JUROR PETERS: Yes.

15    MS. JOHNSON: Okay, thank you.

16    THE COURT: Ms. Baker?

17    MS. BAKER: Did you hear my questions, ma'am?

18    JUROR PETERS: Yes.

19    MS. BAKER: Did any of them prompt anything that

20 you thought we should discuss?

21    JUROR PETERS: No.

22    MS. BAKER: Okay, thank you.

23    THE COURT: If there's no cause, the jury's with

24 the Defendant.

25    MS. BAKER: We'd thank and excuse Mr. Glerum.

---

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 138 of 301

(Videotape, 10-07-14; 10:28:49)

1    THE COURT: Okay.  Mr. Glerum, thank you, sir.
2    You may stand down.
3    THE CLERK: Nancy Evans.
4    THE COURT: Okay, Ms. Evans, have you heard all
5    the questions?
6    JUROR EVANS: Yes.
7    THE COURT: Are you acquainted with anyone
8    involved in the case?
9    JUROR EVANS: No.
10   THE COURT: Are you aware of any reason why you
11   cannot be fair and impartial?
12   JUROR EVANS: No.
13   THE COURT: Ms. Johnson, anything?
14   MS. JOHNSON: Thank you.  Ms. Evans, I see you
15   have a misdemeanor.
16   JUROR EVANS: Yes.
17   MS. JOHNSON: How long ago was that?
18   JUROR EVANS: 11 years.
19   MS. JOHNSON: All right.  Was that here locally?
20   JUROR EVANS: Yeah.
21   MS. JOHNSON: Is there anything about that that
22   you're still holding onto that I need to know about?
23   JUROR EVANS: No.
24   MS. JOHNSON: Would you hold it -- were you
25   treated fairly?

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 139 of 301

(Videotape, 10-07-14; 10:28:49)

1       JUROR EVANS: (Inaudible.)

2       MS. JOHNSON: Okay.  So there's nothing you'd be

3   holding against the police or the prosecution?

4       JUROR EVANS: (Inaudible.)

5       MS. JOHNSON: Okay.  Do you know anyone who's

6   been accused of or a victim of a sexual crime?

7       JUROR EVANS: No.

8       MS. JOHNSON: And with testimonial versus

9   physical evidence, what's your answer in that

10  conversation?

11      JUROR EVANS: I would have no problem, you know,

12  deciding.

13      MS. JOHNSON: Okay, thank you.

14      THE COURT: Okay.  Ms. Baker, anything?

15      MS. BAKER: No, your Honor.

16      THE COURT: Okay.  If there's no cause, back with

17  the People.

18      MS. JOHNSON: The People would thank and excuse

19  the juror in seat number 8, Mr. Shultz.

20      THE COURT: Mr. Shultz, thank you, you may stand

21  now.  Next juror, please.

22      THE CLERK: Eric Wurnstrom.

23      THE COURT: Mr. Wurnstrom, have you heard all the

24  questions?

25      JUROR WURNSTROM: Yeah.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 140 of 301

(Videotape, 10-07-14; 10:28:49)

1     THE COURT: Are you acquainted with anyone in the

2  case?

3     JUROR WURNSTROM: No.

4     THE COURT: Are you aware of any reason why you

5  can't be fair and impartial?

6     JUROR WURNSTROM: No.

7     THE COURT: Ms. Johnson?

8     MS. JOHNSON: Thank you.  Sir, I see you had

9  answered yes for a misdemeanor and left the felony

10  question blank.

11     JUROR WURNSTROM: I got two misdemeanors.

12     MS. JOHNSON: How long ago?

13     JUROR WURNSTROM: I got one like seven months

14  ago.

15     MS. JOHNSON: Okay, so fairly recent.  Was that

16  here in Muskegon?

17     JUROR WURNSTROM: No, Ottawa.

18     MS. JOHNSON: What's that?

19     JUROR WURNSTROM: Ottawa County.

20     MS. JOHNSON: Ottawa?

21     JUROR WURNSTROM: Like I'm still on probation for

22  it and stuff.

23     MS. JOHNSON: You are on probation currently?

24  Would that affect your ability to listen to testimony of

25  police officers?

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

111

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 141 of 301

(Videotape, 10-07-14; 10:28:49)

1   JUROR WURNSTROM: Maybe a little bit, yeah.

2   MS. JOHNSON: Would you keep an open mind -- I

3   mean, the police officers involved in this case are not

4   the same police officers.  Would you keep an open mind to

5   their testimony?

6   JUROR WURNSTROM: Yeah.

7   MS. JOHNSON: Okay, thank you.

8   THE COURT: Ms. Baker, any questions?

9   MS. BAKER: No questions.

10   THE COURT: Okay.  If there's no challenges for

11   cause, we'll go with the Defendant peremptorily.

12   MS. BAKER: We would thank and excuse Ms. Booth

13   in number 12.

14   THE COURT: Okay.  Ms. Booth, you may be excused.

15   THE CLERK: Josephine Terrell.

16   THE COURT: Ms. Terrell, have you heard all the

17   questions?

18   JUROR TERRELL: Yes.

19   THE COURT: Are you acquainted with anyone in the

20   case?

21   JUROR TERRELL: No.

22   THE COURT: Are you aware of any reason why you

23   can't be fair and impartial?

24   JUROR TERRELL: Yes.

25   THE COURT: And what's the problem?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

112

(Videotape, 10-07-14; 10:28:49)

1    JUROR TERRELL: I have two nieces -- two nieces

2    that were molested by their stepdad and they really had a

3    hard time.  Watchin' them go through so much is --

4    THE COURT: Okay.  Well, that was a totally

5    different situation than what we have here.

6    JUROR TERRELL: Yeah.

7    THE COURT: Can you be fair and impartial in

8    deciding the facts in this case?  They have nothing to do

9    with that.

10   JUROR TERRELL: I can't say that I could.

11   THE COURT: Okay, you're excused.  Thank you.

12   Please make sure -- I'll remind everybody you need to call

13   this evening because you're gonna be needed for -- you're

14   gonna start another tomorrow, so okay?

15   JUROR TERRELL: Uh-huh.

16   THE CLERK: Jennifer Swinehart.

17   THE COURT: Ms. Swinehart, have you heard all the

18   questions?

19   JUROR SWINEHART: Yes, sir.

20   THE COURT: Are you acquainted with anybody?

21   JUROR SWINEHART: No, sir.

22   THE COURT: Are you aware of any reason why you

23   can't be fair and impartial?

24   JUROR SWINEHART: No, sir.

25   THE COURT: Okay.  Ms. Johnson?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

113

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 143 of 301

(Videotape, 10-07-14; 10:28:49)

1        MS. JOHNSON: Good afternoon, ma'am.  Do you know

2   anyone who has been a victim or accused of a sexual crime

3   or have you yourself been a --

4        JUROR SWINEHART: No, ma'am.

5        MS. JOHNSON: And the question I've asked about

6   testimonial versus physical evidence.  What's you --

7        JUROR SWINEHART: Not an issue.

8        MS. JOHNSON: Not an issue?  Okay, thank you.

9        JUROR SWINEHART: Uh-huh.

10        THE COURT: Ms. Baker?

11        MS. BAKER: Did you hear my questions, ma'am?

12        JUROR SWINEHART: Yes, I did.

13        MS. BAKER: Thank you.

14        THE COURT: Okay.  If there's no challenge for

15   cause, we are back with the People.

16        MS. JOHNSON: The People would thank and excuse

17   the juror in seat number 8, Mr. Wurnstrom.

18        THE COURT: Okay, Mr. Wurstrom, you may stand

19   down.

20        THE CLERK: Eugene Simmons.

21        THE COURT: Mr. Simmons, have you heard all the

22   questions?

23        JUROR SIMMONS: Yes, sir.

24        THE COURT: Anything -- anybody that you're

25   acquainted with here?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

114

(Videotape, 10-07-14; 10:28:49)

1        JUROR SIMMONS: No, sir.

2        THE COURT: Any reason why you can't be fair and

3    impartial?

4        JUROR SIMMONS: No, sir.

5        THE COURT: Okay.  Ms. Johnson?

6        MS. JOHNSON: Your Honor -- or I'm sorry.  Sir, I

7    see you've been at some point in a mental hospital or a

8    correctional institute?

9        JUROR SIMMONS: In a correctional.

10       MS. JOHNSON: As a visitor or an inmate?

11       JUROR SIMMONS: For about three months, yeah.

12       MS. JOHNSON: How long ago was that?

13       JUROR SIMMONS: That was in the '90s.

14       MS. JOHNSON: Were you convicted of anything?

15       JUROR SIMMONS: Yes.

16       MS. JOHNSON: Misdemeanor or felony.

17       JUROR SIMMONS: Misdemeanor.

18       MS. JOHNSON: Was that here in Muskegon?

19       JUROR SIMMONS: Uh, yes.

20       MS. JOHNSON: Okay.  Do you think you were

21   treated fairly?

22       JUROR SIMMONS: Oh, yeah.  It was my fault.

23       MS. JOHNSON: Okay.  Is there anything about that

24   experience that you're holding bad feelings towards the

25   police or the prosecutor's office or anything like that?

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 145 of 301

(Videotape, 10-07-14; 10:28:49)

1      JUROR SIMMONS: No.

2      MS. JOHNSON: Okay.  The question about

3  testimonial versus physical evidence.  Where do you land

4  in that conversation?

5      JUROR SIMMONS: I guess cases have been solved

6  without physical evidence before, you know.

7      MS. JOHNSON: I mean this is not a case of a

8  whodunit like we see on a lot of TV shows.  This is a do

9  you believe the witnesses case.

10      JUROR SIMMONS: Exactly.

11      MS. JOHNSON: So without anything physical that

12  you can hold in your hand that supports the witness, do

13  you think if you believe them that that's enough?

14      JUROR SIMMONS: Oh, yes.

15      MS. JOHNSON: Okay, thank you.

16      THE COURT: Ms. Baker, any questions?

17      MS. BAKER: Mr. -- or sir, did you hear my

18  questions?

19      JUROR SIMMONS: Yes, ma'am.

20      MS. BAKER: All right.  Sometimes I get accused

21  of talking too softly.  Did any of my questions prompt any

22  thoughts that we should talk about your responses?

23      JUROR SIMMONS: No.

24      MS. BAKER: Okay.

25      JUROR SIMMONS: (Inaudible.)

_Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823_

116

(Videotape, 10-07-14; 10:28:49)

1    MS. BAKER: All right.  Is Mr. Rainbolt guilty or

2    not guilty?

3    JUROR SIMMONS: I don't know.  I aint' heard the

4    case yet.

5    MS. BAKER: Thank you.

6    THE COURT: Okay.  If there's no challenges for

7    cause, we're with the Defendant.

8    MS. BAKER: Just a moment.  We would thank and

9    excuse juror number 9, Ms. Peters.

10   THE COURT: Ms. Peters, thank you.  You may stand

11   down.  Next juror, please?

12   THE CLERK: Laura Lucht, Lucht.

13   THE COURT: Okay, is it Lucht or Lucht or --

14   JUROR LUCHT: Lucht.

15   THE COURT: Okay.  Ms. Lucht, have you heard all

16   the statements that were made here?

17   JUROR LUCHT: Yes.

18   THE COURT: You acquainted with anybody?

19   JUROR LUCHT: No.

20   THE COURT: You aware of any reason why you can't

21   be fair and impartial?

22   JUROR LUCHT: No.

23   THE COURT: All right.  Ms. Johnson?

24   MS. JOHNSON: Good morning -- or good afternoon.

25   All right.  You're a social worker?

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 147 of 301

(Videotape, 10-07-14; 10:28:49)

1          JUROR LUCHT: Yes.

2          MS. JOHNSON: Do you work with any victims of

3   sexual crimes?

4          JUROR LUCHT: Not that I'm aware of.

5          MS. JOHNSON: Okay.  And your husband is a state

6   trooper; right?

7          JUROR LUCHT: State parole agent.

8          MS. JOHNSON: Parole agent.  Sorry, I can't read

9   my own handwriting.  Do you talk to him about his work

10  much?

11         JUROR LUCHT: Not specifics, no.

12         MS. JOHNSON: Okay.  Is there anything about his

13  profession that you think we should be concerned about or

14  yours for that matter?

15         JUROR LUCHT: No.

16         MS. JOHNSON: No, all right.  You've heard the

17  questions about testimonial versus physical.  Where do you

18  fall on that conversation?

19         JUROR LUCHT: (Inaudible.)

20         MS. JOHNSON: Okay.  And have you or anybody

21  close to you been accused of or a victim of a sexual

22  crime?

23         JUROR LUCHT: No.

24         MS. JOHNSON: Okay, thank you.

25         THE COURT: Okay.  Ms. Baker, any questions?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

118

(Videotape, 10-07-14; 10:28:49)

1  MS. BAKER: No questions, your Honor.

2  THE COURT: Okay.  If there's no challenge for

3  cause, we're back peremptorily with the People.

4  MS. JOHNSON: If I could have one moment, your

5  Honor.  The People would thank and excuse the juror in

6  seat number 4, Mr. -- I'm sorry, I'm not gonna be able to

7  pronounce it.  Is it Hudd?

8  JUROR HUDD: Mark Hudd.  H-u-d-d.

9  MS. JOHNSON: Oh, I've got the wrong name.  Thank

10  you.

11  THE COURT: Okay, thank you, Mr. Hudd.  You may

12  stand down.  Thank you, sir, you may stand down.

13  THE CLERK: Samantha Johnson.

14  THE COURT: Okay, Ms. Johnson, have you heard all

15  the questions?

16  JUROR JOHNSON: Yes, I have.

17  THE COURT: Are you acquainted with anybody

18  involved in the case?

19  JUROR JOHNSON: Not to my knowledge.

20  THE COURT: Are you aware of any reason why you

21  can't be fair and impartial?

22  JUROR JOHNSON: No.

23  THE COURT: Okay.  Ms. Johnson, any questions of

24  Ms. Johnson?

25  MS. JOHNSON: Yes, thank you, your Honor.  Ma'am,

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

119

(Videotape, 10-07-14; 10:28:49)

1    I didn't get a questionnaire filled out by you, so let me

2    ask you a few questions.

3          JUROR JOHNSON: Oh.

4          MS. JOHNSON: What do you do for a living?

5          JUROR JOHNSON: I'm a nurse aide.

6          MS. JOHNSON: Okay.  Have you ever been involved

7    in pelvic examinations?

8          JUROR JOHNSON: No, I have not.

9          MS. JOHNSON: Okay.  What hospital or doctor's

10    office do you work at?

11          JUROR JOHNSON: Sanctuary at McAuly.  It's on

12    Sherman Boulevard next to Mercy Hospital.

13          MS. JOHNSON: Okay.  Do you deal with child abuse

14    or rape cases at all?

15          JUROR JOHNSON: No, no.

16          MS. JOHNSON: Okay.  Are you married?

17          JUROR JOHNSON: No.

18          MS. JOHNSON: And have you ever been in a mental

19    hospital or a jail for any reason?

20          JUROR JOHNSON: No, I haven't.

21          MS. JOHNSON: You've heard the question about

22    testimonial versus physical evidence.  Where do you fall

23    in that conversation?

24          JUROR JOHNSON: I can be impartial, testimonial.

25          MS. JOHNSON: Can testimony alone prove it?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 150 of 301*

(Videotape, 10-07-14; 10:28:49)

1    JUROR JOHNSON: Yes, I can believe --

2    MS. JOHNSON: If you believe it?

3    JUROR JOHNSON: Yeah.

4    MS. JOHNSON: Okay.  And have you or anybody

5    close to you ever been a victim of or accused of a sex

6    crime?

7    JUROR JOHNSON: Not to my knowledge.

8    MS. JOHNSON: Thank you.

9    THE COURT: Ms. Baker, any questions?

10   MS. BAKER: Did you hear my questions, ma'am?

11   JUROR JOHNSON: Yes.

12   MS. BAKER: Any of them prompt any responses that

13   you thought we should discuss?

14   JUROR JOHNSON: No.

15   MS. BAKER: Thank you.  I have nothing further.

16   THE COURT: If there's no challenges for cause,

17   we're with the Defendant.

18   MS. BAKER: No challenge for cause.  Peremptorily

19   we would thank and excuse Ms. Lucht.

20   THE COURT: Ms. Lucht, you may stand down.

21   THE CLERK: Peter Benson.

22   THE COURT: Mr. Benson, have you heard all the

23   questions?

24   JUROR BENSON: Yes, sir.

25   THE COURT: Is there anybody you're acquainted

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

121

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 151 of 301

(Videotape, 10-07-14; 10:28:49)

1  with?

2          JUROR BENSON: No, sir.

3          THE COURT: Are you aware of any reason why you

4  can't be fair and impartial?

5          JUROR BENSON: No, sir.

6          THE COURT: Okay.  Ms. Johnson?

7          MS. JOHNSON: Sir, as part of your job you offer

8  counsel to youth that you work with?

9          JUROR BENSON: Uhm, as far as counsel not much.

10  Like I try to help them process through stuff but I'm not

11  a licensed counselor, nor do I say I am or claim to be.

12          MS. JOHNSON: Okay.  But you do talk to them

13  about things they're having difficulty with?

14          JUROR BENSON: Absolutely, yeah.

15          MS. JOHNSON: All right.  Have you ever worked

16  with a child who made sexual abuse allegations and had to

17  help them work through that?

18          JUROR BENSON: Yes, I have.  I have called CPS

19  probably two times since I've been a youth pastor.

20          MS. JOHNSON: Do you think all victims act the

21  same?

22          JUROR BENSON: Absolutely not.

23          MS. JOHNSON: Is there anything about your

24  experience working with those children that would -- that

25  you think we should know about?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

122

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 152 of 301

(Videotape, 10-07-14; 10:28:49)

1    JUROR BENSON: Not necessarily, I guess.

2    MS. JOHNSON: Okay.  There's nothing that would

3    cause you to have a bias for one side or the other?

4    JUROR BENSON: No.

5    MS. JOHNSON: Okay.  Has anybody close to you or

6    yourself ever been a victim or accused of a sexual crime?

7    JUROR BENSON: Yeah, yeah.  I've had two cousins

8    who were molested by their father.

9    MS. JOHNSON: Okay.  How old were they when it

10   happened?

11   JUROR BENSON: 8 to 10.

12   MS. JOHNSON: How old were you?

13   JUROR BENSON: Oh, probably 18.

14   MS. JOHNSON: Okay.  So you're older than them?

15   JUROR BENSON: Yeah, I was probably an adult.

16   MS. JOHNSON: Did you get to know much about what

17   was going on?  Were you involved?

18   JUROR BENSON: I knew what my parents told me,

19   that, you know, there's an accusation made.  I don't

20   believe any jail time was carried out that I can remember,

21   but I know that he lost his rights to visit the child,

22   so ...

23   MS. JOHNSON: Maybe it wasn't handled criminally

24   but in parenting ways?

25   JUROR BENSON: Uhm, I think the Court ordered

_Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823_

123

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 153 of 301

(Videotape, 10-07-14; 10:28:49)

1    that he wasn't allowed to see his son.

2        MS. JOHNSON: Okay.  Is there anything about that

3    that you're going to be bringing with you if you're chosen

4    as a juror here?

5        JUROR BENSON: No, ma'am.

6        MS. JOHNSON: And then my question versus

7    testimonial -- about testimonial versus physical evidence.

8    Where do you fall in that conversation?

9        JUROR BENSON: Uhm, I believe testimony is enough

10    to make a decision.

11        MS. JOHNSON: Okay, thank you.

12        THE COURT: Any questions, Ms. Baker?

13        MS. BAKER: Uhm, did you think that your -- was

14    it your cousin's dad or stepdad that was involved?  Was he

15    treated fairly?

16        JUROR BENSON: Uhm, yeah, I believe so.

17        MS. BAKER: Okay.  You don't think that will

18    color how you listen to the testimony in this case at all?

19        JUROR BENSON: No, ma'am.

20        MS. BAKER: Do you know if he was -- was that

21    here in Muskegon County?

22        JUROR BENSON: No.  Uhm, that was in the Lansing

23    area.

24        MS. BAKER: Okay.  Do you know if there was a

25    criminal case involved?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

124

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 154 of 301

(Videotape, 10-07-14; 10:28:49)

1        JUROR BENSON: I'm not sure exactly, no.

2        MS. BAKER: That's fine.

3        JUROR BENSON: Yeah, I'm not sure.

4        THE COURT: The jury is with the People.

5        MS. JOHNSON: The People would thank and excuse

6    the juror in seat number 1, Ms. Bose.

7        THE COURT: Okay, Ms. Bose, you may stand down.

8    Thank you.

9        THE CLERK: Matthew Ohs.

10        THE COURT: Okay, Mr. Ohs, have you heard all the

11    questions?

12        JUROR OHS: Yes, sir.

13        THE COURT: Can you be fair and impartial?

14        JUROR OHS: Yes, sir.

15        THE COURT: You're not acquainted with anybody?

16        JUROR OHS: No, sir.

17        THE COURT: All right.  Anything, Ms. Johnson?

18        MS. JOHNSON: Thank you, your Honor.  Sir, have

19    you or anybody you know ever been a victim of or accused

20    of a sexual crime?

21        JUROR OHS: No, ma'am.

22        MS. JOHNSON: And the question about testimonial

23    and physical evidence, where do you fall in that

24    conversation?

25        JUROR OHS: No problem making a judgment on

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 155 of 301

(Videotape, 10-07-14; 10:28:49)

1        either.

2                    MS. JOHNSON: Okay, thank you.

3                    JUROR OHS: You're welcome.

4                    THE COURT: Ms. Baker?

5                    MS. BAKER: I have no questions.

6                    THE COURT: The jury's with the Defendant.

7                    MS. BAKER: We'd thank and excuse Mr. Benson.

8                    THE COURT: Thank you.  You may stand down, Mr.

9        Benson.  Next juror, please?

10                   THE CLERK: Kenneth Holubeck.

11                   THE COURT: Mr. Holubeck, have you heard all the

12       questions that were asked of the jurors?

13                   JUROR HOLUBECK: Yes.

14                   THE COURT: Acquainted with anybody?

15                   JUROR HOLUBECK: No.

16                   THE COURT: Any reason why you can't be fair and

17       impartial?

18                   JUROR HOLUBECK: No.

19                   THE COURT: Thank you, sir.  Any questions, Ms.

20       Johnson?

21                   MS. JOHNSON: Sir, where do you work?

22                   JUROR HOLUBECK: I work at Magna in Holland.

23                   MS. JOHNSON: Okay.  And have you or anybody you

24       know ever been a victim or accused of a sexual crime?

25                   JUROR HOLUBECK: Yes.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

126

(Videotape, 10-07-14; 10:28:49)

1          MS. JOHNSON: Okay.  Who?

2          JUROR HOLUBECK: My sister.

3          MS. JOHNSON: A victim or accused?

4          JUROR HOLUBECK: Victim.

5          MS. JOHNSON: How long ago was that?

6          JUROR HOLUBECK: Late '60s.

7          MS. JOHNSON: Okay.  Who did she -- who did it to

8     her?

9          JUROR HOLUBECK: My father.

10         MS. JOHNSON: Okay.  Similar relationship to

11    what's here?

12         JUROR HOLUBECK: Pardon me?

13         MS. JOHNSON: Similar relationship to what we

14    have before us here.

15         JUROR HOLUBECK: Yes.

16         MS. JOHNSON: Father/daughter.  Is that going to

17    affect your judgment in this case?

18         JUROR HOLUBECK: Yes.

19         MS. JOHNSON: Yes, it will?

20         JUROR HOLUBECK: Yes, it will.

21         MS. JOHNSON: Okay.  Should I inquire any

22    further, your Honor?

23         THE COURT: You may stand down.  Thank you.  Next

24    juror, please?

25         THE CLERK: Janis Lavassuer.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 157 of 301

(Videotape, 10-07-14; 10:28:49)

1      THE COURT: Okay, Ms. Lavassuer, have you heard
2   all the questions?

3      JUROR LAVASSUER: Yes.

4      THE COURT: Are you acquainted with anybody?

5      JUROR LAVASSUER: No.

6      THE COURT: Are you aware of any reason why you
7   can't be fair and impartial?

8      JUROR LAVASSUER: No.

9      THE COURT: Ms. Johnson?

10      MS. JOHNSON: Thank you.  Ma'am, you work for Mr.
11   Marek and Mr. (Indistinguishable.)

12      JUROR LAVASSUER: Yes.

13      MS. JOHNSON: Okay.  So you have contact with
14   criminal clients on a regular basis, criminal defense
15   clients?

16      JUROR LAVASSUER: Yes.

17      MS. JOHNSON: And let me see how I want to phrase
18   the next question.  Do you think that's gonna affect your
19   judgment at all sitting here?

20      JUROR LAVASSUER: No.

21      MS. JOHNSON: No?  And you used to work with the
22   police?

23      JUROR LAVASSUER: Yes.

24      MS. JOHNSON: What did you do for the police?

25      JUROR LAVASSUER: I was a clerk.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

128

(Videotape, 10-07-14; 10:28:49)

1        MS. JOHNSON: Okay.  Which department?

2        JUROR LAVASSUER: Roosevelt Park.

3        MS. JOHNSON: Have you had any personal contact

4    with Officer Hertel or Officer VanDommelen?  No?  Okay.

5    I'm sure we've spoken on the phone before, yes, but I

6    can't remember a specific time.  No?  Okay.  And do you

7    know Ms. Baker?

8        JUROR LAVASSUER: Yes.

9        MS. JOHNSON: Okay.  How well do you know her?

10   How well?

11       JUROR LAVASSUER: Uhm, well enough to know who

12   she is.

13       MS. JOHNSON: Okay.  Is there anything about your

14   relationship with her that I should be aware of for, you

15   know -- No?  Okay.  Where do you fall on the question of

16   testimonial versus physical evidence?

17       JUROR LAVASSUER: I had a little problem with it.

18   I don't know how a warrant was issued without any physical

19   evidence.

20       MS. JOHNSON: Okay.  So you don't think testimony

21   without physical evidence is enough to prove a case?

22   Because --

23       JUROR LAVASSUER: I'd have to really be sold.  I

24   was --

25       MS. JOHNSON: I mean -- I'm sorry to interrupt,

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

129

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 159 of 301*

(Videotape, 10-07-14; 10:28:49)

1  but you've said you don't know how a warrant was issued

2  and that's a very low standard as opposed to proof beyond

3  a reasonable doubt in a jury trial; okay?  You understand

4  those two?

5      JUROR LAVASSUER: Yes, yes.

6      MS. JOHNSON: Okay.  So if you have a problem

7  with that low standard being met without physical

8  evidence, do you think the higher standard can ever be met

9  without physical evidence?

10     JUROR LAVASSUER: That I'm not sure of.  I

11 haven't had the opportunity to be on that side of it, I

12 guess.

13     MS. JOHNSON: Okay.  If the Judge instructs you

14 -- and there actually is a jury instruction in CSC cases

15 that if there is victim testimony, there need be no

16 corroboration if that testimony proves a case beyond a

17 reasonable doubt.  Will you be able to follow that

18 instruction from the Judge?

19     JUROR LAVASSUER: Yes.

20     MS. JOHNSON: Okay, thank you.

21     THE COURT: Baker?

22     MS. BAKER: No questions.

23     THE COURT: The jury's with the People.

24     MS. JOHNSON: The People would thank and excuse

25 the juror in seat number 9, Ms. Lavassuer.

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445  231-744-6823*

130

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 160 of 301

(Videotape, 10-07-14; 10:28:49)

1      THE COURT: Okay, thank you, ma'am.  You may
2  stand down.
3      THE CLERK: Steven Kelly.
4      THE COURT: Okay, Mr. Kelly, have you heard all
5  the questions?
6      JUROR KELLY: Yes.
7      THE COURT: Are you acquainted with anybody
8  involved in the case?
9      JUROR KELLY: No, sir.
10      THE COURT: Are you aware of any reason why you
11  cannot be fair and impartial?
12      JUROR KELLY: No.
13      THE COURT: Okay.  Ms. Johnson, any questions?
14      MS. JOHNSON: Yes, thank you.  Sir, I don't have
15  a questionnaire from you so what do you do?
16      JUROR KELLY: I sell life insurance, self-
17  employed.
18      MS. JOHNSON: Have you ever had any misdemeanor
19  or felonies?
20      JUROR KELLY: No.
21      MS. JOHNSON: Have you ever been involved with
22  the criminal justice system in any way?
23      JUROR KELLY: (Inaudible.)
24      MS. JOHNSON: Has anybody close to you or
25  yourself ever been a victim or accused of a sexual crime?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

131

(Videotape, 10-07-14; 10:28:49)

1    JUROR KELLY: No.

2    MS. JOHNSON: And where do you fall on the

3    conversation of testimony versus physical evidence?

4    JUROR KELLY: Yeah, I mean, that doesn't matter.

5    I mean, testimony would be fine.

6    MS. JOHNSON: Okay.  Have you ever been in a jail

7    or a mental hospital for any reason?

8    JUROR KELLY: No.

9    MS. JOHNSON: Okay, thank you.

10   THE COURT: Ms. Baker, anything?

11   MS. BAKER: No, your Honor.

12   THE COURT: Okay, the jury's with the Defendant.

13   MS. BAKER: Your Honor, we're satisfied.

14   THE COURT: Okay.  Ms. Johnson?

15   MS. JOHNSON: We have a jury.

16   THE COURT: Okay.  Thank you, ladies and

17   gentlemen.  Those of you who were not called, I went

18   through the noon hour here so that we could excuse you for

19   the balance of the day, so you are excused.  I thank you

20   for being here today on behalf of the Court and instruct

21   you that you do need to call the jury clerk this evening

22   because your services are going to be needed tomorrow.  We

23   have other courtrooms that will be trying cases.  So

24   you're free to go about your business now.  If you want to

25   remain, you may also.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 162 of 301

(Videotape, 10-07-14; 10:28:49)

1          As for you folks, we will be -- I presume at

2    some point you would like to have a break for lunch.

3          MR. JUROR: What's on the menu?

4          THE COURT: Oh, that comes later.  Well, I'm

5    going to -- it's gonna work out well because I've got to

6    start another case in five minutes anyway so, ten minutes

7    anyway, so you might as well take your break while I do

8    that other case.  So we'll have you come back at 2:45;

9    okay?  Don't have any conversation now about the case with

10   anyone.  I'm sure the first thing that's going to happen,

11   you're going to have contact with family or friends or co-

12   workers or something and they're gonna say where you been?

13   Well, I'm on jury duty.  Oh, next question I guarantee is

14   gonna be what's the case?  What's the case all about?  You

15   cannot talk to them about the case.  You can when the

16   trial's over with, you can talk to them anytime, but until

17   we get to that point you can't talk about the case.  And,

18   of course, don't have any conversation with anybody

19   involved in the case, the attorneys or the witnesses.

20   Don't have any conversation of any kind with them.  And

21   the bailiff will show you where the jury room is.  When

22   you return at 2:45, he'll tell you how to notify us and

23   then we'll come in the courtroom and we'll begin the

24   trial.  Okay.  Remind me to swear the jury in, please,

25   when we return, ladies, and we'll be in recess.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

133

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 163 of 301*

(Videotape, 10-07-14; 10:28:49)

1          (Off the record at 1:15:15.)

2          (Court resumes at 3:06:11.)

3          THE COURT: We're getting started a little bit

4  later than we wanted to, but I understand somebody had

5  some car trouble, and I'm sorry that happened to you, but

6  I understand the police helped us out and got you here, so

7  you get special treatment when you're a juror.

8          MS. JUROR: I'm not the one who was late,

9  actually.

10         THE COURT: Whoever was.

11         MS. JUROR: I was on time.

12         THE COURT: We can get started now, and thank you

13  for all being here, and just try your best to be here as

14  close as you can to the time because we have to have

15  everybody here before we can start.  I understand things

16  come up, I totally get it, so don't worry about that.  But

17  before we actually get started, the first thing I'm gonna

18  do is have the bailiff administer an oath to you to try

19  the case.  So if you'd all please rise now and administer

20  the oath, please?

21         THE CLERK: Would you raise your right hand?  Do

22  each of you solemnly swear or affirm that in this case now

23  before the Court you will justly decide the questions

24  submitted to you, that unless you are discharged by the

25  Court from further deliberation you will render a true

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 164 of 301

(Videotape, 10-07-14; 10:28:49)

1    verdict and that you'll render your verdict only on the

2    evidence introduced and in accordance with the

3    instructions of the Court, so help you God?

4            JURORS: I do.

5            THE COURT: Okay, thank you.  You may be seated.

6    What I'm going to do now is try to give you a road map on

7    how the trial is going to proceed.  Now I can't tell you

8    what the evidence is going to be because I don't know what

9    it is either, but I can tell you how it's going to be

10    presented to you.  The first thing that's going to happen

11    after I'm done talking to you now is the prosecutor is

12    going to be making her opening statement in which she will

13    outline her theory of the case.  Now after she makes an

14    opening statement, the defense attorney has an opportunity

15    to make an opening statement, and she may decide to do it

16    at that time, she may decide to do it at a later time,

17    that's really her call, but if there are opening

18    statements made from both sides, remember these opening

19    statements are not evidence.  They're only here to help

20    you understand the theories that each party has about the

21    case, but they're not evidence.  The actual presentation

22    of the evidence comes after that, and that will come in

23    the form of presentation of witnesses.  The prosecutor's

24    announced to you a number of names of folks she intends to

25    call as witnesses, and I don't know if there are any

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 165 of 301

(Videotape, 10-07-14; 10:28:49)

1  exhibits or not.  There may be exhibits.  An exhibit is
2  something that you pick up and look at, like a document or
3  a photograph or something of that nature, and the defense
4  attorney after each witness is presented by the prosecutor
5  has an opportunity to question or what we call cross-
6  examine that witness.  And then after all of the
7  prosecutor's witnesses have testified, then the defense
8  again is given an opportunity to present any evidence, but
9  remember the Defendant doesn't have to present any
10 evidence and that's because by law the Defendant doesn't
11 have to do anything at a trial or produce any evidence or
12 prove his innocence.  The prosecution has that burden.
13 But if the Defendant does decide to call witnesses, then
14 the prosecutor also has a right to question or cross-
15 examine the witnesses that are presented by the defense
16 and to call any witnesses that she might have to rebut any
17 testimony that was presented by the defense.
18         And then after all this evidence is presented to
19 you, then we give an opportunity to each side to present
20 to you what are called closing arguments.  Again, these
21 are not evidence.  They're simply designed to help you
22 understand what they, each party feels has shown or not
23 shown based on the testimony in the case, but you must
24 base your verdict only upon the evidence.
25         Now my job is different than yours.  My job is

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 166 of 301

(Videotape, 10-07-14; 10:28:49)

1  to see to it that the trial is run fairly and efficiently

2  and to make decisions about what evidence can be admitted

3  and what evidence can't be and to instruct you as to what

4  the law is that you're to apply to the case, and you have

5  to take the law as I give it to you.  Nothing that I say

6  is certainly intended to reflect any personal opinion I

7  might have about the facts in this case, and that's for a

8  good reason.  That's because you as the jurors are the

9  ones who decide the facts in this case.  That's your job.

10  Your job is to decide what the facts are, what happened

11  here.  That's your role and that's your job and no one

12  else's.  You're going to have to think about all the

13  evidence and all the testimony and decide what each piece

14  of evidence means and how important you think it is and,

15  of course, that will include your assessment of the

16  believability of the witnesses, and what you decide about

17  any fact in the case is final.

18          Now when it comes time for you to decide the

19  case, you're only allowed to consider evidence that was

20  properly admitted in the case, and in this case evidence

21  will consist of the sworn testimony of the witnesses and

22  any exhibits that are introduced.  If there's anything

23  else that's going to be considered as evidence, I'll let

24  you know that.

25          Now in this role of deciding what the facts are,

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

137

(Videotape, 10-07-14; 10:28:49)

1  you're going to have to decide which witnesses you believe

2  and how important you think their testimony is.  You don't

3  have to believe everything a witness says.  You don't have

4  to reject everything a witness said.  You can.  You can

5  accept everything, you can reject everything, or you can

6  accept part of it and reject part of it.  And in doing

7  that, in deciding what you believe, just rely on your

8  common sense and everyday experiences.  But you can't use

9  anything based upon a prejudice due to someone's race or

10  national origin or gender or anything like that.

11          Now there isn't an algorithm that I can give you

12  for deciding how to believe a witness.  There are some

13  questions you might want to ask as you go through that

14  process, like how well was the witness able to see or hear

15  the event they're talking about, were they paying

16  attention for a long period of time, was it a short period

17  of time?  Was there something else going on at the same

18  time that might have distracted them?  Does the witness

19  seem to have a good memory of what happened?  How does a

20  witness look and act to you while they're testifying?

21  They're going to be here on the witness stand.  You get a

22  chance to watch them testify.  Does the witness seem to be

23  making an honest effort to tell the truth or does the

24  witness seem to be argumentative and evasive?  Is there

25  anything about the witness's age or maturity that might

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 168 of 301

(Videotape, 10-07-14; 10:28:49)

1    affect how you assess their testimony?  Does the witness

2    project any bias or prejudice or, for that matter, any

3    personal interest in how the case is ultimately decided?

4    Has the witness been suggested any promises or threats or

5    suggestions that might influence their testimony?  In

6    general, does a witness have any special reason to tell

7    the truth or, for that matter, does the witness have any

8    special reason to not tell the truth, and all in all how

9    reasonable does the witness's testimony seem to you when

10   it's considered in the context of all of the other

11   evidence in the case?

12        Now the way we go through this process of

13   presenting the evidence is the attorneys ask questions and

14   the witnesses answer the questions, but it's the answers

15   themselves and only the answers that are the evidence.

16   And so you shouldn't think that something is true simply

17   because one of the attorneys asked a question that assumes

18   or suggests that it is true.

19        It's possible I may ask a question or two of a

20   witness also, and if I do that I'm not trying to reflect

21   any opinion about the evidence in the case.  My only

22   purpose in doing that would be to cover something that I

23   feel should be more fully explored.

24        Now during the trial there may come times when

25   the attorneys feel that some of the rules that we have to

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 169 of 301

(Videotape, 10-07-14; 10:28:49)

1  follow in the courtroom are not being followed, and if

2  they see the situation that way it's their obligation to

3  their client to make an objection, and when they make that

4  objection then the opposing attorney will be given an

5  opportunity to respond to the objection.  Maybe they agree

6  with the objection, maybe they don't, and if there's a

7  disagreement over the validity of the objection then it

8  becomes incumbent upon me to make a decision and to either

9  sustain the objection, in other words agree with it, or to

10 overrule the objection and I have to do that according to

11 the law.  I don't get to decide that based on what my

12 personal opinion may be about that, so if I do that I'm

13 doing it according to the law.

14         Now sometimes those objections may be a little

15 complicated and it may require some discussion with the

16 attorneys about that, and there's a couple of ways that

17 may come about.  I may either invite the attorneys to come

18 over here and have a discussion with me over here to my

19 right or, if I think it's going to be a lengthy discussion

20 about this objection, I may excuse you back to the jury

21 room while we're having that discussion.  Now my reason

22 for doing that is two-fold.  One is that discussion that I

23 have with the attorneys, that's a question about the law,

24 not the facts.  Remember, your job is to decide what the

25 facts are.  My job is to tell you what the law is.  So

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 170 of 301

(Videotape, 10-07-14; 10:28:49)

1    when it becomes a question of law, then I get involved and

2    so there's no use keeping you in the courtroom or

3    involving you in that discussion because it really has

4    nothing to do with what your job is here.

5         The second reason I may excuse you from the

6    courtroom is just to give you a break, to get out of here,

7    while we continue to work on and try to resolve any legal

8    questions there are.

9         Now when we do take that break or when we do

10   take a break like we did over the lunch period or when we

11   do take a break for the evening, you're not to discuss

12   this case as I told you with anyone; family, friends,

13   anybody like that.  And as a matter of fact, you're not

14   even to discuss it among yourselves until it comes time

15   for you to decide the case and that will be after all the

16   evidence has been presented and all the arguments have

17   been made and I've given you some final instructions.  So

18   -- now, listen, when the trial's over with, you can talk

19   about this case to anybody you want to.  You don't have

20   to, but you can if you wish, but until we reach the point

21   in the trial where we actually go into deliberation, or

22   you actually go into deliberation, you may not discuss the

23   case.

24        Now there are, as I said, certain people with

25   whom you can't have any discussion whether it has anything

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

141

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 171 of 301

(Videotape, 10-07-14; 10:28:49)

1   to do with the case or not, and those are the people that

2   are involved in the case and those are the lawyers, the

3   witnesses, the parties.  And the reason we do that, the

4   reason we do that is because, look, we not only want you

5   to in fact be fair and impartial, we also and I think

6   you'd agree want it to look like it's impartial too.  So

7   if you are out in the hall with one of the attorneys

8   having a good laugh over something, well, the other side

9   might look at that and say, well, my, they're awful cozy,

10   I'm not sure this is a level playing field, they seem to

11   be awfully friendly.  So, you know, to avoid even the

12   appearance of impropriety you shouldn't have any

13   discussion with anybody involved in the case because it's

14   very important that the only information that you get

15   about this case is information that comes to you in the

16   courtroom, in my presence, when it's tested under the

17   scrutiny of the legal procedures that we do so.

18       So for that reason I'm also telling you you

19   cannot -- and I don't know if there's any media coverage

20   about this case or not, but if there happens to be, you

21   may not listen to, read, or observe any media accounts of

22   this case for the same reasons.  You know, the media I

23   have great respect for and they make every possible

24   effort -- these reporters that cover this courtroom make

25   every possible effort they can to be as accurate and

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

142

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 172 of 301

(Videotape, 10-07-14; 10:28:49)

1    balanced as they possibly can be, but I have to tell you
2    that it doesn't always get done accurately notwithstanding
3    their best efforts.  If any of you have ever been the
4    subject of any articles in the paper or anything like
5    that, and I have hundreds of time, okay, I'm in the paper
6    every week, and I can tell you that it's not always
7    exactly the way it happens here.  And so for that reason,
8    you rely on yourself to make the decision in this case.
9    Don't rely on what someone else is telling you through the
10   media.

11           Now the restrictions that I have made is to make
12   sure that you not have information outside the courtroom.
13   So that means don't conduct any experiments of your own.
14   You know, we all have access to the internet now.  Don't
15   be doing any investigation or research on the internet
16   about any of the issues that are brought up in this case
17   because that, again, is material that is not subjected to
18   the scrutiny of the rules of procedure and questioning and
19   cross-examination that a courtroom is and that's the only
20   place from which you can derive the information that
21   you're going to use to arrive at your verdict.  And so
22   turn off your cell phones when you're in the jury room
23   and, you know, don't be using your iPads or anything like
24   that.  Base your case on only what is presented to you
25   here in the courtroom in the presence of everybody.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 173 of 301

(Videotape, 10-07-14; 10:28:49)

1    Now I don't believe it's desirable or helpful
2    for you to take notes during the trial. I find that that
3    is distracting you from paying attention to the actual
4    testimony or evidence that's being presented, so you won't
5    be taking any notes.

6    Now you -- by the way, you notice that we have
7    13 of you here and I told you at the outset everyone is
8    entitled to a jury of 12 persons and that is correct, and
9    that means that 12 people will deliberate in this case so
10   that one of you, before we actually start the
11   deliberations, will be excused. And the reason we have an
12   extra person here is, I mean, you never know. You know,
13   health emergencies come up. Every once in a while someone
14   becomes -- you know, has to go to the emergency room
15   because they're violently ill for some reason and can't
16   continue on here, and so we don't want to have to abort
17   the trial at that point, so we have an extra juror just in
18   case. So at the end of the case what we'll do is we'll
19   just draw one of your names out of a hat. That will be
20   the person who won't be in deliberations.

21   The possible penalty, I think a couple of you
22   were asked questions about whether you know anything about
23   the penalty for this type of an offense. Well, the reason
24   that question was asked is because possible penalties
25   should have no influence on your decision whatsoever.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 174 of 301

(Videotape, 10-07-14; 10:28:49)

1    It's my job as the Judge to impose the penalty, so that

2    doesn't have any bearing upon your decision about what the

3    facts are in this case.

4         Now, you know, I may give you some instructions

5    as the trial unfolds.  I can assure you that at the end of

6    the trial I'll be giving you some rather detailed

7    instructions on the law that you're to follow in arriving

8    at your verdict, and you should take all of my

9    instructions together and that's the body of law that you

10   use to arrive at your verdict, and a verdict in a criminal

11   case must be unanimous and that means that each juror must

12   agree upon it and it must reflect the individual decision

13   of each juror, and it's important for you to keep an open

14   mind here and not make up your mind about anything until

15   you've heard all of the evidence in the case.

16        Now I read to you, if you recall, at the outset

17   of the trial when you were back in the audience the

18   Information, which is the charge in this case.  And if

19   you'll recall, the charge in this case is called criminal

20   sexual conduct in the first degree, and there are, as I

21   said, as with all crimes there are certain elements that

22   the prosecutor must prove to establish the guilt of the

23   Defendant beyond a reasonable doubt.  And the elements of

24   first degree criminal sexual conduct are, first, that the

25   Defendant, Mr. Rainbolt, engaged in a sexual act that

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 175 of 301

(Videotape, 10-07-14; 10:28:49)

1   involved entering into Alyssa Ward's genital opening by

2   his penis and any entry, no matter how slight, is enough.

3   It doesn't matter whether the sexual act was completed or

4   whether semen was ejaculated.  Secondly, the prosecutor

5   must prove that Alyssa Ward was at least 13 but less than

6   15 years old at the time of the event, and third, the

7   prosecutor must prove that she was the Defendant's

8   daughter.  Now I think that's all you need to know with

9   regard to this case to be able to sit back and listen and

10  observe the testimony and listen to the testimony and the

11  exhibits and get the information that you need to arrive

12  at a verdict.  So at this time I'm going to invite Ms.

13  Johnson to address the jury with her opening statement.

14          MS. JOHNSON: Thank you, your Honor.  Good

15  afternoon again, everyone.  This is my opportunity to tell

16  you all what I believe the evidence will show.  And I want

17  to start by telling you what I think the evidence is going

18  to show from the very first witness that you're going to

19  hear from.  The first person you are going to meet today

20  is Jennifer Houston.  Jennifer, when she was younger, had

21  a child with the Defendant, Eric Rainbolt.  That child was

22  a girl, her name is Alyssa.  Today she's 16 years old.

23  She was born in January of 1998.  I expect Jennifer will

24  tell you that the Defendant and Alyssa never had a very

25  close relationship.  There was a period of time when he

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 176 of 301

(Videotape, 10-07-14; 10:28:49)

1   was not in her life at all and since then it's been

2   inconsistent at best.

3          The next thing I expect Jennifer to tell you

4   will be that a few years ago she noticed some troubling

5   behaviors in Alyssa.  She noticed Alyssa was wearing dark

6   makeup, a lot of makeup.  She was wearing dark, revealing,

7   tight clothing.  I'll come right out and say this because

8   I know you're going to hear Ms. Baker say it, at this

9   period of time Alyssa is not a perfect person, she was

10  telling some lies, she was telling some lies at this

11  period of time.  She was withdrawn from her family,

12  isolating herself.  She wasn't being an active participant

13  in family life.  She has two younger brothers and a

14  stepfather in the home.  She was withdrawing from all of

15  them.  And she began cutting herself.  For those of you

16  who don't know what cutting is, she was actually taking a

17  razorblade to her skin on her arms and on her thighs and

18  mutilating herself with that razorblade.

19         Now Jennifer observed this behavior and had

20  confronted her daughter about it and for a while she

21  thought the cutting had stopped.  But then on August 6th

22  of 2013 Jennifer found a bloody razor in her daughter's

23  room, razorblade, and this caused Jennifer to confront

24  Alyssa.  In this confrontation Alyssa was resistant to

25  tell her mother anything.  Jennifer said, you know, you

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 177 of 301

(Videotape, 10-07-14; 10:28:49)

1   have to tell us why you're cutting and her stepfather even

2   got involved in the conversation and her stepfather said,

3   you know, this behavior is not normal and it's not okay

4   for a girl your age.  What happened to you to cause you do

5   this?  And at one point in the conversation Jennifer even

6   rose her hands up figuratively speaking.  Throws her hands

7   up and says, I can't deal with you anymore if you're going

8   to be behaving like this.  I'm going to go send you to

9   live with him.  I'm going to go send you to live with your

10  dad.  And you'll hear from Alyssa that at that point she

11  finally broke down in tears and explained to her parents

12  what was going on, her mother and her stepfather, what was

13  going on, and you'll hear from Alyssa that about a year to

14  a year and a half before they confronted her on August 6th

15  when Alyssa was in 8th grade, her father, the Defendant,

16  raped her.

17          When Jennifer got this information, she called

18  the police, and you will hear about the process that

19  unraveled when she called the police.  First of all,

20  you'll hear the police took a report from Jennifer but

21  never interviewed Alyssa and why they never interviewed

22  her is because in a case like this there is a specific

23  kind of interview that must be followed, and instead of

24  the police interviewing her they took her to a trained

25  professional at the Child Abuse Council who is trained in

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 178 of 301

(Videotape, 10-07-14; 10:28:49)

1   what we call forensic interview techniques. And you'll

2   hear from Kim Watson who conducted this interview. And

3   Ms. Watson will tell you what a forensic interview is.

4   It's a specific interview where she's trained to get

5   information from a person who is a victim or a witness

6   without asking any leading questions, without inserting

7   any of her ideas into the conversation so that all of the

8   information comes from Alyssa in this situation, and

9   you'll hear that she followed these protocols.

10          You will hear that as part of this process

11  Jennifer got Alyssa into therapy and you will hear from

12  Alyssa a little bit about her therapy. Obviously there's

13  privilege involved in that. You won't hear the details of

14  the actual therapy, but you will hear that from both

15  Alyssa and Jennifer the remarkable difference that that

16  therapy has made in Alyssa's life. I think Alyssa will be

17  very proud when she tells you she's stopped cutting since

18  she's been in therapy. Jennifer and Alyssa will both tell

19  you she's more involved in the family now. She's no

20  longer wearing this makeup and clothing, and the lies have

21  stopped.

22          You will also hear that as part of what happened

23  after this disclosure Jennifer had to take Alyssa to the

24  DeVos Children's Hospital in Grand Rapids and she had to

25  have a medical examination. She had to have a pelvic exam

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 179 of 301

(Videotape, 10-07-14; 10:28:49)

1    from this.  And you will hear from Dr. Simms, and this is

2    one of the things I asked a lot of you about in voir dire

3    is keeping an open mind to what these expert witnesses

4    have to say.  And you will hear from Dr. Simms that she is

5    specialized in child abuse and child sexual abuse and she

6    specializes in diagnosing and working with these children.

7    And she's going to explain to you a little bit about the

8    female body that may be contrary to some things that we

9    all commonly believe, and that is that the idea that the

10   first sexual experience or first penetration damages the

11   hymen or causes trauma to the body is not a true idea.

12   She's going to explain to you how the female body is made

13   to accept that type of intrusion and penetration and

14   accommodate it, and I know that you will hear Ms. Baker

15   again and again say there's no physical evidence of

16   penetration because the fact is that Alyssa's medical

17   examination was completely normal.  It was about a year

18   and a half after this, and there was no damage to her

19   genital area.  And you'll hear from Dr. Simms that that's

20   not expected in this type of case.

21        And you will hear that the lack of damage in no

22   way disproves anything.  It has no bearing on whether or

23   not this happened; okay?  And part of that is from the

24   delay in the reporting.  This happened a year and a half

25   later.  The body heals itself.  And this delay in

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 180 of 301

(Videotape, 10-07-14; 10:28:49)

1    reporting or what scientists and therapists will call a

2    delayed disclosure, it's another crucial part of this case

3    that you will hear about.

4            And you will hear from Barb Cross, who is a

5    therapist and who specializes and is an expert in sexual

6    abuse and specifically child sexual abuse, and she will

7    tell you that this delay in disclosure is absolutely

8    expected and normal and there is scientific literature to

9    back up this idea that children do not disclose and

10   adolescents do not disclose these sexual abuses

11   immediately.  Then she will give you the reasons; the

12   protection, the embarrassment.  And another thing I expect

13   you'll hear from her is that there's often another

14   triggering event to the disclosure.  It's not the actual

15   sexual abuse that causes disclosure but something else;

16   drug use, alcohol use, you know, any of these ways that

17   people act out after this.  And that fits with exactly

18   what you have before you in this case.

19           It was not the fact of the sexual abuse, it was

20   the confrontation of the cutting that caused Alyssa to

21   finally tell her mother that this had happened.  And I

22   expect that Barb Cross will tell you that that is normal

23   within the literature in her expert experience.

24           And there's another piece to this.  We talked

25   about what happened after the legal process is started,

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 181 of 301

(Videotape, 10-07-14; 10:28:49)

1    but before the legal process started, before her mother

2    confronted her about cutting, before she had to go to

3    therapy, before she had to have that intrusive pelvic

4    exam, before she had had her forensic interview, before

5    the police were thought of, before this trial was thought

6    of, Alyssa told somebody else that this happened.  At a

7    slumber party several months after this happened, Alyssa

8    told her friend that her father had raped her.  At a time

9    when there is no arguable motive to make this up, months

10   before anything in court was ever thought of, Alyssa told

11   a friend and you will hear from that friend in Court today

12   or tomorrow that her father had raped her.

13           You will hear a jury instruction from the Judge

14   that says that to prove this charge, it is not necessary

15   that there be any evidence other than the testimony of

16   Alyssa Ward, if that testimony proves guilt beyond a

17   reasonable doubt.  I told you what I expect the rest of

18   the testimony will show.

19           Now let me tell you what I expect Alyssa's

20   testimony to be.  Alyssa will tell you that this happened

21   in her 8th grade school year.  She was 13 when she entered

22   8th grade, 14 when she left.  She will tell you that it

23   happened at her father's computer shop, which is on

24   Airline Road in Fruitport Township, and she'll tell you

25   that it happened in the time during a school break when

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

152

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 182 of 301

(Videotape, 10-07-14; 10:28:49)

1   she was visiting her father and his girlfriend or fiancé

2   and their two daughters and that the girlfriend and the

3   fiancé had gone out, I believe to her mother's house

4   maybe, and the Defendant told Alyssa we have to go to the

5   store or the shop and we have to clean it. It was not a

6   time when the shop was open. They went to clean the shop,

7   and they did some work at the shop, and at the end of it

8   Alyssa was in a back room. There was a back room there

9   that had an air mattress and she was on a laptop watching

10  Netflix laying on this air mattress and the Defendant came

11  into the back room and told her it's late, we're gonna

12  spend the night here. Get comfortable, take off your

13  pants, your jean shorts, and get comfortable. We're gonna

14  stay here. And she actually got up and went to another

15  computer to play a game and he laid down on the bed, and

16  he convinced her to come back to the bed and watch a movie

17  and as they're watching the movie he's getting closer and

18  closer to her. She doesn't think much of it at first

19  because he's her father. He then gets up to go to the

20  bathroom, and when he comes back he's only in his boxer

21  shorts; okay? And he tells Alyssa to take off her panties

22  and she starts to cry, and he tells her again to take off

23  her panties and she complies. He lays on the bed and

24  tells her to get on top of him. She says he pulled down

25  his boxers, he puts on a condom, and he pulls her down and

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

153

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 183 of 301

(Videotape, 10-07-14; 10:28:49)

1   penetrates her from underneath, and when he's all done, he

2   asks her have you ever done that before?  And when she

3   tells him no, he laughed at her and tells her to go clean

4   herself back up.  Ladies and gentlemen, Alyssa's testimony

5   alone per the jury instruction is enough to prove this

6   case beyond a reasonable doubt, and this case will be

7   proven to you beyond a reasonable doubt when you hear her

8   testimony and you hear all of the other testimony I talked

9   about, and at the end of this case I'll stand before you

10  again and ask you to return a verdict of guilty.

11          THE COURT: Okay.  Thank you, Ms. Johnson.  Ms.

12  Baker, do you care to address the jury?

13          MS. BAKER: I do, your Honor.  Thank you.

14          THE COURT: You may.

15          MS. BAKER: Good afternoon, ladies and gentlemen,

16  and thank you for your attention.  I know it's getting

17  late.  The trial in this case is going to focus a lot on

18  credibility.  I mentioned that during voir dire, and

19  that's going to be the biggest issue for you to decide in

20  this case.  We have this young girl who has a -- who has

21  admitted lying in the past.  We have no evidence of

22  penetration, and we do have a number of details, and

23  that's what I'd like you to focus on during the course of

24  this trial.  If you look at the details that she provides

25  regarding this event, you will be able to determine that

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 184 of 301

(Videotape, 10-07-14; 10:28:49)

1  it doesn't match the life experiences and events that

2  happened in this family.  You're going to find that the

3  location that she described doesn't match up to the loca

4  -- to the time frame that used this location.  You're

5  going to find that where she was before this event doesn't

6  match up with her time frame.  So the details that she

7  should know are true regarding this alleged event should

8  all match up with the life events of this family, and it's

9  our position that once you hear all of the evidence that

10  is presented to you in this trial during cross-

11  examination, during direct examination, and during the

12  presentation of our evidence through our various witnesses

13  you're going to have to conclude that it hasn't proven

14  beyond a reasonable doubt that Mr. Rainbolt had any sort

15  of sexual conduct or contact with his daughter.

16        Now you're going to hear stories about how

17  horrible a dad he was because he wasn't involved in this

18  child's life but, ladies and gentlemen, this is a

19  contentious -- clearly you will hear evidence that there

20  was contention between mom and dad for most of the

21  relationship and especially towards the last couple of

22  years, the time frame that's alleged here.  Most of the

23  visits were coordinated through Mr. Rainbolt's girlfriend,

24  the mother of his two other children, so that she could

25  schedule family time for all of the girls to get together,

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

155

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 185 of 301

(Videotape, 10-07-14; 10:28:49)

1    so all three daughters could visit with each other, and

2    she was the one who set up all of these visits.

3            You're also going to hear that there wasn't a

4    time in 2012 that Mr. Rainbolt was alone with his daughter

5    Alyssa, and particularly not at the location that she's

6    described.  So that's just an I - that's just a little bit

7    of the evidence that we expect to produce during this

8    trial, ladies and gentlemen.  That's just not going to

9    match up, and when you look at what should be consistent

10   during the course of this evidence, you're going to come

11   to the conclusion that the People have not proven this

12   case beyond a reasonable doubt and we will ask you to

13   return a verdict of not guilty.  Thank you.

14           THE COURT: Okay, thank you.  You may call your

15   first witness, Ms. Johnson.

16           MS. JOHNSON: The People call Jennifer Houston.

17           J E N N I F E R   H O U S T O N ,

18   called as a witness at 3:48:08; testified as follows:

19                   DIRECT EXAMINATION

20   BY MS. JOHNSON:

21   Q    Good afternoon, Ms. Houston.

22   A    Hi.

23   Q    Do you have any children?

24   A    Yes.

25   Q    All right.  How many do you have?

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 186 of 301

(Videotape, 10-07-14; 10:28:49)

1   A    Three.

2   Q    Who's your oldest?

3   A    Alyssa.

4   Q    How old is she?

5   A    Se -- 16.

6   Q    What's her date of birth?

7   A    1-6-98.

8   Q    Okay.  Whose her father?

9   A    Derek Rainbolt.

10   Q    Do you see him in the courtroom today?

11   A    Yes.

12   Q    Could you please point to him and identify him by what

13       he's wearing.

14   A    Right there in a shirt and tie.

15           MS. JOHNSON: Your Honor, may the record reflect

16       the witness has identified the Defendant.

17           THE COURT: It will.

18  BY MS. JOHNSON:

19   Q    How close was Alyssa's relationship with her father prior

20       to, say, 2011-2012?

21   A    She would go over there occasionally, mostly through

22       Sarah.

23   Q    Who's Sarah?

24   A    His girlfriend.

25   Q    Okay.

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 187 of 301*

(Videotape, 10-07-14; 10:28:49)

1   A    But she did spend time over there.

2   Q    Do you know if it was a close relationship?

3   A    I wouldn't say extremely close, no.

4   Q    Did there come a time when you found out Alyssa was

5        cutting herself?

6   A    Yes.

7   Q    When did you first find that out?

8   A    Uhm, she was in 8th grade.

9   Q    Okay.

10   A    My stepdaughter told me that she was cutting -- well, told

11        her mother, who called me.

12   Q    Can you tell the jury what you mean when you say cutting?

13   A    Uhm, cutting in spots that weren't shown, with razorblades

14        on like her hips under the underwear so no one could see

15        them.

16   Q    So actually cutting her body with --

17   A    Her body, yes.

18   Q    -- with a razorblade?  What did you do when you first

19        found that out?

20   A    I asked her what was going on, why she started cutting.

21        She said she didn't know.

22               MS. BAKER: Objection; hearsay.

23              THE COURT: That would be hearsay, and the

24        objection is sustained.  You will have to strike and not

25        consider the answer that was just given by the witness.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

158

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 188 of 301

(Videotape, 10-07-14; 10:28:49)

1    Go ahead.

2    BY MS. JOHNSON:

3    Q    Without telling me a reason, did she ever give a reason

4         for why she was cutting at that point?

5    A    No.

6    Q    Around the time that you first learned that she was

7         cutting did you notice any other behaviors in your

8         daughter?

9    A    Uhm, yes.  She became more to herself.  Uhm, she dropped

10        her groups of friends down to just one friend.  Uhm, she

11        started wearin' like the dark makeup around the eyes and

12        stuff like that, and I just thought it was a change.

13   Q    How was her clothing at that time?

14   A    Uhm, she started wearing tight clothes.

15   Q    How was she interacting with you and your family at that

16        time?

17   A    Uhm, she kept herself in her room a lot, didn't come out

18        much, didn't really talk to many people.

19   Q    Uhm, was there a period of time when you thought the

20        cutting had stopped?

21   A    Yeah, 'cause we didn't see it, the actual cuts her --

22        themselves.  Like when we first found out, it was like a

23        little scar that we had saw on her arm.  It wasn't till

24        later when I saw all of the -- the scars.

25   Q    I want to draw your attention to August 6th, 2013.  Was

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

159

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 189 of 301

(Videotape, 10-07-14; 10:28:49)

1    there something that drew your attention back to the

2    cutting on that day?

3 A  Uhm, yes.  Actually she was in her room.  We had my nephew

4    over, and the boys, me and my husband were sitting there

5    and she was off in her room being quiet, whatever.  So I

6    just went in there to see what she was doing, asked her

7    why don't you come out here and sit with us?  She said she

8    didn't feel like it.  There was a little box that had a

9    necklace in it and I had picked it up and the little --

10   the little liner came out with it and there was a bloody

11   razorblade under there.

12 Q  What did you do when you saw that bloody razorblade?

13 A  I asked her what is this and where are your cuts, let me

14   see them, and she said, I don't know what that's from.

15             MS. BAKER: Objection; hearsay.

16             THE COURT: Okay.  Ladies and gentlemen, you

17   cannot consider testimony by a statement of someone who is

18   not testifying here now.  That's called hearsay, and the

19   objection will be sustained, and you have to strike

20   whatever testimony was presented here about what someone

21   else told the witness.

22 BY MS. JOHNSON:

23 Q  Were you immediately able to get her to admit she was

24   cutting?

25 A  Yes.

_Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823_

160

(Videotape, 10-07-14; 10:28:49)

1  Q   Okay.  Were you immediately able to find a reason why she

2      was cutting?

3  A   Yes, after probably 15 minutes or so.

4  Q   Okay.  So tell me about 15 minutes to get a reason.

5  A   Yeah, she just --

6  Q   Without telling me what she was saying, what was going on

7      in those 15 minutes?

8  A   Uhm, she was crying.  I said what are you doing, why are

9      you cutting this, there's -- you know, I've done all I can

10     do for you, maybe if you lived with your dad he could help

11     you through this, and that's when she started bawlin'.

12 Q   Okay.  At some point -- your husband is Tim Houston;

13     right?

14 A   Yes.

15 Q   Okay.  At some point did Tim come into the room?

16 A   Yes, yes, because we were kind of loud.

17 Q   Okay.  What happened when he came into the room?

18 A   Uhm, he asks what was going on in here and I said this is

19     what's goin' on and I was holdin' up the bloody razorblade

20     and I told him she's cutting again.  And he said, Alyssa,

21     why would you cut again, you know, what is your reason?

22     You have everything.  You have your cell phone, you have,

23     you know, your TV, what (indistinguishable.)

24             MS. BAKER: Object to hearsay again.

25             MS. JOHNSON: There's no assertions in that

_____

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

161

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 191 of 301

(Videotape, 10-07-14; 10:28:49)

1    statement.   It's him questioning her.

2              THE COURT: Okay.   What was the testimony again?

3              MS. JOHNSON: That he was asking her why she was

4    cutting.

5              THE COURT: Well, what is that offered for?

6              MS. JOHNSON: It's being offered for the

7    circumstances of what was going around -- going on at this

8    time and there's no assertion there, so it doesn't meet

9    the definition of hearsay.

10             THE COURT: I'll admit the testimony; overruled.

11   The objection doesn't meet the definition of hearsay.

12   BY MS. JOHNSON:

13   Q    And you said at some point you told Alyssa you may send

14        her to go live with her dad.

15   A    Yes.

16   Q    Why did you do that?

17   A    Uhm, because I had done all I could do for the cutting.

18        You know, I thought it stopped.   I said maybe your dad can

19        help you through this because, you know, he wasn't always

20        there, you know.   Maybe he could step in and help with

21        that situation.

22   Q    How did Alyssa react, again without telling me what she

23        exactly said, but what's her reaction to that?

24   A    She just started cryin' really hard.

25   Q    Did she at that point tell you why she's cutting?

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

162

(Videotape, 10-07-14; 10:28:49)

1   A    Yes.

2   Q    And what did she tell you?

3   A    She said that I cannot go stay there --

4              MS. BAKER: Object to hearsay.

5              MS. JOHNSON: Your Honor, the victim's

6        credibility has already been called into question by the

7        defense in opening and this is going to be a prior

8        consistent statement.

9              THE COURT: Well, you have to lay the foundation

10       for that though.  You haven't laid the foundation for it,

11       so I sustain the objection.  Again, you may not consider

12       statements that the victim in this case, alleged victim,

13       made to the witness.  It's hearsay.  It may not be

14       considered by the jury.

15  BY MS. JOHNSON:

16  Q    After she told you whatever she told you, what did you do?

17  A    I punched the wall, I called my mom first, and then I

18       called the police.

19  Q    So let me talk about when you called the police.  Did an

20       officer come to your home?

21  A    No.

22  Q    Did you make a report?

23  A    I talked to one officer who transferred me to another -- I

24       think it was Fruitport possibly, and then they told me I

25       would get a call first thing in the morning from the Child

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 193 of 301

(Videotape, 10-07-14; 10:28:49)

1   Abuse Clinic or from an officer to -- to get with me at

2   the --

3           THE COURT: Okay. I want to go back and revise my

4   ruling admitting the evidence about him asking her about

5   cutting. That evidence should not have been admitted

6   either, because that technically is double hearsay and the

7   hearsay comes from the victim saying that's what he said,

8   and that is offered for the proof of the truth of the

9   matter that he, in fact, said it. So therefore I'm also

10  instructing the jury they may not consider that evidence

11  about him asking her about cutting. That is also hearsay.

12  I'm changing my ruling on that. Go ahead, Ms. Johnson.

13  BY MS. JOHNSON:

14  Q   All right. Did any police officer actually ever interview

15      Alyssa?

16  A   We went to the child abuse clinic the next morning and she

17      had an interview there.

18  Q   Okay. So no uniformed police officers interviewed her?

19  A   Not at my house.

20  Q   Okay. And when you went to the Child Abuse Council, who

21      all went?

22  A   Uhm, me, my husband, Alyssa, and the boys I believe had to

23      show up, too.

24  Q   When you say the boys --

25  A   Shawn and Tyree --

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

164

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 194 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q   -- can you tell the jury who you're talking about?

2  A   My sons, Shawn and Tyree.

3  Q   And are they your sons with the Defendant or with Tim?

4  A   Tim.

5  Q   How old are they?

6  A   9 and 11.

7  Q   So after she was interviewed at the Child Abuse Council,

8      did you also have to take her for a medical exam?

9  A   Yes.

10 Q   Where did you take her for that medical exam?

11 A   We had to go out to DeVos.  There was a -- out in Grand

12     Rapids.  I -- it wasn't at the DeVos actual hospital.  It

13     was in a clinic out there.

14 Q   Okay.  What happened when you first got to the clinic?

15     Did they immediately take her in for a physical exam or

16     did you speak to them first?

17 A   I spoke with the, uhm, doctor first, I believe.

18 Q   And without telling me what was said, did the doctor take

19     a thorough history from you about Alyssa's health up to

20     that point?

21 A   Yes.

22 Q   And without telling me what was said, did the doctor also

23     ask you about why you were there?

24 A   Yes.

25 Q   Did you know if -- were you present when they spoke to

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 195 of 301

(Videotape, 10-07-14; 10:28:49)

1      Alyssa?

2  A    They spoke to Alyssa separately.

3  Q    Okay.  Were you present for the exam?

4  A    Yes.

5  Q    Can you tell the jury what type of exam she had to have?

6  A    She had to have a vaginal exam.

7  Q    Was that her first vaginal exam?

8  A    Yes.

9  Q    Since going to the Child Abuse Council that day for the

10     interview has Alyssa started therapy?

11  A    Yes.

12  Q    How frequently was she going to therapy?

13  A    Weekly.

14  Q    Okay.  For how long?

15  A    Up until a month ago, so a year.

16  Q    What changes have you -- first of all, have you seen any

17     changes in Alyssa since she began therapy?

18  A    I have.

19  Q    Okay.  Can you tell the jury about those changes?

20  A    She's becoming more sociable with everybody, the family,

21     and she's even like started drama.  At school last year

22     she did her first play on stage in front of people, where

23     before she wouldn't want to be the center of attention,

24     wouldn't want no one lookin' at her.

25  Q    Has her makeup changed?

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445  231-744-6823*

166

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 196 of 301

(Videotape, 10-07-14; 10:28:49)

1 A Yes.

2 Q Tell the jury how her makeup has changed.

3 A It's less.  Now it's just a little eyeliner and a little

4   mascara.

5 Q Has her style of dress changed?

6 A Uhm, for the most part, yeah.  It's not so skintight.  I

7   mean she wears her clothes regular.

8 Q Has the cutting changed?

9 A Yes.  She has not cut.

10 Q Do you remember anytime when Alyssa contacted you to come

11   get her early from the Defendant's, a visit with the

12   Defendant?

13 A Uhm, yes.

14 Q Okay.  Do you remember when that was?

15 A Uhm, there's, you know, a couple times that she hasn't

16   wanted to stay the whole time she said she would stay.

17   One night I got a text, it was late at night, wanted to

18   know if she could come home early.  I told her she could.

19   I said to my husband, it's kinda weird, she's textin'

20   late.  Uhm, I said do you want me to come get you now or

21   do you wanna wait till morning, and she said that she'll

22   just wait till morning.  And I asked her where she was at.

23   She's was at Sarah Mom's house, Michelle.

24 Q Okay.

25 A The girls, her sisters over there were sleeping, she said.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

167

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 197 of 301

(Videotape, 10-07-14; 10:28:49)

1   Q    Do you know how old Alyssa was when she started her

2        periods?

3   A    She started at 13.

4             MS. JOHNSON: Okay, thank you.

5             THE COURT: Okay.  Do you have any questions,

6        Ms. Baker?

7             MS. BAKER: I do, thank you.

8                      CROSS-EXAMINATION

9   BY MS. BAKER:

10  Q    When was it that you picked up Alyssa from Sarah's mom's

11       house?

12  A    Uhm, I did not pick her up that time.  Sarah just brought

13       her home early in the morning.

14  Q    So that time where you testified that Alyssa had texted

15       you for an early pickup, you're saying that Sarah brought

16       her --

17  A    Sarah brought her home the next morning.

18  Q    Okay.  Do you recall the last time you picked up Alyssa

19       from Sarah's mom's house?

20  A    No, not right offhand.

21  Q    Do you recall ever picking up Alyssa from her -- from --

22  A    Yes, I have.

23  Q    -- Sarah's mom's house?

24  A    Yes, I have.

25  Q    Now isn't it true that Alyssa was in therapy before her

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

168

(Videotape, 10-07-14; 10:28:49)

1    8th grade year?

2  A    She was --

3            MS. JOHNSON: Objection, motions in limine.

4            MS. BAKER: I think it's relevant, your Honor.

5    I'm not -- I'm not going into the basis of why she was in

6    therapy.  I'm asking if she was in therapy or counseling

7            THE COURT: All right, go ahead.  All right.  You

8    can ask her that.

9  A    Yes, she was in counseling and during that counseling they

10       talked about cutting.

11 BY MS. BAKER:

12 Q    Okay.  So this most -- there have been two counseling

13       sessions or sets of times that Alyssa's been in

14       counseling?

15 A    Yes, yes.

16 Q    This time -- how much time was in between these two

17       counseling -- or the end of the first counseling, the

18       beginning of the second one?

19 A    I'm not sure exactly.

20 Q    Was it weeks, months, years?

21 A    Months; a year maybe.

22 Q    Okay.  It's fair to say that your relationship with

23       Mr. Rainbolt was not the best relationship; correct?

24 A    We didn't have the best of relationships but we didn't

25       fight all the time either.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

169

(Videotape, 10-07-14; 10:28:49)

1  Q  Uhm, can you -- well, can you confirm that most of the

2     visits between Alyssa and Mr. Rainbolt's girlfriend and

3     the other children were mostly arranged through Sarah?

4  A  Correct.

5  Q  Or sometimes her mother, Michelle?

6  A  Correct.

7  Q  It would be fair to say that it was rare for Mr. Rainbolt

8     to coordinate those visits; correct?

9  A  Correct.

10 Q  Now Alyssa was in 8th grade from the 2011 to 2012 school

11    year; correct?

12 A  Yes.

13 Q  What school did she go to?

14 A  Orchard View.

15 Q  And did you keep a calendar of the visits that Alyssa

16    would go on to her -- to see Mr. Rainbolt or Sarah?

17 A  No.

18 Q  Now do you recall how many visits Alyssa had with

19    Mr. Rainbolt or Sarah during, let's say, 2012?

20 A  I do not recall.

21 Q  Do you recall that in June of 2012 you picked up Alyssa

22    early from the computer shop?

23 A  I did.

24 Q  And you were -- you were actually at that location to pick

25    her up; correct?

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

170

(Videotape, 10-07-14; 10:28:49)

1   A   Correct.

2   Q   Did you go inside the shop?

3   A   No.  I was on my way to work when I had got a text.

4   Q   And was it not true -- or isn't it true that you and

5       Mr. Rainbolt had an argument when you came to pick up

6       Alyssa?

7   A   Yes.  We exchanged some words about he knows she is not

8       allowed to sleep at the shop and that I didn't feel it was

9       safe.

10  Q   Was there also some argument about Facebook?

11  A   Yes.

12              MS. JOHNSON: Objection; relevance.

13              THE COURT: Overruled.

14  BY MS. BAKER:

15  Q   There was some argument about Alyssa was on Facebook at

16      that time and she wasn't supposed to be; correct?

17  A   There was not an argument.  When I was telling him that,

18      you know, she's not supposed to be at the shop sleeping

19      here, he said, oh, yeah, you know what's she's doing,

20      she's in there on Facebook and she's not supposed to be.

21      So it wasn't an argument.

22  Q   Ms. Houston, if you could just listen to my questions.  If

23      there's more I need to ask you, I will ask it of you and

24      Ms. Johnson is very good at that as well.  What I'm asking

25      was whether there was an argument about Facebook.  You're

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 201 of 301

(Videotape, 10-07-14; 10:28:49)

1      saying yes and Alyssa wasn't supposed to be on Facebook;

2      correct?

3  A   If you're asking if there was an argument about Facebook,

4      no, there was not an argument.  It was brought up.

5  Q   At the time that you picked up Alyssa on that particular

6      visit, Sarah and her daughters, Zoey and Stormy, were also

7      there; correct?

8  A   Correct.

9  Q   You saw them physically at that location; correct?

10  A   They were inside.

11  Q   And would that have been the last visit that Alyssa had

12      with Mr. Rainbolt?

13  A   Mmmm, I'm not exactly sure.  I think she may have went to

14      Sarah's.

15  Q   But with Mr. Rainbolt, that was the last visit; correct?

16  A   I'm not sure.

17  Q   Isn't it true that during the Christmas holidays Alyssa

18      would sometimes visit with Sarah and her mother and

19      Mr. Rainbolt?

20  A   Yes.

21  Q   Is it true that the last Christmas visit or the

22      Christmastime visit between them would have been in 2011?

23  A   I'm not exactly sure the last Christmas she went there.

24  Q   Well, in 2013, January of 2013, did you have a Facebook

25      account?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 202 of 301

(Videotape, 10-07-14; 10:28:49)

1  A    Yes.

2  Q    And did you post a comment on there about how Alyssa

3       didn't go see her dad for Christmas?

4              MS. JOHNSON: Objection; hearsay and relevance.

5              MS. BAKER: This is relevant.  It establishes

6       this relationship is very bad and she, uhm, attacks him

7       for not visiting with his daughter during the Christmas

8       holidays.

9              THE COURT: Okay.  Go ahead.

10 A    Yes, I made a Facebook post thanking Sarah Beckley and

11      Michelle Race-Beckley for always being there for Alyssa

12      when her father isn't.

13 BY MS. BAKER:

14 Q    So would it be fair based upon that Facebook statement or

15      your statement to conclude that there was no visit between

16      Mr. Rainbolt and his daughter during the Christmas holiday

17      of 2012?

18 A    Was that posted you said January 13th?

19 Q    January 7th of 2013.

20 A    7th?  That was the day after her birthday, and they

21      Facebooked her and called her.

22 Q    Ma'am, I'm asking you did -- is this -- does this show

23      that she didn't visit with her dad during the Christmas

24      2012 holiday?

25 A    Possibly, yes.

_Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823_

173

(Videotape, 10-07-14; 10:28:49)

1   Q    During that -- there were a number of people who responded

2        to your message; correct?

3   A    Correct.

4   Q    And you made some derogatory comments towards Mr. Rainbolt

5        in that; correct?

6            MS. JOHNSON: Objection; argumentative.

7            THE COURT: I'm sorry, what?

8            MS. JOHNSON: Argumentative.

9            MS. BAKER: I don't think I'm arguing with her.

10           THE COURT: Go ahead, overruled.

11  BY MS. BAKER:

12  Q    Did you make derogatory comments about Mr. Rainbolt in

13       that?

14  A    I'm not exactly sure what all I said.

15  Q    Would reviewing it help refresh your recollection?

16  A    Sure.

17  Q    Look at it.  Let me know if that's yours.  Please read it

18       over to yourself.  When you're done reviewing it, let me

19       know.

20  A    I would say I did not call him names in there and it was

21       not derogatory.

22  Q    Okay.  You weren't being derogatory to him in any way that

23       you're --

24  A    By stating facts?

25  Q    No.  Were you bad-mouthing him, ma'am?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

174

(Videotape, 10-07-14; 10:28:49)

1    A    No.

2    Q    Did your daughter have access to you -- this conversation?

3    A    Uhm, yes, she did.

4    Q    She, in fact, responded to this particular conversation;

5         did she not?

6    A    Yes, yes.

7    Q    She participated in this conversation; correct?

8    A    Yep.

9    Q    Would you say that your comments encouraged a relationship

10        between her father and her?

11   A    That relationship door was open.

12   Q    Ma'am, would you say that your comments encouraged a

13        relationship between Mr. Rainbolt and his daughter?

14   A    My comments did not discourage.

15   Q    Okay.  Was there any indication of visits between June of

16        2012 until January of 2013?

17   A    Between Alyssa and Derek?

18   Q    Yes.

19   A    I am not sure when she saw him because he went -- she went

20        with Sarah.

21   Q    Okay.  So Sarah may know more than you?

22   A    Possibly.  She would know if Derek was there.

23   Q    Now is Alyssa getting good grades in school in 2012?

24   A    Mmmm, she doesn't get great grades, no.  There was one

25        before all of this went down that she had pretty good

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

175

(Videotape, 10-07-14; 10:28:49)

1      grades.

2  Q   Okay.  Was that in October of 2012?

3  A   I am not sure the exact date.

4  Q   So other than that she didn't have good grades?

5  A   She used to have good grades.

6  Q   Now you indicated that or you testified that Alyssa

7      started cutting in 8th grade, or you found out about it in

8      8th grade; is that correct?

9  A   Uhm, yes, I believe that was 8th grade.

10 Q   When in 8th grade did you discover this?

11 A   I'm not sure the exact dates.

12 Q   Do you remember the time of year?

13 A   No, not exactly.

14 Q   Okay.  Now did you talk to Dr. Simms about this when you

15     went to DeVos?

16 A   Yes, we discussed cutting.

17 Q   Okay.  And that interview happened in October of 2013;

18     correct?

19 A   Uh-huh.

20 Q   Is that a yes or a no?  I'm sorry.  It's important we

21     gotta have words.

22 A   Yes.

23 Q   Okay.  So in October of 2013 you interviewed with that

24     doctor.  Did you tell Dr. Simms that it had been going on

25     for over two years?

_Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823_

176

(Videotape, 10-07-14; 10:28:49)

1  A   She had been cutting for a year and a half, couple years.
2      I told her I didn't know the exact date.
3  Q   Okay.  So it'd been going on since before her 8th grade
4      year then?
5  A   8th grade started in 2011.
6  Q   Okay.  The fall of 2011; correct?
7  A   Uh-huh.
8  Q   Are you saying that the first cutting that you discovered
9      was in the fall of 2011?
10 A   I'm saying I'm not sure when I first discovered it.
11 Q   Do you recall the time of year at all?
12 A   No.
13 Q   Do you remember any events going on in your family's life?
14 A   No.  I remember my stepdaughter's mother calling to tell
15     me that she had told him --
16 Q   I'm not asking you what the stepmother said.  Do you
17     remember when that stepmother called?
18 A   No, not exactly, I don't.
19 Q   Not even generally?
20 A   No.
21 Q   Now you suggested to your daughter after you discovered
22     this bloody razor in August of 2013 that she might need to
23     go live with her dad; correct?
24 A   Correct.
25 Q   Now had you told him about the cutting before that date?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

177

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 207 of 301

(Videotape, 10-07-14; 10:28:49)

1   A    Probably not 'cause we did not speak really.

2   Q    Okay.  So he wouldn't have known about it unless you had

3        told him?  Yes or no.

4   A    Probably not.

5   Q    And did you usually involve him in issues to -- with

6        Alyssa?

7   A    Not always.

8   Q    Had you involved him in issues with Alyssa before?

9   A    Which issues?  I mean, if something come up, if he was in

10       her life at that time I would have told him.

11  Q    Okay.  How about in or around, I don't know, 2009?

12  A    2009?

13  Q    Yes.

14  A    I'm not exactly sure.

15  Q    Okay.  And did you ever have a family meeting with he and

16       Sarah and --

17            MS. JOHNSON: Objection; motions in limine.

18            MS. BAKER: Your Honor, I am not going to ask

19       about the irrelevant aspects.  I'm asking about whether

20       there was a family meeting with these parties.

21            THE COURT: Without going into the purpose of the

22       family meeting?

23            MS. BAKER: Correct.

24            THE COURT: Okay.  I'll allow.

25  BY MS. BAKER:

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 208 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q    Did you ever have a family meeting with Derek and Sarah

2       and their kids and your husband to talk about Alyssa?

3  A    I do not recall a family meeting.

4                 MS. BAKER: Thank you.  I have nothing further at

5       this time.

6                      REDIRECT EXAMINATION

7  BY MS. JOHNSON:

8  Q    Okay.  Jennifer, you testified that a lot of the visits

9       were arranged through Sarah.  Why was that?

10 A    Me and Sarah had each other's number, I didn't have

11      Derek's number.  I talked through Sarah.  Sarah would

12      call, ask if -- if Alyssa could come over and see the

13      girls.  The girls wanted to see Alyssa.  Michelle has set

14      up arrangements for Alyssa.

15 Q    Were you open to talking to Derek about visitation at that

16      time?

17 A    If he had called I talked to him.

18 Q    Uhm, between 8th grade and the beginning of 10th grade when

19      this was disclosed, did Alyssa ask to go visit her father

20      at all?

21 A    Uhm, she asked if she could see the girls.  I don't recall

22      Derek being mentioned.

23 Q    I want to give you an opportunity to explain -- Ms. Baker

24      was asking you about an argument about Facebook.  You said

25      it wasn't an argument.  Explain that to the jury.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 209 of 301

(Videotape, 10-07-14; 10:28:49)

1   A   Uhm, it wasn't an argument.  It was me stating facts that
2       he did not come around for her birthday, Christmas, when
3       her step family called, txt --
4   Q   No, I'm sorry, and we'll get to that in a minute.
5   A   Oh.
6   Q   The argument at the computer store.
7   A   Oh, at the computer store.
8   Q   Yes.
9   A   Okay.  Uhm, it wasn't an argument about Facebook.  It was
10      me tellin' him that she was not allowed to sleep at the
11      computer shop, that I did not find that safe, and he
12      wanted to throw in, oh, yeah, well, you know, she's in on
13      Facebook right now and she's not supposed to be.  I told
14      him Facebook's irrelevant right now.  She's not supposed
15      to be sleeping here.
16  Q   So he was attempting to bring Facebook into the
17      conversation?
18  A   Yes, because I had no idea what she was doin' in there.
19  Q   Now let's talk about the Facebook account exchange that
20      you were asked about.
21  A   Uh-huh.
22  Q   I believe Ms. Baker and you agreed that that occurred on
23      January 7, 2013?
24  A   Correct.
25  Q   What is the significance again of January 6?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

180

(Videotape, 10-07-14; 10:28:49)

1  A    January 6 is Alyssa's birthday.

2  Q    Okay.  And you said you did not post anything derogatory.

3  A    No.

4  Q    Anywhere in that post did you call him a name?

5  A    I did not see where I called him a name.  I stated that he

6      didn't come around and that his measly $65 a month didn't

7      do anything or something like that.

8  Q    Is anything you said in that post untrue?

9  A    No.

10  Q    Did you use any foul language in that post?

11  A    I don't believe I did.

12  Q    And was that prompted by her birthday or by Christmas?

13  A    Mainly her birthday.

14  Q    Uhm, you said to the doctor, Simms, or someone at Dr.

15      Simms' office that the cutting had been going on for two

16      years.  You said here today a year to a year and a half.

17  A    Couple years.  I -- I don't know exactly when it started.

18      I don't know the exact date.

19  Q    But during the 8th grade?

20  A    Yes.

21  Q    Not something you marked on the calendar?

22  A    No, it's not an event I want to celebrate.

23          MS. JOHNSON: Okay, thank you.

24          THE COURT: Okay, ma'am.  You may stand down.

25      Witness, please?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

181

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 211 of 301

(Videotape, 10-07-14; 10:28:49)

1   MS. JOHNSON: Your Honor, the People call Alyssa

2   Ward.

3                    A L Y S S A   W A R D,

4   called as a witness at 4:18:05, testified as follows:

5                    DIRECT EXAMINATION

6   BY MS. JOHNSON:

7   Q    Hi, Alyssa.

8   A    Hi.

9   Q    How are you doing this afternoon?

10  A    Good.

11  Q    Okay.  What's your date of birth?

12  A    January 6th, 1998.

13  Q    And who is your mother?

14  A    Jennifer Houston.

15  Q    Who is your father?

16  A    Derek Rainbolt.

17  Q    Do you see him in the courtroom today?

18  A    Yes.

19  Q    Could you please point to him and tell me what he's

20       wearing.

21  A    A grey button-up shirt.

22            MS. JOHNSON: Your Honor, may the record reflect

23       the witness has identified the Defendant?

24            THE COURT: It will.

25  BY MS. JOHNSON:

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 212 of 301

(Videotape, 10-07-14; 10:28:49)

1    Q    Who do you live with now?

2    A    My mother.

3    Q    Anyone else in your home?

4    A    My stepfather and siblings.

5    Q    Okay.  What's your stepdad's name?

6    A    Timothy Houston.

7    Q    And how many siblings do you have in the home?

8    A    Two.

9    Q    And are they older or younger than you?

10   A    Younger.

11   Q    Who are they?

12   A    Shawn and Tyree.

13   Q    Are they your half-brothers?

14   A    Yes.

15   Q    Uhm, have you ever lived with your father?

16   A    No.

17   Q    For any period of time?

18   A    No.

19   Q    Prior to, let's say, 8th grade how would you describe your

20        relationship with your dad?

21   A    Uhm, on occasion I would see him.

22   Q    Were you close to him?

23   A    No, not really.

24   Q    Do you know why you're here today?

25   A    Yes.

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 213 of 301

(Videotape, 10-07-14; 10:28:49)

1    Q    Okay.  What are you here to talk about today?

2    A    The rape.

3    Q    When did that happen?

4    A    In -- before -- between the ages of 13 and 14.

5    Q    Do you know what grade you were in in school?

6    A    8th.

7    Q    And 8th -- what grade are you in now?

8    A    11th.

9    Q    So this would be 2014-15 school year; right?

10   A    Yes.

11   Q    Have you skipped any grades or been held back any grades

12        since 8th grade?

13   A    No.

14   Q    So 8th grade would have been your 2011-2012 school year;

15        is that right?

16   A    Yes.

17   Q    And you said your birthday was January of '98, so you were

18        13 in January of 2011 when you entered 8th grade?

19   A    Yes.

20   Q    And 14 in January of 2012, and 14 until you left 8th

21        grade?

22   A    Yes.

23   Q    Now you said you're here to talk about a rape.  Where did

24        that rape happen?

25   A    At Computers Plus, computer store.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

184

(Videotape, 10-07-14; 10:28:49)

1  Q   Okay.  And is that on Airline Road in Fruitport Township

2      in the County of Muskegon and in the State of Michigan?

3  A   Yes.

4  Q   Okay.  Uhm, do you know when during 8th grade that

5      happened?

6  A   No.

7  Q   Can you remember what season it was in?

8  A   No.

9  Q   And was it a weekend or was it a school night?

10  A   I believe it was a school break.

11  Q   And when you say a school break, what do you mean by that?

12  A   Like a few days off of school.

13  Q   Had you -- was this a time that you were visiting with

14      your father?

15  A   Yes.

16  Q   Okay.  Where did you start your visit with your father

17      during that break?

18  A   At the trailer park.

19  Q   Okay.  And is that where he lived at the time?

20  A   Yes.

21  Q   Who else was living in his home at that time?

22  A   His girlfriend, Sarah.

23  Q   All right.  Was anybody else living with them?

24  A   Just their daughters.

25  Q   How old are their daughters?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

185

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 215 of 301

(Videotape, 10-07-14; 10:28:49)

1   A   Now?

2   Q   Now.

3   A   I'm not sure.

4   Q   All right.  How old were they in 8th grade?

5   A   Probably like 3 and maybe 1 or 2.

6   Q   So those would be your half-sisters?

7   A   Yes.

8   Q   Did you have a close relationship with them?

9   A   Yes.

10  Q   And how was your relationship with Sarah?

11  A   Good.

12  Q   At some point did Sarah and the girls leave the trailer?

13  A   Yes.

14  Q   Okay.  Do you know where they went?

15  A   Sarah had to work and the girls were going to Sarah's

16      mom's.

17  Q   At that point was there anyone else in the trailer aside

18      from you and your father?

19  A   No.

20  Q   What happened when it was you and he alone in the trailer?

21  A   He said he needed to go clean up the shop so he could open

22      up the next day.

23  Q   And did he ask you to go with him?

24  A   Yes.

25  Q   Did you do so?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

186

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 216 of 301

(Videotape, 10-07-14; 10:28:49)

1  A    Yes.

2  Q    All right.  And that's to the shop on Airline Road in

3       Fruitport?

4  A    Yes.

5  Q    Okay.  What happened when you got to the shop?

6  A    Uhm, we just start -- picked up the shop and cleaned it.

7  Q    Was it open for business that day?

8  A    No.

9  Q    What kind of store is that if you know or shop?

10 A    Computer store, repair.

11 Q    Computer repair?  Can you describe the layout of it?

12 A    It was a big, open area, and in the back there was -- it

13      was sort of L-shaped and there were two rooms in the back.

14 Q    And what was in the rooms in the back?

15 A    Uhm, the first one was an office area and then on the

16      other side of that there was a air mattress and garbage.

17 Q    Was there also a bathroom back there?

18 A    Yes.

19 Q    At some point did you go into the back room?

20 A    Yes.

21 Q    What were you doing in the back room?

22 A    I was watching Netflix on the computer.

23 Q    And where were you in the back room when you were watching

24      Netflix?

25 A    On the air mattress.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

187

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 217 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q    At some point did your dad come back into the back room

2        with you?

3  A    Yes.

4  Q    Describe what happened when he came back there.

5  A    He came back and he told me that I needed to get ready for

6        bed because he had to get up early the next day.

7  Q    Did he make a move to take you home to go to bed at the

8        trailer?

9  A    No.

10  Q    Where did -- where did he expect you to sleep then?

11  A    He moved onto the air mattress and I guess assumed we were

12        both sleeping there.

13  Q    Did you continue to watch the movie?

14  A    For a while, yeah.

15  Q    Okay.  At some point did you get up and play a video game?

16  A    Yes.

17  Q    Okay.  While you were playing the video game did your dad

18        say anything to you?

19  A    Yes.  He told me I needed to lay back down and get ready

20        for bed.

21  Q    Did you do so?

22  A    Yes.

23  Q    Was there -- how many air mattresses were in the back?

24  A    One.

25  Q    Were you both on that one air mattress?

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

188

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 218 of 301

(Videotape, 10-07-14; 10:28:49)

1  A   Yes.

2  Q   When you got back in the bed were you watching the movie

3      again?

4  A   Yes.

5  Q   Okay.  Describe where your father was when you were

6      watching that movie.  Was he watching it with you?

7  A   Yeah.  He was laying next to me on the air mattress.

8  Q   Okay.  And what, if anything, was he doing while you were

9      watching that movie?

10  A   More like -- I guess you would call it cuddling.

11  Q   Did you think anything of that at that time?

12  A   No, not necessarily.

13  Q   At some point did he leave the bed?

14  A   Yes.

15  Q   Where did he go?

16  A   He went out to the front and turned the lights out.

17  Q   Okay.  And when he returned what was he wearing?

18  A   He was wearing jeans and a shirt, t-shirt.

19  Q   At some point did he go to the bathroom?

20  A   Yes.

21  Q   When he came back from the bathroom what was he wearing?

22  A   Boxers and a t-shirt.

23  Q   What happened when he came back in his boxers?

24  A   He laid back down and told me to move over.

25  Q   Okay.  And did you do so?

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 219 of 301

(Videotape, 10-07-14; 10:28:49)

1    A    Yes.

2    Q    Okay.  Did he say anything else at that point?

3    A    Yeah.  He told me that I couldn't sleep in jean shorts

4         because it'd be uncomfortable.

5    Q    And did you take off your jean shorts at that time?

6    A    Yes.

7    Q    What happened after that?

8    A    Then he told me to turn the movie off.

9    Q    Did you do so?

10   A    Yes.

11   Q    Okay.  What happened after you turned the movie off?

12   A    He called me back over to the bed and told me to climb on

13        top of him.

14   Q    What were you wearing at that time?

15   A    My underwear and a tank top.

16   Q    Did he tell you to do anything with your clothing?

17   A    He told me to take my underwear off.

18   Q    Did you immediately do so?

19   A    No.

20   Q    Why not?

21   A    Because I was confused and I wasn't sure what was going

22        on.

23   Q    Did he ask you a second time?

24   A    He told me.

25   Q    Told you a second time.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

190

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 220 of 301*

(Videotape, 10-07-14; 10:28:49)

1  A   Yes.

2  Q   How did you react the second time he told you remove your

3      underwear?

4  A   I was more numb and I just did what he said.

5  Q   Okay.  What happened after you took your underwear off?

6  A   I went to climb over him.

7  Q   And did you do so?

8  A   Yes.

9  Q   What happened then?

10 A   He told me to lower myself onto him.

11 Q   Did you do so?

12 A   Yes.

13 Q   What was he wearing at that time?

14 A   He had lowered his boxers.

15 Q   So he was nude?

16 A   Yes.

17 Q   From the waist down at least?  Did he penetrate you?

18 A   Yes.

19 Q   Okay.  What part of his body entered what part of your

20     body?

21 A   His penis to my vagina.

22 Q   How were you reacting when this was happening?

23 A   I didn't say anything.  I just sat there.

24 Q   How did it end?

25 A   He told me to get off of him and go clean myself up.

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 221 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q  Did he at any point ask if you'd ever done that before?

2  A  Yes.

3  Q  What did you tell him?

4  A  No.

5  Q  What was his reaction when you told him that?

6  A  He just chuckled a little bit.

7  Q  How long did it last?

8  A  I don't know.

9  Q  Did you end up sleeping at the computer store that night?

10 A  No.

11 Q  Do you need a moment?

12 A  Uhm --

13 Q  Do you need a glass of water?

14 A  No, thank you.

15 Q  Where did you go instead of sleeping at the computer

16    store?

17 A  He brought me to Sarah's mom's.

18 Q  When you got there who was there?

19 A  The girls and Sarah's mom and her dad.

20 Q  Did you talk to anybody when you got there?

21 A  I said hi to Michelle, Sarah's mom, and then I went to

22    bed.

23 Q  When you stay at Sarah's mom -- Sarah's mom's home do you

24    have your own room?

25 A  Sort of.  I shared it with Zoey.

_Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823_

192

(Videotape, 10-07-14; 10:28:49)

| | | |
|---|---|---|
| 1 | Q | Okay.  Did you tell Sarah's mom? |
| 2 | A | No. |
| 3 | Q | Why not? |
| 4 | A | I was scared. |
| 5 | Q | Did you tell anyone about this right away? |
| 6 | A | No. |
| 7 | Q | Why not? |
| 8 | A | At first I was scared, I didn't know what would happen, |
| 9 | | and then over time I started to tell myself maybe it |
| 10 | | didn't really happen. |
| 11 | Q | Do you know if you -- well, who is the very first person |
| 12 | | you told? |
| 13 | A | My friend, Andrea. |
| 14 | Q | When did you tell Andrea? |
| 15 | A | February of the year before last, maybe, or last year. |
| 16 | Q | What year in school were you? |
| 17 | A | Freshman in high school. |
| 18 | Q | So about a year and a half ago? |
| 19 | A | Yeah. |
| 20 | Q | Okay.  Where were you when you told Andrea? |
| 21 | A | Andrea's house. |
| 22 | Q | What were you doing there? |
| 23 | A | Eating dinner. |
| 24 | Q | And what made you tell Andrea this? |
| 25 | A | Because she had found out I had been self-harming again |

*Mills Court Reporting*,  1615 Sunset, N Muskegon, MI 49445  231-744-6823

193

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 223 of 301

(Videotape, 10-07-14; 10:28:49)

1    and she kept asking why I was doing it and threatened to

2    tell.

3  Q    Okay.

4  A    I mean, for doing it if I didn't give her a reason why.

5  Q    Did she encourage you to tell anyone?

6  A    Yes.

7  Q    Who did she encourage you to tell?

8  A    She told me I needed to tell my mom.

9              MS. BAKER: Objection; hearsay.

10             THE COURT: Sustained.  The jury may not consider

11    what someone else told her.

12             MS. JOHNSON: Your Honor, it's not an assertion.

13    There's no truth to it.  It's an encouragement to tell

14    somebody something.  There is no assertion being made.

15             THE COURT: Offered to prove that she made that

16    statement to her only?

17             MS. JOHNSON: That -- that -- just to prove that

18    she encouraged her to tell someone.

19             THE COURT: Okay.  Then that -- if she's offering

20    it just to prove that she made that encouragement, that

21    would not be hearsay, I agree.  The objection will be

22    overruled if that's the only purpose, and that's the only

23    purpose the jury may consider it for.

24  BY MS. JOHNSON:

25  Q    Did you follow her advice and tell anyone?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

194

(Videotape, 10-07-14; 10:28:49)

1  A    No.

2  Q    Why not?

3  A    At that point it was -- I was more scared that they

4       wouldn't believe me.

5  Q    You mentioned that you had been self-harming.

6  A    Yes.

7  Q    What -- can you tell the jury exactly what you mean by

8       that?

9  A    I was cutting myself.

10 Q    And what were you using to cut yourself?

11 A    A razorblade.

12 Q    Where on your body were you cutting yourself?

13 A    My thighs and forearms.

14 Q    How deeply were you cutting yourself?

15 A    I don't know.

16 Q    Why were you doing it?

17 A    It was an escape from the emotional pain.

18 Q    Did it cause you physical pain?

19 A    Yes.

20 Q    When was the very first time that you started cutting

21      yourself?

22 A    I don't know.

23 Q    Had you cut yourself at all before the rape that you just

24      described?

25 A    No, not really.  There were a few occasions where I'd

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

195

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 225 of 301

(Videotape, 10-07-14; 10:28:49)

1       heard about it and I would scratch myself, but that was

2       all.

3    Q  But no razorblades before the rape?

4    A  No.

5    Q  No cuts -- actual intentional cuts before the rape?

6    A  No.

7    Q  All right.  There were multiple times that your mother

8       found out you were cutting yourself; correct?

9    A  Yes.

10   Q  And she would ask you about it.  Why didn't you tell her

11      the first time that she asked about it?

12   A  I was scared she wouldn't believe me.

13   Q  I want to take your attention to August of last year,

14      2013.  Did there -- was there a time that your mom

15      confronted you about the cutting again?

16   A  Yes.

17   Q  Do you know what prompted her to ask you about the cutting

18      again?

19   A  She came into my room and picked up a jewelry box and it

20      was where the blades were and she had dropped it and they

21      had fallen out.

22   Q  And when we're talking blades, are you talking about just

23      standard razorblades?

24   A  Yes.

25   Q  Did she ask you why you were cutting?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

196

(Videotape, 10-07-14; 10:28:49)

1  A   Yes.

2  Q   The very first time she asked you on August 6 did you tell

3      her?

4  A   No.

5  Q   How long did it take before you did eventually tell her?

6  A   Until she threatened to send me to live with my father.

7  Q   What was your emotional reaction to that?

8  A   Just started bawling, crying.

9  Q   And at that point did you tell her why you had been

10     cutting yourself?

11 A   Yes.

12 Q   And what did you tell her?

13 A   I was raped.

14 Q   Did you tell her who had raped you?

15 A   Yes.

16 Q   And who did you tell her had raped you?

17 A   My father.

18 Q   Did you tell her where it had happened?

19 A   Yes.

20 Q   Where did you tell her it happened?

21 A   At Computers Plus.

22 Q   Did you give her the details you gave the jury today?

23 A   Yes.

24 Q   After that did -- did any uniformed police officer ever

25     interview you?

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

197

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 227 of 301

(Videotape, 10-07-14; 10:28:49)

1   A   Yes.

2   Q   Okay.  And where did that happen?

3   A   At my house.

4   Q   And during that interview did you give the details of what

5       had happened?

6   A   Yes.

7   Q   Okay.  Were you then taken also to the Child Advocacy

8       Center?

9   A   Yes.

10  Q   And did you give an interview there?

11  A   Yes.

12  Q   Was that to a person named Kim Watson?

13  A   Yes.

14  Q   And was that the same disclosure that you made to the jury

15      today?

16  A   Yes.

17  Q   I'm going to talk about the cutting.  Were there occasions

18      that would make you cut more frequently or more?

19  A   When I was upset.

20  Q   What type of things would upset you to cause you to cut

21      more?

22  A   If I had had a argument with my parents or anything that

23      would push me in that direction.  I couldn't emotionally

24      handle things as well as I should have been able to.

25  Q   Were there times when people told you you look like your

Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823

198

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 228 of 301

(Videotape, 10-07-14; 10:28:49)

1    dad?

2  A    Yes.

3              MS. BAKER: Objection; leading.

4              THE COURT: Sustained.  Please rephrase the

5    question.

6  BY MS. JOHNSON:

7  Q    Has anyone ever told you you look like your dad?

8              MS. BAKER: Again, this is leading.

9              MS. JOHNSON: It calls for a yes or no answer.

10              THE COURT: Overruled.

11  A    Yes.

12              THE COURT: Form of the question is appropriate.

13  BY MS. JOHNSON:

14  Q    Was that between the rape and the disclosure?

15  A    Yes.

16  Q    And how would you react when people would say those type

17    of things to you?

18  A    I wouldn't comment on it.

19  Q    What would -- would that have an emotional reaction for

20    you?

21  A    Yes.

22  Q    And how would you deal with that emotional reaction?

23  A    Cutting.

24  Q    Uhm, after you went to the Child Abuse Center did you go

25    to DeVos Children's Hospital?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

199

(Videotape, 10-07-14; 10:28:49)

1    A    Yes.

2    Q    And while there did you have a medical exam?

3    A    Yes.

4    Q    Before the medical exam did you -- were you interviewed by

5         the medical staff there?

6    A    Yes.

7    Q    And did you tell them what you told the jurors today?

8    A    Yes.

9    Q    What did you tell them?

10   A    That I was raped by my father.

11   Q    And did you tell them that it happened in the computer

12        store?

13   A    Yes.

14            MS. BAKER: This is cumulative and it's also

15        another hearsay statement.  It's an out of court statement

16        by this declarant.

17            THE COURT: Well, it doesn't violate the

18        confrontation clause since the witness is available for

19        cross-examination, and the Court will allow the testimony.

20   BY MS. JOHNSON:

21   Q    Tell the jury what you told them.

22            THE COURT: Well, wait a minute.

23            MS. JOHNSON: We've not argued prior -- this is

24        just a prior consistent statement.

25            THE COURT: No, no, no.  Right, right.  You

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

200

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 230 of 301

(Videotape, 10-07-14; 10:28:49)

1       haven't attacked it with prior inconsistent (inaudible.)

2       I agree.  At this point you're premature.  The objection

3       is sustained.

4   BY MS. JOHNSON:

5   Q    Okay.  Can you tell the jury about the actual medical exam

6        you had to have?  What medical exam was that?

7   A    I had to have my vagina examined.

8   Q    Was that the first time you'd ever had that type of exam?

9   A    Yes.

10  Q    Have you been in therapy?

11  A    Yes.

12  Q    Okay.  How long have you been in therapy for this?

13  A    Since I told in August.

14  Q    And how frequently do you go?

15  A    Oh, it has -- it's varied between a week and two weeks.

16  Q    In therapy have you talked about any other major traumas

17       in your life?

18  A    Yes.

19  Q    Have you seen any improvement with therapy?

20  A    Yes.

21  Q    Okay.  Tell the jury about what improvements you've seen.

22  A    I've stopped cutting and all around I'm just happier.

23  Q    Prior to therapy how was your relationship with your mom

24       and Tim and your brothers?

25  A    Distant.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 231 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q   And how is it now?

2  A   Better, a lot better.

3  Q   Do you think that's because of therapy?

4  A   Yes.

5  Q   And prior to the therapy how was your relationship with

6      your friends?

7  A   Close.

8  Q   How many friends did you have at that point?

9  A   Not many.

10  Q   And have you seen a difference in your friendships since

11      therapy?

12  A   Yes.

13  Q   And do you think that's because of therapy?

14  A   Yes.

15  Q   Can you tell the jury how your friendships are different

16      now?

17  A   They're still all close but I have more friends now.

18  Q   Have you taken on more activities at school recently?

19  A   Yes.

20  Q   Is that something you did before your disclosure and

21      before therapy?

22  A   No, no.

23  Q   Do you credit the therapy with allowing you to do those

24      things?

25  A   Yes.

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 232 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q  And tell the jury about what types of things you're doing

2     now.

3  A  Theater club and extra credit activities after school for

4     government class.

5  Q  Have you cut recently at all?

6  A  No.

7           MS. JOHNSON: Okay. (Inaudible.)

8           THE COURT: Are you finished?

9           MS. JOHNSON: Yes.

10          THE COURT: Okay. You may cross-examine.

11          MS. BAKER: Your Honor, it's going to take more

12    than 15 minutes.

13          THE COURT: Okay, go ahead.

14          MS. BAKER: Oh, okay.

15                    CROSS-EXAMINATION

16 BY MS. BAKER:

17 Q  Alyssa, my name is Paula Baker and I represent

18    Mr. Rainbolt in this case who's your father; correct?

19 A  Yes.

20 Q  So this event occurred at his shop on Airline Road;

21    correct?

22 A  Yes.

23 Q  And do you recall whether he was only -- whether he was in

24    one location or more than one location during the time

25    that you would visit with him?

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 233 of 301

(Videotape, 10-07-14; 10:28:49)

1  A   One.

2  Q   You only remember one location?

3  A   He moved after -- shop -- he moved his shop after the

4      rape.

5  Q   Okay.  That's what you recall; correct?

6  A   Yes.

7  Q   Now you said that this occurred -- that you started out at

8      the trailer; is that correct?

9  A   Yes.

10 Q   All right.  So in 8th grade you would have started school

11     September of 2011; correct?

12 A   Yes.

13 Q   And you're saying that you were in the 8th grade when this

14     happened; correct?

15 A   Yes.

16 Q   It wasn't the summer break; correct?

17 A   No.

18 Q   And it wasn't the summer between your 13th and 14th year?

19 A   No.

20 Q   So it would have been from September 2011 until you turned

21     14?

22 A   Yes.

23 Q   Okay.  And do you recall if -- well, first of all, when

24     you start school in the fall do you wear shorts to school?

25 A   No.

---

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

204

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 234 of 301*

(Videotape, 10-07-14; 10:28:49)

1 Q No? Okay. So would this have been the spring or the
2   summer of 2012?
3 A I don't know.
4 Q You don't remember?
5 A No.
6 Q Or you don't know?
7 A I don't remember.
8 Q Okay. But you'd know that you wouldn't have worn shorts
9   in the beginning of the school year.
10 A Not to school.
11 Q Well, do you know -- it's the beginning of October right
12   now. Are there any school breaks in September or October?
13 A No.
14 Q All right. And when you talk about this trailer, what
15   trailer are you referring to?
16 A The one that him and Sarah lived in.
17 Q Okay. Now did you know that Derek and Sarah had sold that
18   trailer?
19 A Yes.
20 Q When did you learn that?
21 A Afterwards.
22 Q After what?
23 A After the rape.
24 Q After the rape? You learned of it or you knew that it had
25   been sold after that?

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 235 of 301*

(Videotape, 10-07-14; 10:28:49)

1  A    It hadn't been sold until afterward.

2  Q    Now would it surprise you that that trailer had been sold

3       in the fall of 2011?

4  A    I don't remember.

5  Q    That would have been the year that you would have been in

6       8th grade; right?

7  A    I don't remember the exact time and date.

8  Q    Well, you do remember that you would have started the 8th

9       grade in the fall, September of 2011; correct?

10  A    Yes.

11  Q    Now would it surprise you that the trailer was sold in

12       September of 2011?

13  A    Yes.

14  Q    That would surprise you.  Okay.  And at the time that this

15       what you termed the rape occurred, what was the

16       relationship between your father and Sarah?

17  A    Together.

18  Q    They were together?

19  A    Yes.

20  Q    Now they had had some times that they were separated;

21       correct?

22  A    They were off and on often.

23  Q    Okay.  And this wasn't one of those times; correct?

24  A    Not that I remember.

25  Q    And can you tell me, do you recall the vehicles that were

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 236 of 301

(Videotape, 10-07-14; 10:28:49)

1    driven by your father and Sarah at the time that this

2    incident occurred?

3  A  I know they had a van and a car.

4  Q  They had a van and a car?

5  A  Yes.

6  Q  Okay.  Do you recall what color the van was?

7  A  Burgundy.

8  Q  Burgundy van.  And the car?

9  A  I don't know.

10  Q  Now you've testified before about this incident; correct?

11  A  Yes.

12  Q  And you took an oath to tell the truth?

13  A  Yes.

14  Q  At that previous hearing; correct?

15  A  Yes.

16  Q  Didn't you testify that it was a white car?

17  A  I don't remember.

18  Q  Well, would reviewing your testimony help?

19  A  I don't know.

20  Q  You don't know?

21  A  I don't remember what color the vehicle was.

22  Q  Okay.  Now can you describe this mattress?

23  A  It's a blue air mattress.

24  Q  How big was it?

25  A  I don't know, maybe a full size.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

207

(Videotape, 10-07-14; 10:28:49)

1  Q  Maybe or you don't know?

2  A  I don't know.

3  Q  And where was it in this place?

4  A  In the black -- in the back area.

5  Q  Okay.  Was it inside the office?

6  A  No.

7  Q  All right.  Now at that prior court hearing you also

8     testified about how big the air mattress was; didn't you?

9  A  I don't remember.

10 Q  Okay.  Well, you know, when they had that hearing, you

11    know you were sitting in front of a microphone; correct?

12 A  Yes.

13 Q  And there was somebody in the courtroom recording that

14    particular hearing.  Do you recall that?

15 A  Yes.

16 Q  Then somebody types up what was said in the courtroom.

17 A  Yes.

18 Q  Did you know that?

19 A  Yes.

20 Q  And if I -- I'm looking at the typed up version of that

21    particular hearing.  Would reviewing this particular

22    document refresh your recollection?

23 A  I don't know.

24 Q  Well, may I offer it to you to review?

25 A  Sure.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

208

(Videotape, 10-07-14; 10:28:49)

1 Q    Okay.  Let me make sure I get the right pages.

2           MS. JOHNSON: 16.

3 BY MS. BAKER:

4 Q    Uh-huh, and 14, okay?  Why don't you read -- I'm gonna

5      show this to you.  This is from this case in your prior

6      testimony.  It was on July 2nd of this year; correct?

7 A    Yes.

8 Q    Can you read pages 14 through 16?

9 A    My part or both?

10 Q   You can read the whole thing just to yourself.  You don't

11     have to read it aloud.  Are you done?

12 A   Yes.

13 Q   Do you remember what your testimony was then?

14 A   It's right there.

15 Q   I beg your pardon?

16 A   What's right there.

17 Q   Okay.  Do you remember the color of the car?

18 A   I don't recall saying it but it's typed out that it was

19     white.

20 Q   Okay.  And do you remember the air mattress being a twin

21     size mattress?

22 A   Twin or full.

23 Q   When I asked you how big was this air mattress in the back

24     room you said a twin size; correct?

25 A   Then I said a twin or a full.

*Mills Court Reporting,*  1615 Sunset, N Muskegon, MI 49445  231-744-6823

209

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 239 of 301

(Videotape, 10-07-14; 10:28:49)

1       MS. JOHNSON: Your Honor, I'd ask that the rule
2   of completeness apply and that the next four lines be read
3   into the record as well.
4   BY MS. BAKER:
5   Q   That's fine.  I ask a twin size air mattress and you said
6       twin or twin or full; correct?
7   A   Yes.
8   Q   And both you and your father were laying on this air
9       mattress.
10  A   Yes.
11  Q   In 2011 to 2012; correct?
12  A   Yes.
13  Q   Now I have to ask you.  Is your time frame indicating that
14      this occurred before your 14th birthday?
15  A   Yes.
16  Q   Your 14th birthday would have been in 2012; correct?
17  A   Yes.
18  Q   And you had two visits with Sarah and your father in 2012;
19      correct?
20  A   No.
21  Q   No?  How many visits did you have?
22  A   I don't know, but it was more than two.
23  Q   Okay.  Do you remember a visit in May 2012?
24  A   I don't remember the exact dates that I visited.
25  Q   Okay.  Do you keep a calendar at all?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 240 of 301

(Videotape, 10-07-14; 10:28:49)

1  A   No.  There was nothing set up.  Whenever I was contacted
2      to go over I would.
3  Q   Now did you ever post things on Facebook when you would go
4      visit?
5  A   On occasion.
6  Q   Did Sarah usually set these visits up?
7  A   Sarah or her mother.
8  Q   Her mother is Michelle; right?
9  A   Yes.
10 Q   Okay.  Hang on a minute here.  I'm trying to get this.  I
11     want to show you what's been marked as Defendant's Exhibit
12     A.  Do you recognize that?
13 A   Yes.
14 Q   What is that?
15 A   A picture of me and my sisters.
16 Q   And who are those sisters?
17 A   Stormy and Zoey.
18 Q   Okay.  Which one is in the top picture?
19 A   Stormy.
20 Q   And who is she with?
21 A   Me.
22 Q   And the bottom picture?
23 A   Zoey.
24 Q   Okay.  Where are these pictures from?
25 A   The computer shop he bought after.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 241 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q   So this was at the computer shop?

2  A   A different one than where the rape took place.

3  Q   Okay.  So this happened in 20 -- and the time frame for

4      this is 2012?

5  A   Yes.

6  Q   Was he there at the time that these pictures were taken?

7  A   I don't remember.  Most likely.

8  Q   Well, would you be at the computer shop if he wasn't

9      there?

10 A   Sarah has brought me to the computer shop.

11 Q   By herself?

12 A   Yes.

13 Q   With the girls?

14 A   He wasn't the only one who worked there.  He had friends

15     up there all the time.

16 Q   Okay.  So it was kind of a busy place; wasn't it?

17 A   On occasion.

18 Q   Now would these be fair and accurate depictions of you in

19     2012?

20 A   Yes.

21 Q   On May 24th of 2012?

22 A   Yes.

23          MS. BAKER: Move for admission of Defendant's A.

24          MS. JOHNSON: No objection.

25          THE COURT: Okay.  Defendant's Exhibit A will be

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

212

(Videotape, 10-07-14; 10:28:49)

1   received.  And then could you tell me what that is,

2   please?

3            MS. BAKER: It's photographs of the -- of this

4   witness and her stepsister -- her half-sisters.

5            THE COURT: Okay.  Have you marked the exhibit?

6            MS. BAKER: I have marked it.

7            THE COURT: Okay, with the case number and the

8   date, please?

9            MS. BAKER: No, I haven't.  I will do that

10  though.

11           THE COURT: Okay.  You don't have to do it right

12  now but make sure we do that.

13           MS. BAKER: Sure.

14  BY MS. BAKER:

15  Q   How did you and your dad -- you and your dad used to call

16      each other names; correct?

17  A   Yes.

18  Q   He'd call you punk; right?

19  A   Yes.

20  Q   Sometimes brat or something?

21  A   Yes.

22  Q   That was something he'd always done; correct?

23  A   Yes.

24  Q   Did you call him names as well?

25  A   Yes.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

213

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 243 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q    What did you call him?

2  A    Punk, brat, anything.

3  Q    I want to show you what's been marked as Proposed Exhibit

4      B.  Do you recognize that?

5  A    Yes.

6  Q    What is that?

7             MS. JOHNSON: I'd ask to see the exhibit before

8      it's testified to.  Okay.

9  A    A picture.

10  BY MS. BAKER:

11  Q    And who is that picture of?

12  A    Me.

13  Q    And where's that picture at?

14  A    In the computer shop.

15  Q    That's at your dad's computer shop?

16  A    Yes.

17  Q    Okay.  And who took this photograph?

18  A    Him.

19  Q    And where is it published?

20  A    Facebook.

21  Q    Okay.  And did you make any comments regarding this

22      Facebook post?

23  A    Yes.

24             MS. JOHNSON: Objection; hearsay.

25             THE COURT: I guess, are these assertive comments

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 244 of 301

(Videotape, 10-07-14; 10:28:49)

1    or -- I don't know.

2             MS. BAKER: No.  This is her calling him a name.

3             THE COURT: Okay, that's not assertive.  Go

4    ahead.  It's not hearsay.

5   BY MS. BAKER:

6   Q    Did you make a comment in here?

7   A    Yes.

8   Q    Is that your comment?

9   A    Yes.

10  Q    With respect to that picture you said thanks, dad, p.s.,

11    you're a douche?

12           MS. JOHNSON: Objection; irrelevance.

13           THE COURT: Overruled.

14  A    Yes.

15  BY MS. BAKER:

16  Q    Did you post that back on May 24th of 2012?

17  A    Yes.

18  Q    Is that a fair and accurate depiction of you on May 24th

19    of 2012?

20  A    Yes.

21           MS. BAKER: Move for admission of Defendant's B.

22           MS. JOHNSON: No objection other than my previous

23    relevance objection.

24           THE COURT: Okay.  It will be received then on

25    that basis.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

215

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 245 of 301*

(Videotape, 10-07-14; 10:28:49)

1          MS. JOHNSON: Thank you.

2   BY MS. BAKER:

3   Q    You have a history of lying to your family; correct?

4   A    Yes.

5   Q    It's true that you lied -- you told Sarah that your

6        stepfather was cheating on your mother?

7   A    I don't remember.

8   Q    Would that have been a lie?

9   A    I don't know.

10  Q    But you told them that Tim was yelling at your mother?

11  A    I don't remember.

12  Q    And do you recall a family meeting with Sarah and Derek

13       and your mother and Tim --

14  A    Yes.

15  Q    -- and all of the kids coming to talk about your lying at

16       school?

17  A    Yes.

18  Q    You'd gotten in trouble for lying at school; correct?

19  A    No.

20  Q    But they were trying to come together to work on that?

21  A    Yes.

22  Q    What grade were you in when that happened?

23  A    I don't know.

24  Q    Was it before your 8th grade year?

25  A    I don't remember.

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 246 of 301*

(Videotape, 10-07-14; 10:28:49)

1   Q   Was that before the rape?

2   A   I don't remember.

3   Q   You also created a fake Facebook account; correct?

4   A   No.

5   Q   Isn't it true that you set up a Facebook account in the

6       name of a boy?

7   A   No.

8   Q   Isn't it true you were using that Facebook account to set

9       up relationships or friendships with other girls?

10  A   No.

11  Q   Is there a reason that your mom would tell people that?

12  A   It wasn't Facebook.

13  Q   Oh, it was a different database?

14  A   Yes.

15  Q   What database was it?

16  A   Kik.

17  Q   On Kik?  So you set up a fake profile on that Kik?

18  A   Yes.

19  Q   What is Kik?

20  A   Texting app.

21  Q   A texting app.  Were you -- did this occur before the

22      rape?

23  A   No.

24  Q   When did that occur?

25  A   After.

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 247 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q    When after?

2  A    I don't recall.

3  Q    Well, if you can't recall after, is it possible it could

4       have been before the rape?

5  A    No.

6  Q    So you were using that to pretend to be a boy; correct?

7  A    Yes.

8  Q    And you made friendships with these young girls; correct?

9  A    Yes.

10 Q    And before you told your mom about this you had some

11      access to some pornography online; correct?

12              MS. JOHNSON: Objection, motions in limine.

13              MS. BAKER: Then perhaps we need to excuse the

14      jury, your Honor, and deal with that motion.

15              THE COURT: Okay.  Have the jury step out

16      momentarily.

17              (Jury dismissed at 5:03:43.)

18              (Court resumes at 5:04:23.)

19              THE COURT: Okay.  Ask the question again,

20      please.

21 BY MS. BAKER:

22 Q    You had accessed pornography before you disclosed this

23      rape to your mother; correct?

24 A    Yes.

25              THE COURT: Okay, and your objection?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

218

(Videotape, 10-07-14; 10:28:49)

1    MS. BAKER: I'd asked Ms. Johnson about that

2    before we came to Court today and she indicated that it

3    was within the time frame that made it open to cross-

4    examination so I'm surprised at the objection.

5    THE COURT: What was the objection?

6    MS. JOHNSON: Judge, my note on the motion in

7    limine was that there was to be no discussion of the

8    pornography because it was not relevant.

9    MS. BAKER: No, I think the Judge had said that

10   the pornography would have to be evaluated at the time.

11   THE COURT: Okay.  What is the purpose of asking

12   her this?

13   MS. BAKER: To show knowledge regarding the

14   event, knowledge regarding sex before the disclosure.

15   THE COURT: Okay.

16   MS. BAKER: Because inevitably the jury's going

17   to want to know where she got the knowledge from.

18   THE COURT: Okay.  And your objection is?

19   MS. JOHNSON: Relevance in --

20   THE COURT: No.  I think for a child this age it

21   would be relevant.  I will allow it.  Go ahead.  You may

22   return the jury.

23   MS. BAKER: Okay.  We need the jury back in or is

24   this the time to break?  I don't know.

25   THE COURT: No, no.  We're gonna finish this up.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 249 of 301

(Videotape, 10-07-14; 10:28:49)

1    Okay, the jurors are cycling through the bathroom. I

2    don't want anybody leaving the courtroom. No, nobody

3    leaves the courtroom. Ma'am, nobody leaves the courtroom.

4    The jury's gonna be in the hallway. Nobody leaves the

5    courtroom. I'm sorry, but we only have one bathroom.

6    Just to explain to you, we only have one bathroom in the

7    jury room so we're gonna try to move this along by

8    allowing the jury to use the public bathroom and I don't

9    want to take any chances that the jury has any contact

10   with anybody involved in the case, so that's why I'm

11   asking everybody to remain in the courtroom. If you have

12   to go, as soon as the jury comes back you're free to do

13   whatever you want.

14           (Jury enters courtroom at 5:13:45.)

15           THE COURT: You may continue with your

16   examination, cross-examination, Ms. Baker.

17           MS. BAKER: Thank you, your Honor.

18   BY MS. BAKER:

19   Q   So, Ms. Ward, I was asking you before we took a break,

20       before you disclosed this incident to your mother, you had

21       been caught looking at pornography; correct?

22   A   Yes. I'd had sexual education class too.

23   Q   You have looked at pornography on the internet?

24   A   Yes.

25   Q   Now isn't it true that you and Andrea were friends in

*Mills Court Reporting, 1615 Sunset, N Muskegon, MI 49445 231-744-6823*

220

(Videotape, 10-07-14; 10:28:49)

1    middle school?

2  A  No.

3  Q  You weren't friends in middle school?

4  A  I went to a different school.

5  Q  Is it true that you had acted in a play in middle school?

6  A  No.

7  Q  You used to paint your face that would look like a cat to

8     go to school?

9  A  No.

10          MS. JOHNSON: Objection; relevance.

11          THE COURT: What's the relevancy of that?

12          MS. BAKER: Well, your Honor, she's bringing up

13    this fact that she was in theater as this new event now

14    that she's been through therapy and I'm asking her about

15    the fact that she's been in theater before.

16          THE COURT: Okay.  But what difference does it

17    make if she's dressed up like a cat?  What's --

18          MS. BAKER: It's just more acting, your Honor.

19          THE COURT: Overruled -- or sustained rather.

20  BY MS. BAKER:

21  Q  I want to show you this exhibit, Proposed Exhibit C.  Do

22     you recognize this at all?

23  A  Yes.

24  Q  What is it?

25  A  The computer shop layout.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

221

(Videotape, 10-07-14; 10:28:49)

1  Q    Okay.  And there's a spot that says Computers Plus on it

2       or Computer Plus; correct?

3  A    Yes.

4  Q    Is that the location that you're saying this happened?

5  A    There wasn't a wall that far.

6  Q    Okay.  Can you show us on this particular diagram where

7       this event occurred?

8  A    This looks like it's the layout but there's no hall.  It's

9       missing in part.

10 Q    Now let me just clarify.  Don't think of the words as

11      defining which space is which.  Show us where in there

12      this occurred.

13 A    There's not a spot that looks like it.  There were two

14      front rooms and this back wasn't connected.

15 Q    Okay.  Could it have been in a different unit that's

16      described in there or shown in that picture?

17             MS. JOHNSON: Objection; asked and answered.

18             THE COURT: Well, I'll allow you to cross-examine

19      a little bit further on this, not much further since she's

20      already answered to a certain extent.  Go ahead.

21 A    What was your question?

22 BY MS. BAKER:

23 Q    Could it be in a different unit?  This is supposedly the

24      units that are in that strip mall.

25 A    Yes.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

222

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 252 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q    Okay.  Where did this incident occur in those units?

2  A    This layout doesn't look -- it's not shaped the same way.

3  Q    You're referring to the shaded spot?

4  A    Yes.

5  Q    Is there another unit that looks like it?

6  A    No.  It looks like this one, but there's more to it.  It's

7       not just what's shaded.  This area right here, that led

8       into the vacant lot.

9  Q    Okay.

10  A    Was opened too.  When he was in this one, he still had

11       access to the nextdoor room.  He used the shower and stuff

12       there because he was living in the shop later on.

13  Q    Okay.  Thank you.  Now you -- wasn't it the regular

14       practice that you would spend some time during Christmas

15       with your father and Sarah and her family as well?

16  A    When they contacted me to see if I wanted to go over.

17  Q    Is it fair to say that the last Christmastime period would

18       have been the Christmas 2011?

19  A    I guess.

20  Q    You guess?

21  A    I don't remember.

22  Q    Now you're not saying that this event occurred over the

23       Christmas holiday of 2011; are you?

24  A    No.

25  Q    So it had to have occurred before Christmas of 2011 but

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 253 of 301

(Videotape, 10-07-14; 10:28:49)

1        after September of 2011?

2  A    I don't remember.

3  Q    Is it fair to say that a lot of your communications with

4        Sarah were via Facebook?

5  A    She mostly contacted my mom.

6  Q    Did you communicate with Sarah via Facebook?

7  A    Not that I recall.

8  Q    Did you communicate with your mother via Facebook?

9  A    No, not that I recall.

10  Q    Now in January of 2013, I want to say the day after your,

11        would have been your 15th birthday, was there -- do you

12        recall a Facebook post involving your mother and your dad,

13        Sarah --

14  A    Yes.

15  Q    -- and even your stepdad?

16  A    Yes.

17  Q    And there was some would it be fair to say heated words?

18  A    Yes.

19  Q    In that exchange?  I'm sorry?

20  A    Yes.

21  Q    And were you angry during that Facebook conversation?

22  A    Yeah.

23  Q    And you were kinda mad with your dad; weren't you?

24  A    Yes.

25  Q    And that was in January of 2013; correct?

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 254 of 301

(Videotape, 10-07-14; 10:28:49)

1    A    Yes.

2    Q    Isn't it true you said it's plain as day to me, I finally

3         see the light?

4    A    Yes.

5    Q    You didn't go tell your mom about this rape at that time;

6         did you?

7    A    No.

8    Q    Well, you knew she wasn't happy with your dad; correct?

9    A    Yes.

10   Q    Now you testified that Andrea found out you were cutting

11        again.  When had you been cutting before?

12   A    I don't remember.

13   Q    Do you remember how old you were the first time?

14   A    No.

15   Q    Do you remember what grade you were in?

16   A    No.

17   Q    Were you in counseling in February of 2013?

18   A    I don't remember.

19   Q    Well, can you -- you were in counseling after August of

20        2013; correct?

21   A    Yes.

22   Q    And you were in counseling sometime before that; correct?

23   A    Yes.

24   Q    Were you in counseling before this rape?

25   A    Yes.

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

225

(Videotape, 10-07-14; 10:28:49)

1  Q    Were you in counseling between the rape and August of
2       2013?
3  A    No.  I don't remember.
4  Q    Now on the date that this event, this alleged rape
5       occurred, did your mom come pick you up from Michelle's
6       house?
7  A    Next day.
8  Q    Your mom came the next day?
9  A    Yes.
10 Q    I'm sorry, I have to make notes while I'm standing here.
11      What's your relationship with Andrea?
12 A    Best friend.
13 Q    Best friend?  How long have you been best friends?
14 A    Two years.
15 Q    Do you see her at school every day?
16 A    Yes.
17 Q    Frequently would spend nights together?
18 A    Yes.
19 Q    How often would you spend nights together?
20 A    I don't know.
21 Q    I'm sorry, I have to hear the words --
22 A    I said I don't know.
23 Q    Okay.  I didn't hear you.  You've been interviewed by
24      counselors, medical personnel, your mom, the police
25      officer, the DHS worker; correct?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

226

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 256 of 301

(Videotape, 10-07-14; 10:28:49)

1  A    Yes.

2  Q    Prosecuting attorneys?

3  A    Yes.

4  Q    Do you know how many times you've been interviewed by the

5       prosecutor?

6  A    No.

7  Q    Do you know how many times you've been interviewed period?

8  A    No.

9  Q    And you were interviewed by a police officer at your house

10      the day that you told your mom?

11  A    Not that day.

12  Q    Is that what I recall your testimony being?

13  A    I don't remember.

14  Q    Okay.  I'm asking you about earlier today.

15  A    Yes, I know.  I'm trying -- I don't remember.

16  Q    Oh.

17  A    I recall earlier that I said I was asked at my house, but

18      I don't believe it was the same day.

19  Q    But you were interviewed by the police officer at your

20      house?

21  A    I believe so.

22  Q    Other than this medical exam at the hospital, you haven't

23      been treated medically for anything related to this

24      disclosure; correct?

25  A    No.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 257 of 301

(Videotape, 10-07-14; 10:28:49)

1      MS. BAKER:  Just a moment.  I have no further

2      questions at this time.

3      THE COURT: Okay.  Any redirect?

4      REDIRECT EXAMINATION

5  BY MS. JOHNSON:

6  Q     Okay, Alyssa, the Kik profile that you talked about on

7      cross, was that before or after the rape?

8  A     After.

9  Q     Okay.  And was that before or after the disclosure, I mean

10     when you told your mom?

11  A     Before.

12  Q     Was that before or after therapy?

13  A     Before.

14  Q     Uhm, when did you and Andrea meet?

15  A     We had met in 7th grade but we didn't talk much.  We

16     didn't really start talking until freshman year.

17  Q     On -- I just want to be clear on this diagram.  I couldn't

18     see everything that you were pointing out to Ms. Baker.

19     Do you know for sure which unit this occurred in?

20  A     No.

21  Q     Okay.  And you said the walls look like they are not the

22     same that they were then?

23  A     Yes.

24  Q     I know Ms. Baker asked you about wearing shorts to school.

25  A     Yes.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

228

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 258 of 301

(Videotape, 10-07-14; 10:28:49)

1  Q   Okay.  Do you wear shorts outside of school?

2  A   Yes.

3  Q   At the beginning of the school year?

4  A   Yes.

5  Q   In January of 2013 after that Facebook exchange, did that

6     give you any reason to tell your mom about the rape?

7  A   No.

8  Q   Did it make you think about telling her at all?

9  A   No.

10 Q   And you said Andrea found out you were cutting again and

11    that's when she confronted you; right?

12 A   Yes.

13 Q   Had you ever cut before the rape?

14 A   Not that I remember.

15 Q   Had Andrea known you were cutting before?

16 A   Before?

17 Q   Before the time that you told her about the rape.

18 A   Yes.

19 Q   And was that when she -- when she knew about the cutting

20    before the day that you told her about it, was that

21    sometime in 9th grade or was that --

22        MS. BAKER: Objection; leading.

23 BY MS. JOHNSON:

24 Q   -- or was that in middle school?

25        THE COURT: The -- okay.  Not the way she

---

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

229

(Videotape, 10-07-14; 10:28:49)

1    completed the question, it's not really leading.

2  A    It was freshman year.

3  BY MS. JOHNSON:

4  Q    Do you know if your father used a condom when he raped

5     you?

6  A    I believe he did.

7  Q    The thing that you told Andrea, did you tell her the same

8     version of events that you told the jury?

9  A    Yes.

10     MS. BAKER: Objection.  This is a prior

11  consistent statement.

12     MS. JOHNSON: Your Honor, the victim's

13  credibility has now been attacked on cross-exam and prior

14  consistent statements are admissible.

15     THE COURT: To prove only her credibility, not to

16  prove the truth of the statement that you are referring

17  to.

18     MS. JOHNSON: Correct.  Since her credibility has

19  been attacked --

20     THE COURT: Okay.  You may -- you may

21  rehabilitate the witness with a prior consistent

22  statement, and the jurors are instructed this only

23  addresses whether or not you should believe the witness in

24  Court, not whether or not what she said in this out of

25  court statement is true.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

230

(Videotape, 10-07-14; 10:28:49)

1   BY MS. JOHNSON:

2   Q    Did you get into as much detail with Andrea as you got

3        into with the jury today?

4   A    No.

5   Q    When you spoke to Kim Watson at the Child Abuse Council,

6        did you tell her the same version of events that you told

7        the jury today?

8   A    Yes.

9   Q    And was that in detail?

10  A    Yes.

11  Q    And when you spoke to the medical doctors and nurses, did

12       you give them the same version of events that you gave

13       today?

14  A    Yes.  When I had interviews it was required that I use

15       detail.

16  Q    You indicated that your father moved shops after the rape?

17  A    Yes.

18  Q    How do you know that?

19  A    After I had stopped going after the rape and I visited a

20       few times afterward with the girls, and one of the times

21       Sarah brought us to the shop.

22  Q    And the pictures that were taken in 2012 that have been

23       admitted into evidence, were those at the same shop or at

24       the new shop?

25  A    The new shop.

*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

231

(Videotape, 10-07-14; 10:28:49)

1  Q    So by May of 2012 he was in a different shop?

2  A    Yes.

3  Q    Do you know how many shops he was in total?

4  A    Just the two that I know of.

5  Q    Do you remember going to any of the shops at all after

6      those pictures were taken?

7  A    No.

8             MS. JOHNSON: Thank you.

9             MS. BAKER: Your Honor, if I could just get a

10    couple things before we finish with her, please.

11           THE COURT: If you could what?

12           MS. BAKER: Just get a couple questions in.  I

13    need to --

14           THE COURT: Yeah, go ahead.  You can recross,

15    absolutely.

16           MS. BAKER: Okay, thank you.

17                 RECROSS-EXAMINATION

18  BY MS. BAKER:

19  Q    Ms. Ward, I need you to circle on this diagram where you

20      say this occurred and then put your initials by it.

21           MS. JOHNSON: I'd object.  The witness just said

22    she wasn't sure which one it was.

23           MS. BAKER: She indicated an area that looked

24    like the place that she said it was, that's what I'm

25    asking her to circle.

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

232

*Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 262 of 301*

(Videotape, 10-07-14; 10:28:49)

1      MS. JOHNSON: Your Honor, I'd ask that the Court

2   be addressed.

3           THE COURT: That what?

4           MS. JOHNSON: I'd ask the Counsel to address the

5   Court.

6           THE COURT: Okay, all right.  Well, I'll allow

7   you to circle the area where she believed it was.

8           MS. BAKER: Okay.

9   A   (Witness complies.)

10  BY MS. BAKER:

11  Q   Now, Ms. Ward, you testified earlier that you had started

12      at some point scratching yourself; correct?

13  A   Yes.

14  Q   Had you read about that?

15  A   No.

16  Q   Talked to someone about it?

17  A   No, not that I remember.

18  Q   And that was -- that occurred before the rape; correct?

19  A   I don't recall.

20  Q   I thought I recall your testimony meaning that you had --

21      you didn't start cutting until the rape.

22  A   Yes.

23  Q   Before that, you were doing other injury; correct?

24  A   It's a possibility.

25  Q   It's a possibility?

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 263 of 301

(Videotape, 10-07-14; 10:28:49)

1  A    I don't recall exact times.

2           MS. BAKER: Thank you.  I have nothing further.

3           THE COURT: Any re redirect?

4           MS. JOHNSON: No.

5           THE COURT: Okay, thank you, ma'am.  You may

6   stand down.  Okay.  Do you have another witness ready?

7           MS. JOHNSON: Yes.  The People call Andrea

8   Tindall.

9           THE COURT: Do you know how long this witness is

10  going to be?

11          MS. JOHNSON: She will be brief.

12          THE COURT: Very brief?  Okay.

13               A N D R E A   T I N D A L L,

14      a witness called at 5:37:53, testified as follows:

15                    DIRECT EXAMINATION

16  BY MS. JOHNSON:

17  Q    Andrea, do you know someone named Alyssa Ward?

18  A    I do.

19  Q    How do you know her?

20  A    She's my best friend.

21  Q    When did you become friends with Alyssa?

22  A    In 9th grade.

23  Q    Did you know her before 9th grade?

24  A    I did but we spoke a little bit but not as we do now.

25  Q    Okay.  And -- excuse me one moment.  Okay.  So in 9th

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

234

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 264 of 301

(Videotape, 10-07-14; 10:28:49)

1  grade you were friends?

2  A  Yes.

3  Q  How close is your friendship?

4  A  Very close.

5  Q  And in 9th grade were there occasions when you had

6  sleepovers with her?

7  A  There was.

8  Q  Do you recall a sleepover at which she told you something

9  about her father?

10  A  Yes.

11  Q  Was there anyone else there that night sleeping with you

12  guys?

13  A  No.

14  Q  Okay.  How did this happen to come up?

15  A  A few days before I had told her something about myself

16  that not many people knew and she decided that she should

17  tell me that.

18  Q  Okay.  What did she say happened?

19  A  She said that, uhm, her father --

20  MS. BAKER: I'm gonna object to hearsay.

21  MS. JOHNSON: Your Honor, this comes in under the

22  same hearsay rule, her prior consistent statements under

23  801(D)(1)(e).

24  THE COURT: Okay.  At this time we'll excuse the

25  jury and we'll excuse you for the evening.  We have an

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

235

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 265 of 301

(Videotape, 10-07-14; 10:28:49)

1    evidentiary question to take up and I don't want to keep

2    you here while we're doing that.  So I will instruct you

3    that you are allowed to retire to your home or work or

4    wherever you gotta go for the evening.  I just want to

5    remind you you're not to discuss the case with anyone.

6    You're not to have any discussion with anyone involved in

7    the case.  You're not to do any experiments or

8    investigations of your own or read any -- or listen to any

9    media accounts of this event, but other than that you're

10   free to go about your business, and we'd like to have you

11   return here tomorrow morning at 9:30.  If you'd assemble

12   in the jury room, press the buzzer when you're ready,

13   we'll be ready to re-commence.  Okay.

14              (Jury dismissed at 5:41:32.)

15              THE COURT: Okay.  Now you're trying to admit

16   this under 801(D) what?

17              MS. JOHNSON: (D)(1)(B), for a prior consistent

18   statement.  It requires the declarant be present to

19   testify and subject to cross-examination, which already

20   occurred.

21              THE COURT: Right.

22              MS. JOHNSON: She is still under subpoena.

23              THE COURT: Right, agreed.

24              MS. JOHNSON: It requires -- it requires --

25              THE COURT: So you're trying to introduce it as

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

236

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 266 of 301

(Videotape, 10-07-14; 10:28:49)

1    substantive evidence then?

2              MS. JOHNSON: Yes.

3              THE COURT: And say it's not hearsay.

4              MS. JOHNSON: Yes.

5              THE COURT: Okay.  Go ahead.

6              MS. BAKER: Well, your Honor, if I can respond.

7              THE COURT: Well, no, she hasn't finished.

8              MS. BAKER: Okay.

9              THE COURT: Or have you?  I don't know.

10             MS. JOHNSON: Well, it's a consistent statement

11   to show the, you know, now that her credibility has been

12   attacked, that this statement was made before there was a

13   purpose for fabrication or -- or -- wait, what does it

14   say?  A recent fabrication or improper influence or

15   motive.  I think that it's been made clear that the

16   alleged motive for fabrication is this argument with her

17   mother, the threat to go live with her father and being

18   angry at her father.  This prior consistent statement

19   maybe -- was made well before any of those allegations or

20   any of those reasons for fabrication occurred.  It was

21   made at a slumber party during the 9th grade year, which

22   was well before the disclosure actually came and is under,

23   you know -- has no -- none of the same motives as telling

24   her mother had.

25             THE COURT: Okay.  When is it claimed that the

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 267 of 301

(Videotape, 10-07-14; 10:28:49)

1    motive to fabricate took place, arose?

2            MS. JOHNSON: When her mother -- when her mother

3    threatened to have her live with her father.

4            THE COURT: Okay.  And did this statement that

5    the victim made to this declarant here, or to this witness

6    rather, did that take place before that or after that?

7            MS. JOHNSON: Before.

8            THE COURT: It took place before her mother

9    threatened to have her move in with her father?

10           MS. JOHNSON: Yes.

11           THE COURT: Okay.  Any response you want to make

12   to that, Ms. Baker?

13           MS. BAKER: Your Honor, I think that the court

14   rule or the rule of evidence addresses an indication of a

15   recent fabrication, and I'm not saying that there's a

16   recent fabrication.  That is not the implication in this

17   particular case or improper influence by other people or

18   motives.  I can't even speak to this young lady's motive,

19   but I'm not alleging recent fabrication and I think that

20   that rule only allows it in those very limited

21   circumstances.

22           THE COURT: Well, what is your alleged motive for

23   her to fabricate?

24           MS. BAKER: Her motive for ly -- I don't have a

25   motive for her lying.  I don't know what it is, your

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

238

(Videotape, 10-07-14; 10:28:49)

1    Honor.

2              THE COURT: Well, didn't you bring out the fact

3    that her mother had threatened to take her to her dad's or

4    send her to her dad's?

5              MS. BAKER: That's what the prosecution alleged

6    or they've presented that evidence; I didn't.

7              THE COURT: Okay.  So you're not alleging that

8    she has any motive to fabricate that.  You're not gonna

9    argue that to the jury and you're not alleging that --

10             MS. BAKER: I'm alr -- I will be arguing she's

11   lying, yes.

12             THE COURT: Okay.  And what do you claim -- are

13   you going to claim is a reason for her lying?

14             MS. BAKER: I -- I -- I don't know what her

15   reason for lying is, your Honor, and I don't --

16             THE COURT: Okay.  So you're just gonna say she's

17   lying, I don't know why she's lying?  You're not gonna say

18   she didn't want to go back to her dad's or she didn't want

19   to do this or she didn't want to do that; you're just

20   gonna say she's lying and I don't know why.

21             MS. BAKER: Right.

22             THE COURT: Okay.  If that's what she's doing,

23   then she's not alleging any recent fabrication or motive

24   to fabricate.

25             MS. JOHNSON: Will objections to such arguments

*Mills Court Reporting,  1615 Sunset, N Muskegon, MI 49445  231-744-6823*

239

(Videotape, 10-07-14; 10:28:49)

1      be sustained in closings?

2                  THE COURT: Pardon?

3                  MS. JOHNSON: Will objections to such arguments

4      by Counsel be sustained in closing?

5                  THE COURT: Oh, if you object to that?

6                  MS. JOHNSON: Yes.

7                  THE COURT: Well, yeah, because I'm not going to

8      allow her to go into it.  Now I want to be clear on the

9      record.  You can do that.  You can allege a motive to

10     fabricate if you wish.  I'm not trying to foreclose you

11     from doing that, but if you're going to do that then it

12     becomes relevant in time when this motive to fabricate

13     arose for me to determine whether or not the statement

14     that is consistent that was made to this witness occurred

15     before or after that motive to fabricate arose.  I have to

16     make that determination.  But if you're telling me that

17     you don't want to present any motive for fabrication, your

18     only argument to the jury is going to be, I don't know,

19     she decided to lie, well, then if that's the situation,

20     then I'm not -- I'm not going to allow the prosecutor to

21     go into this, so I just want to make sure I understand.  I

22     want the record to be clear.  I'm not foreclosing your

23     opportunity to allege a motive to fabricate.  You have

24     every right to do that.

25                 MS. BAKER: Okay.

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 270 of 301

(Videotape, 10-07-14; 10:28:49)

1   THE COURT: But if you're saying you're not going

2   to do that, then I'm not going to allow an inquiry into

3   this under 801(D)(2).  So is that your position?

4   MS. BAKER: Can I get back with you in the

5   morning?

6   THE COURT: Sure, yep.  We'll have the witness

7   come in the morning.  So the record is clear, you

8   acknowledge that you have tried to impeach the witness

9   with prior inconsistent statements.

10   MS. BAKER: Yes.

11   THE COURT: About where the mattress was and how

12   big it was and that sort of thing; correct?

13   MS. BAKER: Yes.

14   THE COURT: Okay, all right.  So that part we're

15   not dealing with.  Okay.  Well, you can let us know in the

16   morning what we're going to do with this and we'll return

17   in the morning; okay?

18   MS. BAKER: Thank you.

19   (Court adjourned at 5:47:52.)

20   -oOo-

21

22

23

24

25

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 271 of 301

(Videotape, 10-07-14; 10:28:49)

STATE OF MICHIGAN          )

                          )     SS

COUNTY OF MUSKEGON          )


        I, certify that this transcript, consisting of 242 pages
is a complete, true, and correct transcript of the videotaped
proceedings and testimony taken in PEOPLE V RAINBOLT, 14-64458-
FC on October 7, 2014, Videotaped.
**Please note proper names and/or case names unknown to this
reporter are spelled phonetically and may not be correct.*


*Bobbie Springer*

Bobbie Springer

Certified Court Recorder 3408


*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

Certified Document - File Locator: MUS-J68GIY-A0C8FB2E - Monday, May 07, 2018 3:51 PM Eastern Daylight Time - Page 272 of 301